Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice**
  tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice**
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming

*Attorneys for Plaintiff Culture of Life
Family Services, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CULTURE OF LIFE FAMILY SERVICES, INC. a California nonprofit corporation, <br><br> Plaintiff, <br><br> v. <br><br> ATTORNEY GENERAL ROB BONTA, in his official capacity as the California Attorney General, <br><br> Defendant. | Case No.: 3:24-cv-01338-GPC <br><br> **VERIFIED FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1.      California Attorney General Rob Bonta, his Healthcare Rights and Access Section, and his Reproductive Rights Task Force have decided to target organizations that help women who have changed their minds about their abortions. In a flagrant constitutional overreach, Bonta seeks to prohibit doctors, nurses, or advocacy organizations from helping these women by forbidding them from telling women about a safe and effective treatment that is lawfully available across the country and around the world—"Abortion Pill Reversal." In lawfare initiated last year in California Superior Court, Bonta accused a group of five pro-life community medical clinics in the Bay Area of engaging in fraudulent business practices and misleading advertising by providing women with no-cost Abortion Pill Reversal ("APR") treatment. *See* Cal. Bus. & Prof. Code §§ 17200, 17500. *See* Exhibit 1, Press Release;[1] Exhibit 2, Transcript of Press Conference;[2] Exhibit 3, Complaint.[3]

2.      The premises of the Abortion Pill and Abortion Pill Reversal ("APR") are quite simple. During a healthy pregnancy, a woman's body naturally produces a hormone called progesterone. Progesterone is so key to maintaining a healthy pregnancy that, as stated in the federal injunction blocking Colorado's attempt to restrict APR, supplemental progesterone is prescribed for 12% of all pregnancies. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1197 (D. Colo. 2023). One way to chemically cause an abortion is to block the body's natural supply of progesterone,

---

[1] Press Release, *Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients*, Off. of the Att'y Gen. (Sept. 21, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-anti-abortion-group-five-california-crisis-pregnancy.

[2] Cal. DOJ, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, YouTube (Sept. 21, 2023), https://www.youtube.com/watch?v=_kOyqRQ9EtU.

[3] *The People of the State of California v. Heartbeat Int'l., Inc. and RealOptions, Inc.*, No. 23-cv-44940 (Cal. Super. Ct., Alameda Cnty., Sep. 21, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Complaint.pdf.pdf.

most commonly through a drug called mifepristone, and then to induce expulsion of the uterine contents, typically through the use of misoprostol administered 24-48 hours after mifepristone. *See All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023), *rev'd on standing grounds*, 602 U.S. 367 (2024).

3.     The decision to end a pregnancy is often stressful and complicated and, unsurprisingly, some women initially choose to take mifepristone, but later decide that they wish to remain pregnant. Other women seek medical help because they were forced or deceived into taking mifepristone.[4] Upon seeking medical help to stop a mifepristone-induced abortion, experienced medical providers will prescribe supplemental progesterone to maintain the woman's pregnancy. Despite the simplicity and obviousness of APR treatment, and California's constitutional guarantee that "[t]he state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions," Cal. Const. art. I, § 1.1, Bonta is trying to deprive women of this life-saving treatment.

4.     Culture of Life Family Services, Inc. ("COLFS") is a Catholic non-profit that operates COLFS Medical Clinic, a state licensed community health clinic based in San Diego County. COLFS provides compassionate, high-quality, life-affirming, and holistic healthcare for patients with or without insurance. COLFS is a comprehensive community health clinic, providing family medicine, pediatric medicine, and women's healthcare. COLFS's comprehensive services for women include well woman care, STD testing and treatment, pregnancy testing, pregnancy options consultations, ultrasounds, prenatal care, and Abortion Pill Reversal treatment. Founded in 2001, COLFS Medical Clinic operates in three locations throughout San Diego County.

5.     On May 3, 2022, in response to the *Dobbs* leak the day prior, Bonta issued a press release to announce that he would be meeting with reproductive rights

---

[4] *See* Melanie Israel, *Abortion Pills, Coercion, and Abuse*, The Heritage Found. (Dec. 1, 2023), https://www.heritage.org/life/commentary/abortion-pills-coercion-and-abuse.

advocates throughout California and to confirm that he will use the full force of the California Department of Justice to protect Californians' reproductive rights. *See* However, Bonta's first action was to fight *against* reproductive rights. As both the U.S. Supreme Court and California Supreme Court have recognized, "reproductive rights" does not mean simply access to abortion. It means the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). "[T]he constitutional question before us does not involve a weighing of the value of abortion as against childbirth, but instead concerns the protection of either procreative choice from discriminatory governmental treatment." *Comm. to Defend Reprod. Rts. v. Myers*, 29 Cal. 3d 252, 256 (1981).

6.    On June 1, 2022, Bonta issued a "Consumer Alert," drafted by his Healthcare Rights and Access Section, advising women that "crisis pregnancy centers," i.e., pregnancy help resource organizations, do not provide abortions. *See* Exhibit 4, Press Release;[5] Exhibit 5, Transcript of Press Conference;[6] Exhibit 6, Consumer Alert.[7] At the end of his press conference—after giving a Planned Parenthood representative time to speak—Bonta announced that the California Department of Justice was setting up a website to receive complaints about pregnancy help organizations. *See* Exhibit 7.[8]

---

[5] Press Release, *Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care*, Off. of the Att'y Gen. (June 1, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-consumer-alert-warning-californians-crisis

[6] Cal. DOJ, *AG Bonta Provides Californians Seeking Abortion Care with Update on Reproductive Healthcare Options*, YouTube (June 1, 2022), https://www.youtube.com/watch?v=-lzCjC22zXc.

[7] Healthcare Rights and Access Section, *Consumer Alert: Know the Difference: Crisis Pregnancy Centers v. Reproductive Healthcare Facilities*, Cal. DOJ (June 1, 2022) https://oag.ca.gov/system/files/attachments/press-docs/Crisis%20Pregnancy%20Center%20Bulletin.pdf.

[8] *Crisis Pregnancy Center Complaint*, Cal. DOJ, https://oag.ca.gov/crisis-pregnancy-

7.    At the end of June—after issuance of the *Dobbs* decision on June 24, 2022—Bonta set up the "Reproductive Rights" page on the California Department of Justice website, to provide information about abortion rights and collect details on Bonta's fight to expand abortion access. Later, he also partnered with UCLA Law to set up a legal hotline for women to call if they believe that their reproductive rights have been violated.

8.    In September 2022, Bonta also began the administrative investigation *In the Matter of the Investigation of Crisis Pregnancy Centers*, and issued administrative interrogatories and document requests to pro-life pregnancy help organizations across the state. Over the next year, his team also authored six amicus briefs in support of abortion access—and joined five others—and Bonta formed a Reproductive Rights Task Force to align his attorneys with local counsel throughout the state. Many of Bonta's amicus briefs are co-authored—not merely joined in—by New York Attorney General Letitia James.

9.    But despite his investigations, and despite his website and hotline, Bonta could not find anybody to sue. Apparently pro-life pregnancy help organizations across the state are not nearly as fraudulent and misleading as he claimed. So, to justify the work of his Healthcare Rights and Access Section, on September 21, 2023, Bonta decided they would file their first and only Reproductive Rights lawsuit, *attacking the right of women to keep wanted babies* through APR treatment.

10.    At its core, the lawsuit alleges that a pro-life medical clinic, in offering progesterone to women who have taken mifepristone, is fraudulently misrepresenting to them that Abortion Pill Reversal or APR is safe and effective at reversing the abortion pill. But the idea that the speech of purely charitable pregnancy help organizations amounts to "fraudulent misrepresentation" by offering women no-cost services is incongruous. The subtext of Bonta's argument is that pregnancy help organizations may speak, but *only* if they speak the State's message.

center-complaint.

11.    In argument, Bonta has stated that healthcare professionals can still offer Abortion Pill Reversal to women—so long as they do so "truthfully," by telling women that have taken mifepristone that they *can* take progesterone, but that they must also falsely tell women that it will not actually reverse the abortion pill, is ineffective at preserving pregnancy, is unstudied, and may kill them. None of this is anywhere near accurate. Each of Bonta's proposed "true" statements is actually false, and when put all together, has the practical effect of banning APR altogether. The false choice Bonta offers to either not speak or else spread unscientific lies that he prefers reveals his true motive—*find somebody to sue and find a way to discredit "Crisis Pregnancy Centers."*

12.    Bonta's attack against APR is merely the latest development in his politically motivated campaign against pregnancy help organizations in general. Instead of celebrating the reproductive choice of pregnant women who have decided to seek to preserve their pregnancies and bring their children to term—and celebrating the work of California's pregnancy help organizations which empower them in the exercise of their rights—Bonta has launched a public campaign of opprobrium against the organizations and the APR protocol.

13.    This time, Bonta is targeting protected speech and activities engaged in for the sole benefit of pregnant women who have ingested—whether voluntarily or via trick or force—mifepristone. These pregnant women are at serious and imminent risk of pregnancy termination because of the ingestion of mifepristone. They urgently seek information and assistance to continue their pregnancies. Pregnancy help resource organizations provide these women with necessary information, referrals, and even access to free medical care to empower them to save the lives of their *wanted* babies.

14.    Bonta has no business butting into the intimate medical decision of an expectant mother, in consultation with the medical professional of her choice, to carry her pregnancy to term and save her unborn baby from the disastrous effects of

mifepristone while there is still time to reverse the effects of that powerful chemical. Yet Bonta is butting in, and is joined in that campaign by his political allies—Planned Parenthood and the abortion industry—in California *and nationally*. Indeed, shortly after filing his lawsuit, a similar one was initiated by New York Attorney General Letitia James against eleven pro-life pregnancy help organizations in her state.[9]

15.    Accordingly, to avoid an "enforcement [action] against nearly identical conduct," *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023), and to protect its constitutional rights, and the rights of its patients, COLFS brings this Complaint seeking declaratory and injunctive relief.

## JURISDICTION AND VENUE

16.    This action arises under 42 U.S.C. §§ 1983 in relation to Defendant's deprivation of Plaintiff's constitutional rights to freedom of religion and freedom of speech under the First Amendment to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. §§ 1988.

18.    The Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because Plaintiff resides here and because it is a District in which the Attorney General maintains an office.

## PARTIES

19.    Plaintiff CULTURE OF LIFE FAMILY SERVICES, INC. ("COLFS") is a 501(c)(3) non-profit state licensed community health clinic. COLFS has its principal place of business in San Diego County, and operates a full-service clinic at

---

[9] *See* Press Release, *Attorney General James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment*, N.Y. State Att'y Gen. (May 6, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-sues-anti-abortion-group-and-11-new-york-crisis-pregnancy.

three locations throughout the County. COLFS provides free Abortion Pill Reversal Treatment and associated free medical services to women who come looking for intervention after beginning the chemical abortion process. Chemical abortion is also sometimes called the "abortion pill," "medical abortion," or "medication abortion."

20.    Defendant ROB BONTA is the Attorney General of the State of California. The California Constitution vests the Attorney General with the duty "to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 13; *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943-44 (9th Cir. 2013).

## FACTUAL ALLEGATIONS

### A.    Culture of Life Family Services, Inc. ("COLFS")

21.    Plaintiff COLFS is a 501(c)(3) religious non-profit and state licensed community health clinic. In accordance with its Catholic identity, the "primary mission of COLFS is to ensure that Christ-centered medical care and pregnancy clinic services are available to all women regardless of ability to pay. This mission includes access to Abortion Pill Reversal for women who have regret after starting a medication-induced abortion."[10] "At COLFS Medical Clinic, [the] mission is deeply rooted in faith and guided by traditional Christian ethics. [COLFS is] committed to providing compassionate care that aligns with these principles, ensuring that [its] patients receive respectful and dignified treatment throughout their healthcare journey."[11]

### B.    The "Abortion Pill"

22.    When a woman becomes pregnant, the corpus luteum is formed within her ovary to secrete progesterone. "Progesterone is needed for the pregnancy to continue; it prepares and maintains the uterine lining and stimulates the production

---

[10] *See About Us*, Friends of COLFS, https://friendsofcolfs.org/about-us/.

[11] *See About Us*, COLFS Medical Clinic, https://colfsclinic.org/about-us/.

of nutrients." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 224 (5th Cir 2023) ("*All. for Hippocratic Med. II*"), *rev'd on standing grounds*, 602 U.S. 367 (2024) ("*All. for Hippocratic Med. III*").

23.    In the 1980s, Roussel Uclaf S.A.—a French pharmaceutical firm—developed a drug named RU-486, which acts as an antiprogesterone by occupying a pregnant woman's progesterone receptors and thus preventing progesterone from binding to those receptors. It "blocks the hormone progesterone, halts nutrition, and ultimately starves the unborn human until death." *All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023) ("*All. for Hippocratic Med. I*"), *rev'd on standing grounds*, 602 U.S. 367 (2024).

24.    In the mid-1990's, the Clinton administration worked with Roussel Uclaf S.A. to bring RU-486 to the American market. *All. for Hippocratic Med. I*, 668 F. Supp. 3d at 554. It negotiated the donation of RU-486 by Roussel Uclaf S.A. to a nonprofit called "the Population Council," *All. for Hippocratic Med. II*, 78 F.4th at 224 n.1, so that the latter could sponsor it as a new drug for approval by the FDA—under the generic name mifepristone and the brand name Mifeprex. *Id.* at 223-24. Ultimately, "the Population Council applied for FDA to approve mifepristone as a new drug, as part of a two-drug regimen designed to cause abortion." *Id.* at 223.

25.    "Mifepristone alone, however, is not fully effective in aborting an embryo," with a scientific "dispute as to just how effective mifepristone is alone." *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1197 (D. Colo. 2023). "This is why patients also take the second drug—misoprostol—within a day or two of taking mifepristone to complete a medication abortion. Misoprostol dilates the cervix and induces muscle contractions, clearing the uterus of the embryo." *Id.* "The full, two-drug regimen is highly effective at ending a pregnancy, causing 97% of early-term pregnancies to terminate." *Id.*

26.    Mifepristone was developed in France as an abortifacient because it competes with progesterone at the receptor level. Early in vitro animal studies

demonstrated that raising progesterone concentrations led to a displacement of mifepristone from the progesterone receptor.[12] As a result, scientists concluded that mifepristone acts "reversibly."[13]

27.     "In 2000, FDA approved a new drug application for mifepristone tablets marketed under the brand name Mifeprex. FDA approved Mifeprex for use to terminate pregnancies, but only up to seven weeks of pregnancy." *All. for Hippocratic Med. III*, 602 U.S. at 375. In undertaking this review, the FDA performed its own Pharmacology Review where it undertook various animal studies. As a result of those studies, the FDA similarly concluded that "the abortifacient activity of RU 486 is antagonized by progesterone *allowing for normal pregnancy and delivery.*"[14] That is, the FDA itself confirmed and recognized that progesterone can neutralize the effects of mifepristone/RU 486 and allow for normal pregnancy and delivery.

28.     Notably, the FDA has never added termination of pregnancy to the misoprostol label, meaning that the use of misoprostol in the chemical abortion context is "off-label."[15]

## C.     "ABORTION PILL REVERSAL"

29.     "Some women regret their decision to start the medication abortion regimen after taking the first pill…. And others may have been coerced to start the

---

[12] M. Moguilewsky & D. Philibert, *Biochemical Profile of RU 486, in* The Antiprogestin Steroid RU486 and Human Fertility Control 95-96 (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985).

[13] Etienne-Emile Baulieu, *RU 486: An Antiprogestin Steroid with Contragestive Activity in Women, in* The Antiprogestin Steroid RU486 and Human Fertility Control 1 (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985).

[14] Mifeprex Drug Approval Package, *Pharmacology Review(s)*, FDA 16-17 (Sept. 28, 2000) (emphasis added) https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_mifepristone.cfm; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_phrmr_P2.pdf.

[15] *Label for Cytotec (misoprostol) Tablets*, FDA (2009), https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/019268s041lbl.pdf; *Misoprostol*, in StatPearls (2023), https://www.ncbi.nlm.nih.gov/books/NBK539873.

regimen against their will." *Bella Health*, 699 F. Supp. 3d. at 1197. Some "doctors and medical professionals, however, have investigated whether treatment with progesterone can reverse the effects of mifepristone, the first abortion pill, better than just watchful waiting and avoiding use of the second abortion pill. This is commonly called 'abortion pill reversal' or 'medication abortion reversal.'" *Id*.

30.    Supplemental progesterone itself is indubitably safe, and accordingly is classified as a "Category B" drug for pregnant women—the same category as Tylenol, the most commonly used pain reliever during pregnancy.[16] Researchers estimate that "providers employ the use of progesterone in 5-12% of all pregnancies for a variety of reasons." *Bella Health*, 699 F. Supp. 3d. at 1197.

31.    The first known attempt to reverse the effects of mifepristone using bioidentical progesterone occurred in 2006. In that year, Dr. Matthew Harrison, MD, was approached by a woman who had taken mifepristone and wanted to reverse the effects of it. He treated her with progesterone, and she went on to deliver a healthy baby.

32.    Based on his own experience, a few years later, COLFS's medical director, Dr. George Delgado, devised the APR protocol for reversing the effects of mifepristone and began to advise doctors on APR.

33.    As stated above, the basic premise of APR is to counteract the effects of an antiprogesterone (mifepristone) with supplemental progesterone. Mifepristone is a progesterone receptor antagonist that binds twice as aggressively to the progesterone receptors in the uterus as progesterone does, but not permanently.[17]

34.    The basic biochemical premise of APR is that the effect of a competitive

---

[16] *Label for Prometrium (progesterone) Capsules*, FDA (2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/019781s017,020843s011lbl.pdf; Emily Oster, Expecting Better 169 (2016) (discussing Tylenol use during pregnancy).

[17] George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018).

receptor *antagonist* may be "reversed" by increasing the amount of the receptor *agonist*.[18] Stated differently, the effect of competitive inhibitors (*e.g.*, mifepristone) that block substrates (*e.g.*, progesterone) can be thwarted by adding more substrate.[19] APR is modeled on these basic principles of biochemistry and is supported by a long line of studies.

35.    For example, in 1989, Japanese researchers studied "the role of progesterone in the maintenance of pregnancy" using a population of pregnant rats. After four days, only 33.3% of the rats who received mifepristone remained pregnant—but 100% of the rats who received progesterone simultaneously with mifepristone remained pregnant. The Yamabe study therefore indicated that progesterone can counteract the effects of mifepristone's blocking of progesterone receptors.[20]

36.    This was later confirmed by both the FDA (discussed above), and another animal study published by Christina Camilleri and Stephen Sammut in July 2023. Following up on the Yamabe study, researchers evaluated the "non-simultaneous, subsequent administration" of progesterone following mifepristone in rats. Vaginal impedance measurements and other parameters indicated that the abortion process began in all the rats given mifepristone. None of the rats who received mifepristone alone during the equivalent of the first trimester of a human pregnancy remained pregnant, while 81.3% of the rats who received mifepristone followed by progesterone at the same stage remained pregnant.[21] The study

---

[18] Barbara J. Pleuvry, *Receptors, Agonists and Antagonists*, 5 Anaesthesia and Intensive Care Medicine 350, 350 (2004).

[19] John W. Pelley, Elsevier's Integrated Review Biochemistry 33-34 (2d ed. 2011).

[20] S. Yamabe, et al., *The Effect of RU486 and Progesterone on Luteal Function during Pregnancy*, 65 Nihon Naibunpi Gakkai Zasshi 497, 497 (1989).

[21] Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 12 Sci. Rep. 10942, at 4 (2023).

concluded that "[t]he administration and actions of the natural agonist, progesterone, in the presence of the antagonist, mifepristone, appears to be in concordance with the literature and our understanding of the pharmacological functioning of reversible competitive antagonism, where *sufficient levels of the agonist [progesterone] can override a given concentration of an antagonist [mifepristone].*"[22]

37.    In 2012 and 2017, two small human case studies were published. In 2012, Dr. Delgado and Dr. Mary Davenport published a small case series that followed seven women who had taken mifepristone and then received progesterone therapy after seeking medical assistance to maintain their pregnancies. Four of the six women (66%) who completed the study carried their pregnancies to term and delivered live infants, with no birth defects observed.[23]

38.    Then, in 2017, a similar small case series out of Australia (Garratt and Turner) was published. In that series, two out of three women (66%) who received progesterone therapy after ingesting mifepristone carried their pregnancies to term and delivered healthy live infants.[24]

39.    In follow-up to his small 2012 case series, Dr. Delgado then engaged in a much larger case series. His 2018 study analyzed the charts of 547 women who had ingested mifepristone and then received progesterone therapy within 72 hours. (207 women from the initial 754 were excluded for control purposes.) The study found an overall fetal survival rate of 48%. The study showed even higher survival rates when the patients were divided into treatment subgroups. The subgroup that received progesterone intramuscularly showed fetal survival rates of 64%, and the subgroup

---

[22] *Id.* at 7 (emphasis added).

[23] George Delgado & Mary Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46 Ann. of Pharmacother. e36, 21 (2021).

[24] *See* Deborah Garratt & Joseph V. Turner, *Progesterone for Preventing Pregnancy Termination after Initiation of Medical Abortion with Mifepristone*, 22 Eur. J. Contracept. Reprod. Health Care 472 (2017).

1  that received a high dose of oral progesterone followed by daily oral progesterone
2  until the end of the first trimester had survival rates of 68%. The study concluded that
3  these two subgroups represented two viable APR protocols for use moving forward.[25]

4     40.    A scoping review was also published in July 2023, which reviewed the
5  existing scientific literature and concluded that there was "*no increased maternal or
6  fetal risk from using bioidentical progesterone in early pregnancy*," and that "mifepristone
7  antagonization with progesterone is a *safe and effective treatment*."[26]

8     41.    Even Dr. Harvey Kliman, the director of the reproductive and placental
9  research unit at the Yale School of Medicine, told the *New York Times* that using
10 progesterone to reverse the effects of mifepristone "makes biological sense." Dr.
11 Kliman further stated that "if one of his daughters came to him and said she had
12 somehow accidentally taken mifepristone during pregnancy … he would tell her to
13 take 200 milligrams of progesterone three times a day for several days, just long
14 enough for the mifepristone to leave her system: 'I bet you it would work.'"[27]

15    42.    In light of the above studies, over a decade of widespread successful use
16 of APR by licensed healthcare professionals, and given the irrefutable evidence of its
17 biochemistry, APR has been endorsed by the American Association of Pro-Life
18 Obstetricians & Gynecologists (over 7,000 members), the Catholic Medical
19 Association (2,500 members), and Canadian Physicians for Life (2,500 members).[28]

20

---

21 [25] *See* George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 27 & tb.1 (2018).

22
23 [26] Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, 402 (2023) (emphasis added).

24 [27] Ruth Graham, *A New Front in the War over Reproductive Rights: 'Abortion-Pill
25 Reversal'*, N.Y. Times Mag. ( July 18, 2017), https://www.nytimes.com/2017/07/18/magazine/a-new-front-in-the-war-over-reproductive-rights-abortion-pill-
26 reversal.html.

27 [28] *See, e.g.*, Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *2019 AAPLOG
28 Position Statement on Abortion Pill Reversal* (Feb. 2019), https://aaplog.org/wp-content/uploads/2019/02/2019-AAPLOG-Statement-on-Abortion-Pill-

### D.   THE ABORTION PILL RESCUE NETWORK

43.     Given the demonstrable life-saving potential of APR, in May 2012, COLFS's medical director, Dr. George Delgado, set up a website and hotline to educate pregnant women who seek to reverse the effects of mifepristone about Abortion Pill Reversal, provide them with practical support and resources, and connect them with licensed medical professionals. This effort became known as the APR Network. This APR Network consists of physicians or other medical providers who are willing to assist a woman who wishes to try reversing the effects of mifepristone and prevent the death of her unborn child.

44.     In April 2018, to ensure expansion of the APR Network and increased public awareness of the APR protocol, COLFS transferred it for the nominal sum of $1 to a nationwide trade group that represents pro-life pregnancy help resource organizations, called Heartbeat International.

45.     Upon acquiring the APR Network, Heartbeat International began providing continuing education courses for nurses regarding Abortion Pill Reversal. Heartbeat is a registered continuing education provider with the California Board of Registered Nursing (because it is industry practice for nursing continuing education providers to become registered by California). Most states accept California's continuing education credits for nurses.

46.     On January 29, 2016, the Nursing Board sent Heartbeat an audit letter seeking course outlines and instructor resumes for all continuing education courses concerning Abortion Pill Reversal. COLFS is informed that, at that time, an advocacy group had lobbied State Senator Jerry Hill to call up and pressure the Nursing Board, which he did. On November 2, 2016, Heartbeat provided a comprehensive response

Reversal.pdf; Cath. Med. Ass'n, Press Release, *New Abortion Pill Reversal Study Shows a 68% Success Rate, Authors Include Catholic Medical Association Members* (Apr. 4, 2018), https://www.cathmed.org/resources/new-abortion-pill-reversal-study-shows-a-68-success-rate-authors-include-catholic-medical-association-members/.

VERIFIED FIRST AMENDED COMPLAINT

with the relevant scientific literature. That same month, on November 29, the Nursing Board sent Heartbeat a letter stating simply that "[t]he audit is now closed."

47.    Two months later, the Nursing Board mailed Heartbeat a letter on January 17, 2017, stating that "content related to abortion medication reversal … does not meet the scientific knowledge required for the practice of nursing." This conclusion apparently flowed from a new statute introduced by Senator Hill which required that continuing nursing education courses be based on "generally accepted scientific principles." This bill was introduced by Senator Hill in February 2016 and signed into law in September 2016. *See* 2016 Cal. Stat., ch. 799 § 16 (SB 1039) (amending Cal. Bus. & Prof. Code § 2811.5).

48.    On March 1, 2017, Heartbeat provided a response to the Nursing Board, requesting reconsideration of the conclusion. On July 28, 2017, the Nursing Board sent a short letter stating simply that "[t]he board has reconsidered its position and restores permission for Heartbeat International to offer APR related courses."

49.    In September 2017, the Nursing Board flip-flopped again, sending another letter to Heartbeat and ordering Heartbeat to cease and desist offering continuing education courses on APR. Heartbeat requested a conference with the Nursing Board, which occurred on December 11, 2017. In response to it, the Nursing Board reversed course again.

50.    Thus, in response to a years-long audit, the California Board of Registered Nursing confirmed that continuing education courses on Abortion Pill Reversal are indeed based on "generally accepted scientific principles."

51.    Since its founding in 2012, the APR Network has confirmed saves of over 1,000 babies. However, with respect to women who underwent APR treatment but did not report their ultimate result, the APR Network estimates saves of over 5,000 babies. Prior to COLFS handing over the APR Network to the national trade organization, it had connected women and physicians for over 400 confirmed saves. To date, from its location in San Diego County, COLFS has personally coordinated

1    approximately 100 confirmed saves. As part of its pro-life mission, COLFS is 100%

2    committed to providing APR treatment to women regardless of their ability to pay.

3    **E.    THE FAILED DANCO/CREININ STUDY**

4    52.    Compared to the many studies supportive of APR, there is only one

5    study purportedly critical of its efficacy. That study was performed by Dr. Mitchell

6    Creinin and funded by Danco Laboratories, the principal manufacturer of

7    mifepristone.[29] All other criticisms of Abortion Pill Reversal come in the form of

8    "policy statements" or articles merely seeking to undermine the statistical analyses

9    or methods of the APR-supportive studies cited above. Those criticisms universally

10   ignore the ethical concerns with giving a placebo to a woman who wishes to save her

11   pregnancy, and the unremarkable and commonsensical biochemistry underlying

12   Abortion Pill Reversal.

13   53.    The Danco/Creinin study was small, involving only twelve pregnant

14   women who were scheduled for abortions. All twelve took mifepristone, and then half

15   received progesterone while half received a placebo. Two women, one from the

16   progesterone group and one from the placebo group, left the study. First, the authors

17   of the Danco/Creinin study noted that "patients who receive high-dose oral

18   progesterone treatment do not experience side effects that are noticeably different

19   than placebo."[30]

20   54.    Of the five women who took progesterone, four (80%) were recorded to

21   have healthy pregnancies at the conclusion of the study period, with one who went to

22   the hospital with "severe bleeding" that required no medical intervention.[31] Of the

23   five women in the placebo group, two women (40%) were recorded to have healthy

---

24

25   [29] *See* Mitchell D. Creinin, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstet. Gynecol. 158

26   (2020).

27   [30] *Id.* at 162.

28   [31] *Id.* at 160.

1  pregnancies at the conclusion of the study period, and *two* of the other women

2  experienced severe bleeding, with one of the two requiring a blood transfusion.[32]

3      55.    Thus, the Danco/Creinin study, if its size allows for any conclusions,

4  stands for the propositions that (1) administering progesterone after mifepristone

5  (i.e., APR) gives a pregnant woman a better chance of a healthy pregnancy over doing

6  nothing (sometimes euphemistically called "watchful waiting") and (2) administering

7  progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of

8  avoiding severe bleeding over doing nothing. Any enhanced risk to a woman in this

9  situation who wants to continue her pregnancy would arise from *not* receiving APR

10 treatment. This is borne out by the FDA's required warning labels. *Mifepristone can*

11 *cause severe bleeding.* Progesterone does not.[33]

12     **F.    COLFS's Constitutional Rights**

13     56.    Bonta's attack on APR is chock full of constitutional implications. Under

14 both the U.S. Constitution and the California Constitution, COLFS has free exercise

15 of religion and free speech rights. U.S. Const. amend. I; Cal. Const. art. 1, §§ 2, 4.

16 And under both the U.S. Constitution and the California Constitution, women have

17 the right to make their own reproductive decisions—without interference by the

18 government. U.S. Const. amend. XIV; Cal. Const. art. I, §§ 1, 1.1.

19     57.    While *Dobbs* allows states to ban abortion, longstanding constitutional

20 precedent prohibits states from preventing reproduction. "Marriage and procreation

21 are fundamental to the very existence and survival of the race" and thus "one of the

22 basic civil rights of man." *Skinner v. Okla.*, 316 U.S. 535, 541 (1942). "The [Supreme]

23 Court has … describ[ed] the varied rights as a unified whole: '[T]he right to 'marry,

24

---

25 [32] *Id.* at 160-61.

26 [33] Indeed, the recent scoping review performed by DeBeasi, discussed above,

27 examined all the literature on APR safety, including Dr. Creinin's study, and found

*no evidence* that APR is unsafe. *See* Paul L.C. DeBeasi, *Mifepristone Antagonization*

28 *with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, at 8 (2024).

1 establish a home and bring up children' is a central part of the liberty protected by the
2 Due Process Clause.'" *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (quoting
3 *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)).

4      58.    The U.S. Constitution also protects the right to refuse "unwanted
5 medical treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citing
6 *Jacobson v. Mass.*, 197 U.S. 11, 24-30 (1905)), and the right "to bodily integrity." *Wash.*
7 *v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. Calif.*, 342 U.S. 165 (1952)).
8 This right protects against "'forced medical treatment' for the recipient's benefit."
9 *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

10      59.    "[W]here a decision as fundamental as that whether to bear or beget a
11 child is involved, regulations imposing a burden on it may be justified only by
12 compelling state interests, and must be narrowly drawn to express only those
13 interests." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 686 (1977); *accord Am. Acad.*
14 *of Pediatrics v. Lungren*, 16 Cal. 4th 307, 340-41 (1997). "When a fundamental right is
15 at stake, the Government can act only by narrowly tailored means that serve a
16 compelling state interest," i.e., "strict scrutiny." *Dep't of State v. Muñoz*, 602 U.S 899,
17 910 (2024). Here, in light of the actual science behind APR, Bonta cannot possibly
18 hope to show either a compelling state interest or narrow tailoring.

19      60.    With respect to COLFS's right to the free exercise of religion, under the
20 U.S. Constitution, if "challenged restrictions are not 'neutral' and of 'general
21 applicability,' they must satisfy 'strict scrutiny.'" *Roman Cath. Diocese of Brooklyn v.*
22 *Cuomo*, 592 U.S. 14, 18 (2020). Government "regulations are not neutral and
23 generally applicable ... whenever they treat *any* comparable secular activity more
24 favorably than religious exercise." *Fellowship of Christian Athletes v. San Jose Unified*
25 *Sch. Dist.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc) (quoting *Tandon v. Newsom*, 593
26 U.S. 61, 62 (2021)). In that context, there is no need to assess "whether a law reflects
27 'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible
28 targeting' of religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717

VERIFIED FIRST AMENDED COMPLAINT

(2021) (Statement of Gorsuch, J.) (quoting *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534-35 (1993)).[34]

61.    Bonta cannot hope to meet his burden to infringe on COLFS's right to the free exercise of religion. Last year, Colorado passed a statute prohibiting APR treatment. But as soon as it was issued, a federal district court enjoined it as a violation of the medical provider's free exercise rights. Allowing bioidentical progesterone to be prescribed for everything except APR treatment is not neutral and generally applicable, nor narrowly tailored to achieve a compelling government interest. *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212 (D. Colo. 2023).

62.    Lastly, under free speech precedent, "[w]hile the law is free to promote all sorts of *conduct* in place of harmful behavior, it is not free to interfere with *speech* for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (emphasis added).

63.    Government actions abridging speech based on its content or viewpoint, such as COLFS's statements concerning APR, are presumptively unconstitutional unless narrowly tailored to advance a compelling government interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That standard of review—strict scrutiny—is the most stringent in all of constitutional law and is satisfied only by government actions that narrowly target "the gravest abuses, endangering paramount interests." *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

---

[34] In contrast, the California Constitution uses a pre-1990 federal test. *Valov v. Dep't of Motor Vehicles*, 132 Cal. App. 4th 1113, 1126 & n.7 (2005); *Vernon v. Los Angeles*, 27 F.3d 1385, 1392-93 (9th Cir. 1994). Under this standard, there is an easier, "two-fold analysis which calls for a determination of, first, whether the application of the statute imposes any burden upon the free exercise of the defendant's religion, and second, if it does, whether some compelling state interest justifies the infringement." *Montgomery v. Bd. of Ret. of Kern Cnty. Emp. Ret. Ass'n*, 33 Cal. App. 3d 447, 451 (1973) (quoting *People v. Woody*, 61 Cal. 2d 716, 719 (1964)).

64.     That is because the First Amendment forbids the government from doing precisely what Bonta is trying to do: "excise certain ideas or viewpoints from the public dialogue." *303 Creative LLC v. Elenis*, 600 U.S. 570, 559 (2023) (cleaned up). A policy "aim[ed] at the suppression of views" is flatly prohibited. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (cleaned up). The government "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Thus, when the government's interest is "related to the suppression of free expression, … it is not valid, let alone substantial." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024).

65.     The Supreme Court has further explained that "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Thus, "an important tool to prevent that outcome—to stop people from steering 'wide[] of the unlawful zone'—is to condition liability on the State's showing of a culpable mental state." *Id*. Under this reasoning, "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). But "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).

66.     For example, "the solicitation of charitable contributions is protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988). As the Court memorably noted, "the passing of the collection plate in church [does not] make the church service a commercial project." *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943). Thus, to give the freedom of speech adequate "breathing room," *Counterman*, 600 U.S. at 75, under the First Amendment, a "[f]alse statement alone does not subject a fundraiser to fraud liability." *Alvarez*, 567 U.S. at 719 (quoting *Illinois v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003)).

67.     Bonta has attempted to sidestep free speech principles through the

argument that the provision of APR treatment is *commercial*. This is absurd. "Commercial speech is 'usually defined as speech that *does no more* than propose a commercial transaction.'" *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App. 4th 322, 343 (2004) (emphasis added). And to provide adequate "breathing room," the U.S. Supreme Court has been clear that speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley*, 487 U.S. at 796. But pregnancy help organizations "are not compensated by the individuals they speak to, provide pregnancy tests for, or give baby supplies to. The same is true for sidewalk counselors." *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023), *permanent injunction entered*, 2023 WL 9325644 (N.D. Ill., Dec. 14, 2023). Like pregnancy help organizations generally, COLFS provides free material and support to needy women. "[T]here is no economic motivation of any kind." *Id*.

68.    In any event, a restriction on speech also "requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys," and "[c]ommercial speech is no exception." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-67 (2011). Thus, where the government is "regulat[ing] based on actor," especially when the actor has a "lack of economic motivation for [the] speech," that implies the "conclusion that the regulated speech is not purely commercial." *Nat'l Inst. of Fam. & Life Advocs. v. Clark*, No. 2:23-cv-229, 2024 WL 3027983, at *9 (D. Vt., June 14, 2024).

69.    In other words, California does not have freewheeling authority to police the views of private citizens on medical issues touching on matters of public importance because medical professionals "might have a host of good-faith disagreements, both with each other *and with the government*, on many topics in their respective fields." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 772 (2018) (emphasis added). Thus, the debate over Abortion Pill Reversal—that is, *speech* about it, with no claim and no evidence that Abortion Pill Reversal has harmed

1  anyone—is simply none of Bonta's business.

2        **G.**  **CALIFORNIA'S PROTECTION FOR REPRODUCTIVE PRIVACY**

3      70.  In California, every woman enjoys "[t]he fundamental right … to choose
4  whether to bear children," as part "of a 'right of privacy' or 'liberty' in matters
5  related to marriage, family, and sex." *People v. Belous*, 71 Cal. 2d 954, 963 (1969). As
6  stated by the California Constitution, "[a]ll people are by nature free and independent
7  and have inalienable rights. Among these are enjoying … liberty … and privacy," such
8  that "[t]he state shall not deny or interfere with an individual's reproductive freedom
9  in their most intimate decisions." Cal. Const. art. I, §§ 1, 1.1.

10      71.  As codified in California's Reproductive Privacy Act, "every individual
11  possesses a fundamental right of privacy with respect to personal reproductive
12  decisions, which entails the right to make and effectuate decisions about all matters
13  relating to pregnancy." Cal. Health & Saf. Code § 123462. As a result, "[t]he state
14  shall not deny or interfere with the fundamental right of a pregnant individual or an
15  individual who may become pregnant to choose to bear a child." *Id.* at subd. (c).

16      72.  Further, "[a] person who aids or assists a pregnant person in exercising
17  their rights under this article [the Reproductive Privacy Act] shall not be subject to
18  civil or criminal liability or penalty, or otherwise be deprived of their rights, based
19  solely on their actions to aid or assist a pregnant person in exercising their rights
20  under this article with the pregnant person's voluntary consent." Cal. Health & Saf.
21  Code § 123467(b). This provision flows naturally from California's longstanding
22  acceptance that healthcare providers generally have standing to raise the "sexual
23  privacy" interests of their patients. *Planned Parenthood Affiliates v. Van de Kamp*, 181
24  Cal. App. 3d 245, 256-57 (1986). Indeed, as stated by the California Supreme Court,
25  in the context of "novel reproductive techniques, … [i]t is not the role of the judiciary
26  to inhibit the use of reproductive technology when the Legislature has not seen fit to
27  do so." *Johnson v. Calvert*, 5 Cal. 4th 84, 100-01 (1993).

28      73.  These provisions were added to the Reproductive Privacy Act in 2022.

When doing so, the California Legislature declared that "[r]eproductive justice is the human right to control our bodies, sexuality, gender, work, and reproduction." 2022 Cal. Stat., ch. 629, § 1(b) (AB 2223). Yet "pregnant people are under threat of civil penalties for their actual, potential, or alleged pregnancy outcomes and civil penalties have been threatened against people who aid or assist pregnant people in exercising their rights." *Id*. at subd. (e). Thus, "[a] critical part of realizing reproductive justice for people in California is clarifying that there shall be no civil and criminal penalties for people's actual, potential, or alleged pregnancy outcomes." *Id*. at subd. (c).

## H.  DEFENDANT BONTA'S ANIMUS

74.    As California Attorney General, Rob Bonta has brazenly tethered his office to the advancement of his militantly pro-abortion politics and corresponding official harassment of pro-life pregnancy help organizations such as COLFS.

75.    As stated above, in response to the *Dobbs* leak, Bonta issued a press release to announce that he would immediately begin "us[ing] the full force of the law to defend Californians' reproductive rights."[35] He then held three livestreamed meetings with various politicians to attack the Supreme Court.[36]

76.    As stated in the Introduction, Bonta's first action, on June 1, 2022, was to have his Healthcare Rights and Access Section publish a "Consumer Alert" to advise women that "crisis pregnancy centers," i.e., pregnancy help organizations, do

---

[35] Press Release, *Attorney General Bonta Reaffirms Commitment to Protecting Reproductive Rights*, Off. of the Att'y Gen. (May 3, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-reaffirms-commitment-protecting-reproductive-rights.

[36] *See* Cal. DOJ, *AG Bonta, Asm. Weber Convene Local Leaders to Discuss Reproductive Rights and Abortion*, YouTube (May 5, 2022), https://www.youtube.com/watch?v=m8ybtYawPLI; Cal. DOJ, *AG Bonta, Sen. Gonzalez, Mayor Garcia, & Local Leaders Discuss Fight to Protect Reproductive Rights*, YouTube (May 6, 2022), https://www.youtube.com/watch?v=MVYzNfx08Hg; Cal. DOJ, *AG Bonta, Leg. Leaders, & Reproductive Rights Advocates Discuss Fight to Protect Reproductive Rights*, YouTube (May 10, 2022), https://www.youtube.com/watch?v=ZVFY06x6yyU.

not provide abortions. He then had the Department of Justice set up a website to receive complaints about pregnancy help organizations.

77.    After the *Dobbs* decision was issued at the end of June 2022, Bonta displayed that he knows as little history as he does science by announcing in a press release that "[i]t blasts our nation back into the dark ages"—a historical era that ended nearly eight hundred years before the nation was even founded.[37] Bonta set up the "Reproductive Rights" page on the Department of Justice website, to provide information about abortion rights, provide a link for the public to file complaints, and to collect details on Bonta's fight to expand abortion access—showing just how many amicus briefs he'll have his office file.[38]

78.    One case in which Bonta filed numerous amicus briefs concerned attempts to restrict access to mifepristone. When the Supreme Court reversed the underlying decisions on standing grounds, Bonta proudly announced, "At the California Department of Justice, we remain unwavering in our commitment to ensure that our state continues to be a safe haven for all individuals seeking reproductive healthcare services and medication."[39]

79.    Bonta also sponsored legislation. In the Fall of 2022, he sponsored AB 1242, which was quickly signed into law (2022 Cal. Stat., ch. 627) and which prohibits California agencies from cooperating with states investigating illegally conducted

///

---

[37] Press Release, *Attorney General Bonta: California Won't Backslide, We'll Keep Fighting to Strengthen and Expand Access to Safe and Legal Abortion*, Off. of the Att'y Gen. (June 24, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-california-won%E2%80%99t-backslide-we%E2%80%99ll-keep-fighting-strengthen.

[38] *See Reproductive Rights*, Cal. DOJ, https://oag.ca.gov/reprorights.

[39] Press Release, *Attorney General Bonta: U.S. Supreme Court Overturns Decision on Medication Abortion, but the Fight for Reproductive Rights is Far from Over*, Off. of the Att'y Gen. (June 13, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-us-supreme-court-overturns-decision-medication-abortion.

abortions.[40] Six months later, he joined Governor Newsom to announce a bevy of new abortion protections.[41]

80.    In the Fall of 2022, Bonta began an investigation into pregnancy help organizations titled *In the Matter of the Investigation of Crisis Pregnancy Centers*— sending subpoenas to dozens of organizations across the state. He also formed a Reproductive Rights Task Force to align his attorneys with local counsel throughout the state.[42] And on the one-year anniversary of the *Dobbs* leak, Bonta partnered with UCLA Law School to set up a legal hotline for women to call if they believe that their reproductive rights have been violated.[43]

81.    In light of the above, one might be led to think that access to abortion in California is threatened. But, of course, this is not the case. As stated by the Guttmacher Institute (an abortion rights research and policy organization), California

---

[40] *See* Press Release, *Governor Newsom Signs Assemblymember Bauer-Kahan and Attorney General Bonta's Groundbreaking Legislation Protecting Digital Information on Abortion*, Off. of the Att'y Gen. (Sept. 27, 2022), https://oag.ca.gov/news/press-releases/governor-newsom-signs-assemblymember-bauer-kahan-and-attorney-general-bonta%E2%80%99s.

[41] *See* Cal. DOJ, *AG Bonta Joins Gov. Newsom & other Leaders to Highlight New Actions to Protect Reproductive Freedom*, YouTube (Apr. 18, 2023), https://www.youtube.com/watch?v=xtshHcQj_08; Press Release, *One Year After Roe v Wade Was Overturned, Attorney General Bonta Highlights Californians' Rights to Abortion, Birth Control*, Off. of the Att'y Gen. (June 24, 2023), https://oag.ca.gov/news/press-releases/one-year-after-roe-v-wade-was-overturned-attorney-general-bonta-highlights.

[42] *See* Press Release, *Attorney General Bonta Launches California Reproductive Rights Task Force,* Off. of the Att'y Gen. (Oct. 25, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-california-reproductive-rights-task-force; Cal. DOJ, *Attorney General Bonta Launches California Reproductive Rights Task Force*, YouTube (Oct. 25, 2022), https://www.youtube.com/watch?v=3ckIfo0Ukmg.

[43] *See* Press Release, *Attorney General Bonta: As Attacks on Reproductive Rights Persist, California Will Continue to Lead Nationwide Defense*, Off. of the Att'y Gen. (May 2, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-attacks-reproductive-rights-persist-california-will; Cal. DOJ, *AG Bonta Highlights Efforts of SoCal Legal Alliance for Reproductive Justice, Announces New Hotline*, YouTube (May 2, 2023), https://www.youtube.com/watch?v=jVImjAAzW-A.

---

is "very protective" of abortion access.[44] According to the medical magazine *Verywell Health*, California is the second best state for abortion access—after only Maine.[45] Another policy group places New Jersey first—but still places California second.[46] Whichever way you slice it, Bonta has ensured that California is a "safe haven" for abortion access.[47]

82.     But despite his investigations, and despite his website and hotlines, Bonta ***could not find anybody to sue***. For over a full year, their Healthcare Rights and Access Section and Reproductive Rights Task Force found that abortion access was not actually threatened in California. So, to justify their existence, on September 21, 2023, they decided to file their first and only Reproductive Rights lawsuit, *attacking the right of women to keep wanted babies through APR treatment even after they have revoked their consent to abortion.*

83.     As shown above, there is no evidence to support Bonta's allegation that pregnancy resource help organizations have misled women about APR. Yet he and his Healthcare Rights and Access Section have chosen to commence an *in terrorem* lawsuit for injunctive relief, ancillary relief, restitution, and civil penalties. Bonta is motivated by retaliatory animus against pro-life speech and expressive association of all pro-life pregnancy help resource organizations.

---

[44] *See Interactive Map: US Abortion Policies and Access After Roe*, Guttmacher Inst. (as of June 7, 2024), https://states.guttmacher.org/policies/california/abortion-policies.

[45] *See* Jennifer Welsh, *A Verywell Report: Abortion Access Ranked By State*, VeryWell Health (Sept. 27, 2021), https://www.verywellhealth.com/abortion-access-ranking-states-5202659.

[46] *See* C. Nicole Mason, et al., *IWPR Reproductive Rights Index: A State-by-State Analysis and Ranking*, Inst. for Women's Policy Res. (July 2022), https://iwpr.org/wp-content/uploads/2022/07/Reproductive-Rights-Index-2022_FINAL_website.pdf.

[47] *See* Press Release, *Attorney General Bonta: From Idaho to Arizona, We Welcome Abortion Care Providers Willing to Practice in California*, Off. of the Att'y Gen. (Apr. 23, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-idaho-arizona-we-welcome-abortion-care-providers-willing.

## I.    Defendant Bonta's Viewpoint Discrimination

84.    While Bonta has chosen to prosecute pro-life pregnancy help organizations, despite lacking any evidence of fraud, deception, or injury to anyone, Bonta has taken no action regarding the demonstrably false and misleading statements of providers of chemical abortion as described above—a risky procedure that uses two powerful drugs to end a pregnancy in its early stages. *All. for Hippocratic Med. II*, 78 F.4th at 229-32.

85.    For example, for at least the past six years, Planned Parenthood has made false and misleading statements about both Abortion Pill Reversal and abortion pill administration under the chemical abortion regimen.

86.    As to APR, Planned Parenthood has falsely claimed on its website that APR has never "been tested for safety, effectiveness, or the likelihood of side effects."[48] Much more than just a misleading statement about the safety or efficacy of APR treatment, Planned Parenthood's claim is an objective falsehood. The misrepresentation deceives visitors to Planned Parenthood's website, interfering with the reproductive rights of those who will be misled into believing that they have no option but to finish their unwanted abortions.

87.    In addition to lying about APR, Planned Parenthood misleads vulnerable women about the serious risks involved in the chemical abortion regimen, consisting of two powerful drugs: first mifepristone, which blocks progesterone, literally starving the unborn child, and then off-label misoprostol, which forcibly expels the child from the uterus. For example, Planned Parenthood has for years falsely advised vulnerable women, with no mention of risks, that "Medication abortion – also called the abortion pill – is a *safe and effective* way to end an early pregnancy."[49]

---

[48] Emily, *Ask the Experts: Can the Abortion Pill Be Reversed after You Have Taken It?*, Planned Parenthood (Sept. 14, 2017), https://www.plannedparenthood.org/blog/can-the-abortion-pill-be-reversed-after-you-have-taken-it.

[49] *The Abortion Pill*, Planned Parenthood, https://www.plannedparenthood.org/learn/

Verified First Amended Complaint

88.     Further misleading women, Planned Parenthood, which charges for administration of the second drug in the chemical abortion regimen, misoprostol, states that "the Abortion Pill" merely "causes cramping and bleeding that can last several hours or more. You can be at home, or wherever is comfortable for you. Plan on taking it easy for the day." [50]

89.     Even more egregiously, in answer to the specific question: "What can I expect after I take the abortion pill?," Planned Parenthood—again avoiding any mention of potential risks or serious side effects, states on its website that "You may feel tired or crampy for a day or so, and you'll have bleeding and spotting for awhile [sic]. Most people go back to normal activities the day after a medication abortion." [51]

90.     Planned Parenthood fails to disclose that the FDA estimates that more than 4,000 women who completed the two-drug medication regimen have suffered serious adverse medical events, including hemorrhage, septic shock, ruptured ectopic pregnancies, and at least 28 deaths. [52] Also not disclosed is the far greater risk of emergency hospitalization due to chemical versus surgical abortion. [53]

91.     In contrast, as shown above, APR is entirely safe with no such history of adverse outcomes. For over 50 years, medical professionals have used bioidentical progesterone to support healthy pregnancies and prevent miscarriage when a

---

abortion/the-abortion-pill.

[50] *How does the abortion pill work?*, Planned Parenthood, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-does-the-abortion-pill-work.

[51] *What can I expect after I take the abortion pill?*, Planned Parenthood, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/what-can-i-expect-after-i-take-the-abortion-pill.

[52] Susan Jaffe, *Drug Developers Caution Against US Mifepristone Ban*, 401 The Lancet 1325, 1326 (2023).

[53] Maarit Niinimaki, et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstet. Gynecol. 795 (2009) (finding that "overall incidence of adverse events was fourfold higher in the medical compared with surgical abortion cohort (20.0% compared with 5.6%, P<.001)").

pregnant woman naturally produces too little of the hormone for a pregnancy to continue.[54] In 1998, the FDA gave the administration of bioidentical progesterone the agency's formal approval to support healthy pregnancies.[55]

92.    The FDA based that approval, in part, on a pharmacology/toxicology review that found that the bioidentical progesterone produced the same pharmacologic responses as naturally occurring progesterone and is thus not at all harmful.[56] Today, bioidentical progesterone treatment is commonly used worldwide to reduce the risk of miscarriage.[57]

93.    Bioidentical progesterone treatment is also used to help prevent uninduced abortion that would occur from IVF patients' bodies rejecting embryos trying to implant.[58] Multiple peer-reviewed medical studies have found that this same kind of progesterone supplementation treatment discussed above can save about two-thirds of unborn children from death if given within three days of when mifepristone was administered.[59]

94.    The APR protocol is a legitimate reproductive health procedure, fully legal in California, the advocacy and promotion of which are protected by the U.S.

---

[54] Gian Carlo Di Renzo, et al., *Progesterone: History, Facts, and Artifacts*, 69 Best Pract. & Res. Clinical Obstet. & Gynecol. 78 (2020).

[55] *See Drug Approval Package: Prometrium*, FDA (Dec. 26, 1998), https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/020843_s000_Prometri umTOC.cfm.

[56] *See* FDA, Center for Drug Evaluation and Research, Application No. NDA 2-843, p.4 (Feb. 25, 1998), https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/ 020843_S000_PROMETRIUM%20CAPSULES_PHARMR.PDF.

[57] Line Rode, et al., *Systematic Review of Progesterone for the Prevention of Preterm Birth in Singleton Pregnancies*, 88 Acta Obstet. et Gynecol. Scandinavica 1180 (2009).

[58] Am. Soc'y for Reprod. Med., *Fact Sheet: Progesterone Supplementation During IVF* (2016), https://www.reproductivefacts.org/news-and-publications/fact-sheets-and-infographics/progesterone-supplementation-during-ivf/.

[59] *See, e.g.*, George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018).

Constitution and the California Constitution as a matter of public concern in which government has no right to interfere by attempts to impose, through lawfare or otherwise, Defendant Bonta's preferred perspective in favor of abortion-on-demand or his view of what constitutes "credible scientific evidence."

95.    Yet, despite the medical facts showing the serious risks of chemical abortion versus the safety of progesterone therapy to reverse the effects of chemical abortion, including the off-label use of misoprostol, Defendant Bonta has not noticed a proposed lawsuit against Planned Parenthood for its misleading statements and omissions relating to the safety and efficacy of pregnancy-destroying chemicals.

96.    Rather, precisely because APR *saves* lives instead of ending them in the womb, Bonta has decided to target pro-life pregnancy help organizations in California, with *in terrorem* litigation with no evidence of harm to anyone from the administration of a pregnancy-protecting hormone approved by the FDA for that very purpose. Defendant Bonta thus reveals his intent to impose viewpoint-discriminatory censorship and other restrictions on COLFS's protected speech and expressive conduct and association. This is blatantly unconstitutional. Debates over the Abortion Pill and Abortion Pill Reversal should "be left to the political and democratic process"—not the courts. *All. For Hippocratic Med. III*, 602 U.S. at 396.

J.    **COLFS's Need for Pre-Enforcement Relief**

97.    COLFS has provided Abortion Pill Reversal as a treatment option for patients since its medical director, George Delgado, first treated a woman in COLFS's offices seeking help in maintaining her pregnancy after taking mifepristone in 2010. COLFS continues to provide Abortion Pill Reversal as a treatment option today. This includes both describing Abortion Pill Reversal as acting to "reverse" the effects of a chemical abortion, and accurately describing what various scientific studies report about APR, both on COLFS's website, in individual interactions with patients, and in other contexts.

98.    Defendant Bonta's civil enforcement action against Heartbeat

International and RealOptions has caused concern at COLFS because it is a religious nonprofit and is morally obligated to provide life-affirming care to any woman who requests it from COLFS. This includes offering Abortion Pill Reversal. Because of the religious nature of the COLFS organization, it is obligated to help any woman who is at risk of losing her pregnancy—for any reason whatsoever—to the best of its ability. COLFS is committed to this obligation despite the risk of staggering fines which the Attorney General is potentially seeking in his prosecution of Heartbeat International and RealOptions.

99.     The civil enforcement action does not allege that any woman has been deceived or harmed by Heartbeat's or RealOptions's purely charitable speech about Abortion Pill Reversal, and thus does not seek restitution or damages. Rather, the Complaint solely seeks civil penalties for unfair business practices and misleading advertising—up to $5,000 per incident. *See* Cal. Bus. & Prof. Code §§ 17206(a), 17500; *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) (same conduct can receive separate $2,500 fines under the UCL and FAL).

100.     The civil enforcement action contains several discrete categories of information that AG Bonta contends are fraudulent to repeat either on websites or in individual interactions with patients. *See* Exhibit 3, Complaint, ¶¶97, 100-01. These include: (1) that Abortion Pill Reversal is "effective" at "revers[ing]" a medical abortion, leading to thousands of lives saved; (2) that the standard Abortion Pill Reversal protocol has been shown to have a 64-68% success rate and no increased risk of birth defects (via primarily the 2018 Delgado study); and (3) that Abortion Pill Reversal may still be effective in non-standard situations (such as more than 72-hours after taking mifepristone, or after taking misoprostol or methotrexate). The Complaint also alleges that it is fraudulent to fail to mention (4) that Abortion Pill Reversal may lead to life-threatening bleeding. *See id.* The Complaint alleges that Heartbeat and RealOptions made these misrepresentations on their websites, in individual interactions with clients or patients, and on pro-life podcasts. *See id.* at ¶¶49-95.

VERIFIED FIRST AMENDED COMPLAINT

101.    In determining an appropriate fine for these alleged violations, the court must consider a host of equitable factors, and compare the total fine against the seriousness of the defendant's misconduct and against its assets. *See* Cal. Bus. & Prof. Code § 17206(b); *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) ($302 million); *People v. Overstock.com, Inc.*, 12 Cal. App. 5th 1064, 1087-88 (2017) ($6.8 million). Weighing against a lenient fine is a defendant's choice to continue with his allegedly illegal conduct during the litigation. *San Francisco v. Sainez*, 77 Cal. App. 4th 1302, 1316 (2000) (referencing $9.5 million fine). In light of these cases, COLFS is potentially subject to very significant fines.

102.    Despite COLFS's significant concerns, it has decided to not pull down the information about Abortion Pill Reversal from its websites. COLFS continues to have generic webpages which mention as a matter of course that "[t]he abortion pill can be reversed."[60] COLFS also has webpages that discuss successful reversals, including personal testimony pages. Those webpages imply—contrary to the Attorney General's belief—that Abortion Pill Reversal is effective.[61]

103.    COLFS also frequently discusses Abortion Pill Reversal in other contexts that are not unlike the podcast appearances through which the Attorney General accuses Heartbeat of engaging in fraudulent business practices. For example, every year, COLFS holds an annual fundraising gala. Every year COLFS mentions its work, including Abortion Pill Reversal.[62]

---

[60] *Are there Different Types of Abortion?*, COLFS Medical Clinic, https://colfsclinic.org/abortion-consultation/types-of-abortion/; *Abortion Pill Rescue*, COLFS Medical Clinic, https://colfsclinic.org/abortion-consultation/abortion-pill-rescue/.

[61] *Stacy's Testimony: Saving Baby Brayleigh*, Friends of COLFS (July 22, 2022), https://friendsofcolfs.org/stacys-testimony-saving-baby-brayleigh/.

[62] COLFS, *8th Annual Pro-Life is Good Gala Promotional Video*, YouTube (Oct. 10, 2017), https://www.youtube.com/watch?v=G1IS35gJXVs; COLFS, *7th Annual Pro-Life is Good Gala Promotional Video*, YouTube (Oct. 11, 2016), https://www.youtube.com/watch?v=ax8_DK2vsaE; COLFS, *6th Annual Pro-Life is Good Gala Promotional*

104.    Also, on COLFS's website is a detailed FAQ page describing much of the science underlying Abortion Pill Reversal. This includes reference to Dr. Delgado's 2018 case series, and its conclusion that viable APR protocols have a 64-68% success rate and no birth defects. That page also tells women to reach out to COLFS even if they have a non-standard situation since COLFS will always do what it can to provide them with care, and because "[i]t may not be too late" or "[y]ou may still be pregnant."[63] Although COLFS does not include any specific representations about non-standard situations on its websites, its religious mission requires it to provide care to any woman who presents for care.

105.    Worried that it too may be subject to civil enforcement actions, and unwilling to cease offering to help women despite the threat of ruinous fines, Plaintiff Culture of Life Family Services, Inc. now brings this complaint for declaratory and injunctive relief, and nominal and actual damages.

### FIRST CAUSE OF ACTION
**Violation of the Free Speech Clause of the U.S. Constitution:**
**Content & Viewpoint Discrimination: U.S. Const. amend. I; 42 U.S.C. § 1983**

106.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

107.    The First Amendment to the U.S. Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

108.    "The Free Speech Clause of the First Amendment … protect[s] the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*,

---

*Video*, YouTube (Nov. 5, 2015), https://www.youtube.com/watch?v=M-HKXf8ydqY.

[63] *Abortion Pill Rescue FAQs*, COLFS Medical Clinic, https://colfsclinic.org/abortion-pill-rescue-faqs/.

600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)). Under the First Amendment, "governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). When the government's interest is "related to the suppression of free expression, … it is not valid, let alone substantial." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024).

109.    Government action is content-based if it "on its face draws distinctions based on the message a speaker conveys" or if it "cannot be justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (cleaned up).

110.    Viewpoint discrimination is "an egregious form of content discrimination," in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 829 (1995). A restriction is viewpoint-based "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*.

111.    Even within a proscribed category of speech, the government may not engage in content or viewpoint discrimination within that proscribed category. *R.A.V. v. St. Paul*, 505 U.S. 377, 384 (1992) ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.").

112.    Restricting speech about Abortion Pill Reversal is a content-based restriction on speech. California seeks to punish advertising for Abortion Pill Reversal, and truthful descriptions of it, and to prohibit COLFS from truthfully counseling patients in connection with the safety, efficacy, and side-effects of Abortion Pill Reversal.

113.    This proposed restriction is content-based because, "on [their] face," each "draws distinctions based on the message a speaker conveys" and "cannot be

justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163-64 (cleaned up).

114. This proposed restriction is also viewpoint-discriminatory because it "targets … particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829.

115. There is no prospect that the government can demonstrate that restricting speech about Abortion Pill Reversal actually furthers a compelling government interest, let alone an "exceedingly persuasive" one. *Students for Fair Admissions, Inc. v. Harvard Coll.*, 600 U.S. 181, 217 (2023).

116. First, given that there is no evidence of a single woman harmed by Abortion Pill Reversal, California cannot show an "actual problem in need of solving." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). Indeed, in light of the fact that APR treatment has actually been proven effective, and because of California's strong protection for reproductive privacy, there is no problem in need of solving.

117. Second, restricting speech about Abortion Pill Reversal is vastly underinclusive, in that it does not reach the majority of situations in which pregnant women take progesterone to ward off threatened miscarriage. Nor does it address countless other examples of off-label drug use (like misoprostol itself). A government fails to show a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993); *see also Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

118. Third, the response of California's own purported experts in the field—the California Board of Registered Nursing—belies any claim that anything remotely approaching a compelling interest exists here. If the interest in saving women from

Abortion Pill Reversal were so strong, and the science so clear, then why did the Nursing Board audit Abortion Pill Reversal and then approve including it in continuing education courses? California cannot pretend to have a compelling interest in prohibiting a practice its own regulators deemed fine.

119.    Nor can California hide behind the single failed randomized trial conducted by Dr. Creinin. As stated above, the Danco/Creinin study, if its size allows for any conclusions at all, stands merely for the propositions that (1) administering progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of a healthy pregnancy over doing nothing (sometimes euphemistically called "watchful waiting") and (2) administering progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of avoiding severe bleeding over doing nothing. Any enhanced risk to a woman in this situation who wants to continue her pregnancy would arise from *not* receiving Abortion Pill Reversal treatment.

120.    Nor can California plausibly carry their burden of showing that restricting Abortion Pill Reversal is narrowly tailored to any valid interest, much less a compelling one. The same underinclusivity that dooms the compelling interest argument also forecloses narrow tailoring, because a law that is "underinclusive in substantial respects" demonstrates an "absence of narrow tailoring" that "suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546.

121.    Bonta's assertion that speech about Abortion Pill Reversal must be restricted violates COLFS's right to aid women in exercise of their reproductive privacy rights as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

122.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict Abortion

1   Pill Reversal.

2       123.    COLFS has engaged the services of private counsel to vindicate its rights

3   under the law. COLFS is therefore entitled to an award of attorneys' fees and costs

4   pursuant to 42 U.S.C. § 1988.

5   <center>**SECOND CAUSE OF ACTION**</center>

6   <center>**Violation of the Right to Free Exercise of Religion Under the U.S. Constitution**</center>

7   <center>**U.S. Const. amend. I; 42 U.S.C. § 1983**</center>

8       124.    Plaintiff incorporates by reference all allegations contained in the

9   preceding paragraphs as though fully set forth herein.

10       125.    The First Amendment to the U.S. Constitution provides that "Congress

11   shall make no law respecting an establishment of religion, or prohibiting the free

12   exercise thereof." U.S. Const. amend. I. The Free Exercise clause applies to the states

13   through the Due Process Clause of the Fourteenth Amendment. *Cantwell v.*

14   *Connecticut*, 310 U.S. 296 (1940).

15       126.    The Free Exercise Clause "protects not only the right to harbor religious

16   beliefs inwardly and secretly. It does perhaps its most important work by protecting

17   the ability of those who hold religious beliefs of all kinds to live out their faiths in daily

18   life through 'the performance of (or abstention from) physical acts.'" *Kennedy v.*

19   *Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div. v. Smith*, 494 U.S.

20   872, 877 (1990)).

21       127.    Under the Free Exercise clause, if "challenged restrictions are not

22   'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this

23   means that they must be 'narrowly tailored' to serve a 'compelling' state interest."

24   *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

25       128.    "A government policy will fail the general applicability requirement if it

26   'prohibits religious conduct while permitting secular conduct that undermines the

27   government's asserted interests in a similar way.'" *Kennedy*, 597 U.S. at 526 (quoting

28   *Fulton v. Philadelphia*, 593 U.S. 522, 534 (2021)). Government "regulations are not

neutral and generally applicable ... whenever they treat *any* comparable secular activity more favorably than religious exercise." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)).

129.    In that context, there is no need to assess "whether a law reflects 'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible targeting' of religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.) (quoting *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534-35 (1993))

130.    Consistent with its underlying commitment to the dignity of every human life, COLFS provide life-affirming medical care to every woman at risk of miscarriage—whether that risk arises biologically, due to physical trauma, or because she has willingly or unwillingly ingested the first abortion pill. As a matter of conscience, COLFS cannot refuse to administer progesterone to a woman who desires to continue her pregnancy simply because she first took mifepristone. COLFS is therefore religiously obligated to offer Abortion Pill Reversal. As part of offering Abortion Pill Reversal, and counseling women with respect to it, COLFS is similarly religiously bound to make truthful and accurate statements regarding its safety, efficacy, and side-effects.

131.    California's asserted interest in restricting speech about Abortion Pill Reversal is to protect women from a dangerous and deceptive practice. But California's restriction of speech about Abortion Pill Reversal is not neutral and generally applicable for three reasons.

132.    First, the statutes which California seeks to enforce are themselves not generally applicable. Cal. Bus. & Prof. Code §§ 17200, 17500, expressly do not apply to "public entit[ies]" regardless of their "involvement in commercial activity." *Cal. Med. Ass'n, Inc. v. Univ. of Cal.*, 79 Cal. App. 4th 542, 551 & n.14 (2000) (citing Cal. Bus. & Prof. Code §§ 17201, 17506; Cal. Gov. Code § 811.2); *see also Trinkle v. Cal.*

*State Lottery*, 71 Cal. App. 4th 1198, 1203-04 (1999) (rejecting policy argument that state is "competing" in business). Thus, hospitals operated by public universities can offer Abortion Pill Reversal, and engage in speech regarding it, with no fear of prosecution under Cal. Bus. & Prof. Code §§ 17200, 17500.

133.    The statutes also only apply to *commercial* activity. *See O'Connor v. Superior Ct.*, 177 Cal. App. 3d 1013, 1019 (1986). Thus, they do not apply to political campaigns which send out fraudulent campaign advertisements, *Chavez v. Citizens for a Fair Farm Lab. Law*, 84 Cal. App. 3d 77, 79 n.2 (1978), or even use fraudulent election fundraising practices. *Nat'l Comm. of Reform Party of U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 363 (9th Cir. 1999). Even if COLFS's provision of APR treatment was "commercial," which it is not, it is sufficiently similar to non-commercial activities that are categorically exempted to be comparable to them.

134.    Both the government and political campaigns can engage in unfair competition and injure consumers, and so exemptions for them are relevantly comparable to exemptions for religious organizations, triggering strict scrutiny. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212-13 (D. Colo. 2023).

135.    Second, general applicability also "requires, among other things, that the laws be enforced evenhandedly." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). A government regulation is not generally applicable when it "results in a pattern of selective enforcement favoring comparable secular activities." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc); *accord Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012). This can include the failure of civil enforcement authorities to enforce a statute against comparable secular conduct. *See Soos v. Cuomo*, 470 F. Supp. 3d 268, 282-83 (N.D.N.Y. 2020); *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 647-54 (2018) (Gorsuch, J., concurring).

136.    Here, as stated above, Planned Parenthood makes false statements regarding the Abortion Pill and Abortion Pill Reversal. Specifically, Planned Parenthood makes the categorically false statement that Abortion Pill Reversal has

never "been tested for safety, effectiveness, or the likelihood of side effects." Planned Parenthood also misleads women about the safety, efficacy, and side-effects of the Abortion Pill. These statements are relevantly comparable to COLFS's statements regarding Abortion Pill Reversal. Yet Defendant Bonta has not sought to enforce Cal. Bus. & Prof. Code §§ 17200, 17500, against Planned Parenthood, making the statutes not generally applicable.

137.    Third, Defendant Bonta's attempted restriction on truthful speech about the safety, efficacy, and side-effects of Abortion Pill Reversal will have the cumulative and practical effect of restricting provision of that service. But Abortion Pill Reversal is nothing more than supplemental progesterone. And there are a multitude of off-label uses of progesterone, which has been widely prescribed to women—including pregnant women—for more than 50 years. Yet California makes no attempt to regulate—much less outright prohibit—the off-label use of progesterone (or any other drug) in any other circumstance. That omission renders California's attempted restriction of APR not generally applicable. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212-13 (D. Colo. 2023).

138.    For the same reasons as stated in the First Cause of Action, Bonta cannot show that restricting speech about Abortion Pill Reversal as a fraudulent business practice or false advertising is narrowly tailored to achieve a compelling state interest.

139.    Bonta's assertion that speech about Abortion Pill Reversal must be restricted violates COLFS's right to aid women in exercise of their reproductive privacy rights as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

140.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive

relief invalidating and restraining enforcement of Bonta's attempt to restrict Abortion Pill Reversal.

141.    COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

### Violation of the Free Speech Clause of the U.S. Constitution:
### Right to Receive Information: U.S. Const. amend. I; 42 U.S.C. § 1983

142.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

143.    The First Amendment to the U.S. Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

144.    The First Amendment protects not only the right to disseminate information but also the "reciprocal right to receive" information. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976). "[T]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own right[] of speech." *Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). Under the "right to listen," the listener must have "a concrete, specific connection to the speaker." *Murthy v. Missouri*, 603 U.S. 43, 75 (2024).

145.    Physicians have third-party standing to assert the interests of their patients so long as the physician has also suffered injury himself. *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015); *All. for Hippocratic Med. III*, 602 U.S. at 393 n.5 (third-party standing denied in absence of any injury to physician).

146.    Restricting speech about APR is a content-based restriction on speech. California seeks to punish advertising for Abortion Pill Reversal and to prohibit COLFS from counseling patients in connection with APR.

147.   This proposed restriction is content-based because, "on [their] face," each "draws distinctions based on the message a speaker conveys" and "cannot be justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163-64 (cleaned up).

148.   This proposed restriction is also viewpoint-discriminatory because it "targets … particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829.

149.   For the same reasons as stated in the First Cause of Action, Bonta cannot show that restricting speech about Abortion Pill Reversal as a fraudulent business practice or false advertising is narrowly tailored to achieve a compelling state interest.

150.   Bonta's assertion that speech about Abortion Pill Reversal must be restricted violates COLFS's patients' right to receive information as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS's patients have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

151.   Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict Abortion Pill Reversal.

152.   COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///

# FOURTH CAUSE OF ACTION

**Violation of the Substantive Due Process Rights of the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C. 1983**

153. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

154. Under the Due Process Clause of the Fourteenth Amendment, all Americans have a "right of privacy," which means "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). This includes the "right to decide independently, with the advice of [her] physician, to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

155. The U.S. Constitution also protects the right to refuse "unwanted medical treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citing *Jacobson v. Mass.*, 197 U.S. 11, 24-30 (1905)), and the right "to bodily integrity." *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. Calif.*, 342 U.S. 165 (1952)). This right protects against "'forced medical treatment' for the recipient's benefit." *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

156. "[W]here a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 686 (1977); *accord Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 340-41 (1997). "When a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest," i.e., "strict scrutiny." *Dep't of State v. Muñoz*, 602 U.S 899, 910 (2024).

157. Physicians have third-party standing to assert the interests of their patients so long as the physician has also suffered injury himself. *McCormack v.*

*Herzog,* 788 F.3d 1017, 1027 (9th Cir. 2015); *All. for Hippocratic Med. III*, 602 U.S. at 393 n.5 (third-party standing denied in absence of any injury to physician).

158. Here, California's attempt to restrict speech about Abortion Pill Reversal violates the Fourteenth Amendment rights of pregnant women to not be forced to undergo or continue an abortion.

159. Bonta's assertion that speech about Abortion Pill Reversal must be restricted violates COLFS's patients' rights to procreation, reproductive privacy, and to reject unwanted medical treatment as guaranteed by the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. COLFS's patients have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

160. Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict Abortion Pill Reversal.

161. COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///

///

///

///

///

///

///

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the entry of an Order and Judgment, as applicable, for the following relief:

A.    An order and judgment declaring that Defendant, his agents and employees, and all those acting in concert with them, may not enforce Cal. Bus. & Prof. Code §§ 17200 or 17500, or any substantively similar statute, against Plaintiff's provision of Abortion Pill Reversal treatment to pregnant women, which includes truthful statements regarding the safety, efficacy, and side-effects of Abortion Pill Reversal;

B.    An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendant, his agents and employees, and all those acting in concert with them, may not enforce Cal. Bus. & Prof. Code §§ 17200 or 17500, or any substantively similar statute, against Plaintiff's provision of Abortion Pill Reversal treatment to pregnant women, which includes truthful statements regarding the safety, efficacy, and side-effects of Abortion Pill Reversal;

C.    Nominal and actual damages;

D.    Attorneys' fees pursuant to statute;

E.    Litigation costs and expenses; and

F.    Such other and further relief as the Court deems appropriate and just.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: November 15, 2024          By: _____

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Attorneys for Plaintiff Culture of Life Family Services, Inc.

**VERIFICATION OF WILLIAM R. GOYETTE**

I, William R. Goyette, am the CEO and Chairman of the Board of Culture of Life Family Services, Inc., a plaintiff in this action. I have read the above Verified First Amended Complaint and know its contents. The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my staff, attorneys, or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my staff, attorneys, or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 15th day of November 2024, at San Marcos, California.

William R. Goyette

## VERIFICATION OF GEORGE DELGADO, M.D.

I, George Delgado, am the Medical Director of Culture of Life Family Services, Inc., a plaintiff in this action. I have read the above Verified First Amended Complaint and know its contents. The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my staff, attorneys, or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my staff, attorneys, or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 15th day of November 2024, at Escondido, California.

George Delgado, M.D.

**EXHIBIT 1**

11/8/23, 1:28 AM — Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients | State of Cali…

Case 3:24-cv-01338-GPC-KSC   Document 19   Filed 11/15/24   PageID.959   Page 50 of 117

 **Subscribe to Our Newsletter**   [ Enter your ]   Subscribe



# ROB BONTA
*Attorney General*

# Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients

Press Release    /  *Attorney General Bonta Sues Anti-Abortion Group, Five Califo…*

Thursday, September 21, 2023

Contact: (916) 210-6000, agpressoffice@doj.ca.gov

*Lawsuit alleges companies used false and misleading claims to market unproven and potentially harmful 'abortion pill reversal' procedure*

**OAKLAND** — California Attorney General Rob Bonta today announced a lawsuit against Heartbeat International (HBI), a national anti-abortion group, and RealOptions Obria (RealOptions), a chain of five crisis pregnancy centers in Northern California. The lawsuit alleges that the two organizations used fraudulent and misleading claims to advertise an unproven and largely experimental procedure called "abortion pill reversal (APR)". The procedure is

11/8/23, 11:38 AM    Attorney General Bonta Sues Anti-Abortion Group Five California Crisis Pregnancy Centers | State of Cali…

Case 3:24-cv-01338-GPC-KSC    Document 1-9    Filed 11/15/24    PageID.960    Page 51 of 117

touted by HBI and RealOptions as a safe and effective way to "reverse" a medication abortion — in reality, it has no credible scientific backing, and has potential risks for patients who undergo it. Given the lack of credible scientific evidence supporting APR's safety and efficacy, it is crucial that pregnant patients are provided with accurate information before deciding whether to undergo this experimental procedure. Attorney General Bonta's lawsuit, filed today in the Alameda County Superior Court, seeks to block HBI and RealOptions from falsely advertising APR as safe and effective.

"Those who are struggling with the complex decision to get an abortion deserve support and trustworthy guidance — not lies and misinformation," **said Attorney General Bonta**. "And let me be clear: the evidence shows that the vast majority of people do not regret their decision to have an abortion — more than 95% of patients who undergo an abortion later say they made the right decision. HBI and RealOptions took advantage of pregnant patients at a deeply vulnerable time in their lives, using false and misleading claims to lure them in and mislead them about a potentially risky procedure. We are launching today's lawsuit to put a stop to their predatory and unlawful behavior. I urge any Californian seeking information related to reproductive care to visit our Reproductive Rights website, which lists programs and resources that can provide the accurate, timely, and reliable help they need."

Medication abortion typically uses a combination of two drugs — mifepristone and misoprostol — taken within 24 to 48 hours of each other to terminate a pregnancy. Advocates of APR falsely claim that if a pregnant person takes high doses of the hormone progesterone within 72 hours of taking the first drug, mifepristone, it will safely and effectively cancel the effects of the mifepristone.

11/8/23, 1:53 AM — Attorney General Bonta Sues Anti-Abortion Group Five California Crisis Pregnancy Centers for Misleading Patients | State of Cali…

Case 3:24-cv-01338-GPC-KSC Document 1-8 Filed 11/15/24 PageID.961 Page 52 of 117

There is absolutely no scientific basis to support such a claim. While medication abortion has been proven by decades of research to be exceedingly safe and reliable, no credible research so far has supported the safety or efficacy of APR. The first and only credible study that tried to test the safety and efficacy of APR had to be halted after three of its 12 participants experienced severe bleeding and had to be rushed by ambulance to the emergency room, raising questions about the risks of stopping a medication abortion midway and of APR. In addition, numerous medical experts, and leading medical associations, including the American College of Obstetricians and Gynecologists and the American Medical Association, have spoken out against APR and refused to support its use due to the lack of credible medical evidence supporting APR.

Despite the lack of scientific basis and lack of certainty about its safety, HBI and RealOptions falsely and illegally advertise APR as a valid and successful treatment option, and do not alert patients to possible side effects, such as the risk of severe bleeding.

Today's complaint alleges that HBI and RealOptions' deceptive and fraudulent advertising of APR violates California's False Advertising Law and Unfair Competition Law. The lawsuit seeks an injunction to block further dissemination of the misleading claims by the defendants, as well as other remedies and penalties available under state law.

California Attorney General Bonta remains committed to the fight to protect reproductive freedom in California. For more on his actions, and for key resources to assist you in obtaining reproductive healthcare, visit https://oag.ca.gov/reprorights.

If you are looking for information specific to abortions, the California Abortion Access website provides a safe space to find resources and guidance. The privacy of those who visit this website is protected, and their information is not saved or tracked.

A copy of today's filed complaint can be found here.

# # #

Office of the Attorney General    Accessibility    Privacy Policy    Conditions of Use    Disclaimer

© 2023 DOJ

**EXHIBIT 2**

1
2
3
    **TRANSCRIPT OF ATTORNEY GENERAL BONTA ANNOUNCES LEGAL ACTION TO PROTECT REPRODUCTIVE FREEDOM AND TRANSPARENCY**
4
5  R. BONTA:    Good morning, everyone. California Attorney General Rob Bonta here. And we are
6                 excited to announce an important action that my office is taking, uh, and that we
7                 took today to, uh, protect California's leadership role as a reproductive freedom-,
8                 reproductive freedom state. And before I get into the details of that action, I want to
9                 thank the members of my team who are getting after it every day, standing up, uh,
10                for freedoms, for rights, uh, for access to high quality healthcare, to, uh, truth and to
11                science and to facts. Uh, and, uh, I want to call them out, uh, for all that they do to
12                make sure that w-, that every Californian has, uh, true access to high quality,
13                affordable healthcare. I want to say a th-, a big thank you to Renuka George, who's
14                been doing such great work for so long for our team, uh, and yet again today, leading
15                us, uh, to where we are, Senior Assistant Attorney General. Also want to say thank
16                you to Karli Eisenberg and Kathleen Boergers, Supervising Deputy Attorneys
17                General, uh, James Toma, Special Assistant Attorney General, and Hayley Penan
18                and Erica Connolly, Deputy Attorneys General. This is an incredible team who is
19                fighting for the rights of Californians every day. And, uh, I want to make it clear
20                that the California Department of Justice will continue to use the full force of the
21                law, the full authority of this office, to defend and protect the rights and freedoms
22                of Californians. If -- and California patients not only have the right to access safe
23                and legal abortion care, they have the right to know all the facts. They have the right
24                to the truth as they decide, uh, what is best for their health and their futures. They
25                have the right to make informed decisions bathe-, on based on facts and science and
26                data and evidence and truth. Um, those who attempt to illegally mislead Californians
27                or circumvent the law will face consequences, and that's what brings us here today.
28                Today, my office filed a lawsuit against national antiabortion group, Heartbeat

International or HBI, uh, and a chain of five crisis pregnancy centers, uh, in Northern California called Real Options o-, Obria, for using fraudulent and misleading claims to advertise an unproven and largely experimental protocol called abortion pill reversal, or sometimes shorthand a-, uh, referred to as APR. The evidence overwhelmingly shows that the vast majority of people do not regret their decision to have an abortion. More than 95% of patients who undergo an abortion, later say they made the right decision. This lawsuit is about the very small percentage of pregnant patients, about .004%, um, who, a fraction of 1%, who may consider their decision while in the midst of a medication abortion. Medication abortion typically uses a combination of two drugs: Mifepristone and Misoprostol, uh, taken within 24 to 48 hours of each other to terminate a pregnancy. It's, it's a combination approach. Advocates of abortion pill reversal falsely claim that if a pregnant person takes high doses of the hormone progesterone within 72 hours of taking the first drug, Mifepristone, it will safely and effectively cancel its effects and, in doing so, reverse the abortion. That's the idea. Here's the problem: There's absolutely no scientific basis to support such a claim. It's a claim; it is not based on any facts or scientific data. I cannot emphasize that enough for anyone who's listening. This is an unproven and potentially risky protocol. While medication abortion, uh, abortion has been, uh, proven by decades of research to be exceedingly safe and reliable, no credible research so far, has supported the safety or efficacy of abortion pill reversal. The first and only credible study that tried to test the safety and efficacy of this protocol had to be halted after three of its 12 participants experienced severe bleeding and had to be rushed by ambulance to the emergency room. Numerous medical experts and leading medical associations, including the American College of Obstetricians and Gynecologists and the American Medical Association, have refused to support the use of this protocol due to the lack of credible medical evidence supporting it. Despite the protocol's lack of scientific basis and doubts about its safety, HBI and Real Options falsely and illegally advertised abortion pill

2.

1    reversal as a valid and successful treatment option. They lied about that. And they

2    failed to alert patients to possible side effects including the risk of severe bleeding.

3    This is unacceptable. Patients making serious and time sensitive medical decisions

4    must have transparency. They must have the facts. They must have all the data in

5    front of them, uh, so they can make the right decision for their own health based on

6    facts, based on being fully informed. That's not what they're getting from HBI and

7    from Real Options. HBI operates two websites that use misleading statements to

8    persuade pregnant people who have already started a medication abortion treatment

9    to undergo abortion pill reversal. They advertise that potential patients should

10   contact their hotline or live chat, even if more than 72 hours have passed since the

11   pregnant person took Mifepristone, stating, quote, We are here to help. It may not

12   be too late, end quote. Their tactics are aimed at creating a false impression that

13   abortion pill reversal is effective and safe during the 72 hour window and beyond.

14   Their hotline staff are guided by an HBI created, uh, by HBI created policies and

15   procedures manual, instructing them to use the term reverse or reversal to describe

16   APR, and to falsely imply that the protocol has a high success rate of between 64 to

17   68%. More lies, more deception, more misleading, um, statements. HBI executives

18   have made multiple media appearances, from podcasts to YouTube videos where

19   they've made disingenuous claims about the effectiveness of abortion pill reversal.

20   And while HBI engages in widespread promotion of a-, of APR and spreads

21   inaccurate training and materials, Real Options is an on the ground provider.

22   Through its five clinics, Real Options states that it will provide abortion pill reversal

23   to pregnant people. Real Options utilizes HBI created materials and similarly

24   advertises on its website that the protocol can reverse a medication abortion. I want

25   to emphasize these statements are misleading because there is no existing credible

26   evidence that supports them. This deceptive and fraudulent advertising violates

27   California law, California's false advertising law, and it's unfair competition law.

28   That's why DOJ is seeking to block HBI and Real Options from continuing to falsely

San Diego
Transcription

3.

AG BONTA ANNOUNCES LEGAL ACTION TO PROTECT REPRODUCTIVE FREEDOM

1    advertise this protocol as safe and as effective. Those who are struggling with the

2    complex, often difficult and deeply personal decision to get an abortion deserve

3    support and trustworthy science-backed guidance, not lies and disinformation. Let

4    me be clear: The evidence shows that the vast majority of people don't regret their

5    decision to have an abortion. More than 95% of patients who undergo an abortion

6    later say they made the right decision. HBI and Real Options took advantage of

7    pregnant patients at a deeply vulnerable time in their lives, using false and

8    misleading claims to lure them in and mislead them about a potentially risky

9    protocol. We're launching today's lawsuit to put a stop to their predatory and

10   unlawful behavior. The horrifying reality is that right now there are more crisis

11   pregnancy centers in California then abortion care clinics. Crisis pregnancy centers

12   do not provide abortion or abortion referral, though they may want you to believe

13   they do. They do not. Nearly across the board, they do not provide birth control or

14   other forms of contraceptives. Crisis pregnancy ce-, pregnancy centers may not be

15   licensed medical clinics and may not be required to keep medical records private.

16   Anyone who is considering going to a crisis pregnancy center needs to know crisis

17   pregnancy centers may attempt to delay appointments or provide misinformation

18   about the legality or safety of abortions. They may provide inaccurate health

19   information about a person's pregnancy and other aspects of reproductive

20   healthcare. They often look like and are located near real reproductive healthcare

21   facilities. I urge Californians looking for comprehensive reproductive health

22   services to know their rights, do their research and be aware that crisis pregnancy

23   centers don't offer comprehensive reproductive healthcare services. However, there

24   are a number of programs that exist to help patients access abortion care including

25   the following: California Abortion Access at abortion.ca.gov, which is a safe space

26   to access detailed guidance and resources on abortions. It has a find a provider tool;

27   Access Reproductive Justice, which connects people to free and low cost programs;

28   Women's Reproductive Rights Assistance Project, which provides direct and

1    logistical support for abortion services; The National Abortion Federation, which

2    maintains a list of real abortion providers. Not to mention, of course, trusted clinics

3    like Planned Parenthood. California has strong laws in place protecting reproductive

4    freedom. Access to reproductive healthcare is your right. That includes the right to

5    safe and legal abortion. And don't let anyone tell you otherwise. If you believe

6    you've been the victim or target of deceptive, misleading, unfair or unlawful

7    conduct, immediately file a complaint with my office at oag.ca.gov/report. As your

8    attorney general, I'm going to use the full authority of my office to defend your

9    rights to protect your freedom. The California Department of Justice, alongside

10   everyone here today, is determined to ensure our State remains a beacon of

11   reproductive freedom in courtrooms, in clinics and on the ground in our

12   communities. DOJ is proud to stand up for people seeking or providing an abortion

13   here in California and across the nation. With that, thank you for your attendance

14   and attention and happy to open it up to any questions you might have.

15   [End of recording]

16

17

18

19

20

21

22

23

24

25

26

27

28

San Diego
Transcription

**AG BONTA ANNOUNCES LEGAL ACTION TO PROTECT REPRODUCTIVE FREEDOM**

1

**PROOFREADER'S CERTIFICATE**

2      I, Erica Lowther, owner of San Diego Transcription, certify that on March 23, 2024,

3   I proofread all the transcript of the above-referenced recording, while listening to the recording

4   from which the same was transcribed, and that said transcript as typed accurately reflects the spoken

5   word, to the best of my ability to hear those recorded words and identify the persons speaking.

6      I declare under penalty of perjury under the laws of the State of California that the foregoing

7   is true and correct.

8      Executed on March 23, 2024, at San Diego, California.

9

10   _____

11   ERICA LOWTHER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 3**

1   ROB BONTA
    Attorney General of California
2   RENU GEORGE (SBN: 262310)
    Senior Assistant Attorney General
3   KARLI EISENBERG (SBN: 281923)
    Supervising Deputy Attorney General
4   KATHLEEN BOERGERS (SBN: 213530)
    Supervising Deputy Attorney General
5   ERICA CONNOLLY (SBN: 288822)
    Deputy Attorney General
6   HAYLEY PENAN (SBN: 313693)
    Deputy Attorney General
7   1300 I Street, Suite 125
    P.O. Box 944255
8   Sacramento, CA 94244-2550
    Telephone: (916) 210-7755
9   Fax: (916) 327-2319
    E-mail: Erica.Connolly@doj.ca.gov
10
    *Attorneys for Plaintiff*
11   *People of the State of California*

12                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                            COUNTY OF ALAMEDA

14

15

16

17  **THE PEOPLE OF THE STATE OF**          Case No.  23CV044940
    **CALIFORNIA,**
18                                          **COMPLAINT FOR PERMANENT**
                                Plaintiff,  **INJUNCTION, CIVIL PENALTIES,**
19                                          **AND OTHER EQUITABLE RELIEF**
            v.
                                            (Bus. & Prof. Code §§ 17200, et seq.,
20                                          17500, et seq.)
    **HEARTBEAT INTERNATIONAL, INC.,**
21  **REALOPTIONS, DOES 1-100, INCLUSIVE,**  **[VERIFIED ANSWER REQUIRED**
                                             **PURSUANT TO CODE CIV. PROC. §**
22                            Defendants.    **446]**

23

24

25

26

27

28

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**09/21/2023 at 08:51:18 AM**
By: Milagros Cortez,
Deputy Clerk

*Filing Fee exempt per Govt. Code Section 6103*

1

2      Plaintiff, the People of the State of California, by and through Attorney General Rob

3  Bonta ("Plaintiff" or "the People"), alleges the following, on information and belief:

4                              **INTRODUCTION**

5      1.      For the vast majority of pregnant people who choose to undergo an abortion, their

6  most common emotion is relief.[1]  For a significant percentage of those people, medication

7  abortion is their preferred method of exercising their reproductive choice.  The standard

8  medication abortion regime, consisting of two medications, mifepristone and misoprostol, has

9  been proven to be incredibly safe—safer than Penicillin, Viagra, and even some over-the-counter

10 drugs like Tylenol.[2]  It is also incredibly effective, with more than 95% of individuals who take

11 the standard two-dose regime completing their abortion without need for any further

12 intervention.[3]

13     2.      A vast majority, however, is not everyone.  A small percentage of pregnant

14 people—0.004%—may reconsider their decision while in the midst of a medication abortion.[4]  As

15

16     [1] (Corinne H. Rocca et al., *Emotions & Decision Rightness over Five Years Following an Abortion: An Examination of Decision Difficulty & Abortion Stigma* (2020) 248 Soc. Sci. & Med. 112704, https://www.sciencedirect.com/science/article/pii/S0277953619306999?via%3Dihub; *see also* Lauren Ralph et al., *Measuring decisional certainty among women seeking abortion* (2017) 95 Contraception 269-78; Diana Greene Foster, The Turnaway Study: Ten Years, A Thousand Women, and the Consequences of Having—or Being Denied—an Abortion (2021) pp. 124 [describing the seminal study regarding emotions and decision rightness following abortion, which provides that "at every interview over the five years after their abortion, 95% of women reported that having the abortion was the right decision for them."].)

21     [2] (Annette Choi & Will Muller, *How Safe Is the Abortion Pill Compared with Other Common Drugs*, CNN (Apr. 21, 2023), https://www.cnn.com/2023/03/15/health/abortion-pill-safety-dg/index.html; Amy Schoenfeld Walker et al., *Are Abortion Pills Safe? Here's the Evidence*, N.Y. Times (Apr. 7, 2023), https://www.nytimes.com/interactive/2023/04/01/health/abortion-pill-safety.html.)

24     [3] (FDA, Full Prescribing Info.: Mifeprex, p. 12, https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020687Orig1s026lbl.pdf [as of Aug. 16, 2023].)

26     [4] (See Daniel Grossman et al., *Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review* (2015) 92 Contraception 206-11 ["According to data obtained from Danco Laboratories, the U.S. manufacturer of mifepristone, less than 0.004% of patients who took mifepristone between 2000 and 2012 ended up deciding to

2

part of that change of heart, these people likely face emotional turmoil—anxious and unsure about what choices remain open to them.  In such a vulnerable state, they need and deserve accurate, scientifically sound information about their options, including the risks involved with those options.

3.     Instead of offering vulnerable pregnant people accurate information, Defendants Heartbeat International, Inc. ("HBI") and RealOptions provide them with false and misleading statements.  They claim that there is a way to "reverse" the effects of mifepristone, which they call "abortion pill reversal" or "APR."  They further claim—falsely—that through APR "thousands of lives" have been "saved."[5]  But, there is no evidence showing that mifepristone can be "reversed" or that the APR "protocol" contributes to the continuation of a pregnancy.

4.     Defendants know this.  Nevertheless, they regularly continue to advertise and promote APR, and they cite flawed and misleading reports to support their claims.

5.     Defendants further misrepresent that APR can be safe and effective if initiated after a pregnant person has taken misoprostol (i.e., the second abortion drug in the two-drug abortion regime), or after taking a different medication abortion drug, methotrexate, or when initiated longer than 72 hours after taking the mifepristone dose.  There are **no studies** suggesting APR is effective or safe in those situations.

6.     Defendants falsely imply to patients that APR is safe, even though the only credible study on APR suggests potentially significant health risks.  Defendants fail to disclose these potential risks, which can arise from stopping a medication abortion midway.  They also fail to disclose the potential for unknown risks, which, given the absence of long-term data, may not be evident for many years.  This information is crucial for pregnant individuals and their families as they decide their next steps in this time-sensitive situation.

7.     In essence, Defendants use emotionally vulnerable individuals who come to them in the midst of a gut-wrenching life choice as subjects in experiments to determine whether APR

_____

continue their pregnancies."].)

[5] (Heartbeat International, *Abortion Pill Rescue Network*, https://www.heartbeatinternational.org/our-work/apr [as of Aug. 21, 2023].)

is safe and effective.  Defendants attract these individuals through multiple misrepresentations and pressure them by claiming they must start treatment as quickly as possible, further exploiting these individuals' heightened emotional state.

8.    The People of the State of California bring this suit to end this misconduct.

### PARTIES

9.    Plaintiff is the People of the State of California.  The People bring this action by and through Rob Bonta, Attorney General of the State of California ("Attorney General").  The Attorney General is the chief law officer of the State and has authority to file civil actions to protect public rights and interests.  (Const., art. V, § 13; Bus. & Prof. Code, § 321.)[6]  The Attorney General is authorized by Business and Professions Code sections 17204 and 17535 to obtain injunctive relief to halt violations of, and enforce compliance with, Business and Professions Code section 17200 et seq., and Business and Professions Code section 17500 et seq., respectively.  The Attorney General is authorized by Business and Professions Code sections 17206 and 17536 to obtain civil penalties of up to $2,500 for each violation of sections 17200 et seq. and 17500 et seq., respectively.  The Attorney General brings this challenge pursuant to his independent constitutional, statutory, and common law authority to represent the public interest.

10.    Defendant Heartbeat International, Inc. ("HBI") is a 501(c)(3) charitable organization that operates the "most expansive network" of "pro-life pregnancy resource centers" and has "over 3,000 affiliated pregnancy help locations," including over 2,000 locations throughout the United States.[7]  HBI is incorporated and has its principal place of business in Columbus, Ohio.  HBI owns and operates the Abortion Pill Rescue Network ("APRN") as well as the Abortion Pill Reversal ("APR") hotline.

11.    Defendant RealOptions ("RealOptions") is a 501(c)(3) non-profit organization that is incorporated in California, has a principal place of business in San Jose, and operates five clinics in California.  RealOptions operates the clinics under the name "RealOptions Obria

---

[6] All further statutory references are to California statutes.

[7] (Heartbeat International, *Our Mission & Vision*, https://www.heartbeatinternational.org/about/our-passion [as of Aug. 21, 2023].)

Medical Clinics." Two of RealOptions' clinics are located in San Jose; one clinic is located in Union City; one clinic is located in Oakland; and one clinic is located in Redwood City. RealOptions advertises APR as a service available at all five of its clinics.

12.     The true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, are unknown to the People, who therefore sue said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, the People will ask leave of the court to amend this Complaint to insert in lieu of such fictitious names the true names and capacities of said fictitiously named Defendants.

13.     At all relevant times, Defendants have controlled, directed, formulated, known, and/or approved of, and/or agreed to the various acts and practices of each of the Defendants.

14.     Whenever reference is made in this Complaint to any act of any Defendant or Defendants, such allegation means that such Defendant or Defendants did the acts alleged in this Complaint either personally or through the Defendant's officers, directors, employees, agents, and/or representatives acting within the actual or ostensible scope of their authority.

15.     Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. The conspiracy, common enterprise, and common course of conduct continue to the present.

**<u>JURISDICTION AND VENUE</u>**

16.     This Court has jurisdiction over the People's claims pursuant to article VI, section 10 of the California Constitution and Business and Professions Code sections 17204, 17206, 17535, and 17536.

17.     This Court has personal jurisdiction over Defendants because each Defendant intentionally avails itself of the California market so as to render the exercise of jurisdiction by California courts consistent with traditional notions of fair play and substantial justice. Defendant RealOptions additionally is incorporated in and has a principal place of business in California and therefore resides in the state. Since 2008, defendant HBI has been registered with the California Secretary of State as doing business in the state. HBI has multiple affiliated clinics in California,

1    and a number of those affiliates, including RealOptions, offer APR as a medical service.  On

2    information and belief, HBI refers pregnant individuals who contact its APR hotline or livechat to

3    its California-based affiliates that offer APR services.

4         18.    The violations of law alleged in this Complaint occurred in the Counties of San

5    Mateo, San Jose, Alameda, and throughout California.

6         19.    Venue is proper in Alameda County pursuant to Code of Civil Procedure section

7    393, subdivision (a) because Defendant RealOptions operates a medical clinic offering APR

8    within this county, in Oakland, and HBI advertises APR to the public and Abortion Pill Rescue

9    Network Training to potential affiliates within the county.  Accordingly, at least some part of the

10   cause of action arose within this county.  (See Code Civ. Proc., § 393, subd. (a).)

11                                    **FACTUAL ALLEGATIONS**

12   I.    **"ABORTION PILL REVERSAL"**

13        20.    Abortion pill reversal ("APR") is an experimental protocol that Defendants claim

14   is "safe" and "effective" for "reversing" a medication abortion when a pregnant person has taken

15   the first drug, mifepristone, but before having taken the second drug, misoprostol, in the standard

16   two-drug medication abortion regime.  Mifepristone blocks the effects of progesterone and

17   thereby inhibits the continuation of the pregnancy.  Misoprostol, which is taken 24-48 hours after

18   the mifepristone, causes the uterus to contract and expel the remaining pregnancy tissue,

19   completing the abortion.

20        21.    As HBI explains the process, the APR "protocol" directs a patient to take high

21   doses of progesterone within 72 hours of taking mifepristone to try to "reverse" the effects of the

22   mifepristone.  Although HBI uses the term "reverse" and "reversal," the theory underlying APR

23   is more akin to a "competition" between progesterone and mifepristone.  Even APR's proponents

24   acknowledge that APR cannot truly "reverse" mifepristone, such as by acting as an antidote.

25        22.    As of the date of this filing, not a single credibly designed medical study has

26   verified HBI's claims.

27        23.    According to HBI, the APR "protocol" requires the pregnant person who has taken

28   mifepristone to be administered a high dose of progesterone in one of three ways: orally,

6

vaginally, or through intramuscular injection.  The pregnant person is also advised not to take the second drug in the medication abortion regimen, misoprostol.  The "protocol" calls for treatment with progesterone to be tapered after the first three days, and then to continue until the end of the first trimester.  Under this "protocol," the dosage and frequency of progesterone differs depending on the route of administration.

24.    HBI offers similar "protocols" of high-dose progesterone administration for pregnant individuals who have taken <u>both</u> drugs in the standard medication abortion regime (mifepristone and misoprostol).  As of the date of this filing, no medical study has verified this protocol.

25.    HBI also offers similar "protocols" of high-dose progesterone administration for those pregnant individuals who have taken methotrexate, a separate drug that can be used to induce an abortion.  Unlike mifepristone, however, methotrexate inhibits folic acid rather than progesterone.  For the "attempted reversal of methotrexate" "protocol," HBI advises providers to also administer leucovorin and folic acid to counteract the effects of the methotrexate—another "protocol" which has never been studied.

## II.    2012 CASE SERIES AND 2018 REPORT

26.    The original APR "protocol" for pregnant people who have completed only the first step in a medication abortion (i.e., taken only mifepristone) was conceptualized by two providers, Dr. George Delgado and Dr. Matthew Harrison.  Harrison purportedly first used progesterone in 2006 on a pregnant patient who had taken mifepristone but did not want to continue with a medication abortion.  In 2008, Delgado, a California-based family physician and HBI's medical advisor, devised the APR "protocol" described above.

27.    To support the APR "protocol," in 2012, Delgado and Dr. Mary Davenport, a California-licensed physician and the current medical director of RealOptions' Redwood City and Oakland locations, published a case series review ("2012 Case Series").[8]  In the 2012 Case Series, they described the administration of progesterone to seven pregnant women who had taken

---

[8] (George Delgado & Mary Davenport, *Progesterone Use to Reverse the Effects of Mifepristone* (2012) 46 Pharmacotherapy 1723.)

mifepristone, six of whom were included in the case series' analysis and four of whom carried their pregnancies to full-term, reportedly with no birth defects.  The progesterone route of administration and dosage varied among the women included in the case series, and there was no control group.

28.    Despite the small sample size, the presence of confounding variables, and the lack of control group, Delgado nevertheless concluded that "[t]he experience of these patients suggests that medical abortion can be arrested by progesterone injection after mifepristone ingestion prior to misoprostol" and that further research was necessary only "to have an evidence basis for the best protocol."[9]  The 2012 Case Series, however, was insufficient evidence for these conclusions.

29.    In May 2012, Delgado created the Abortion Pill Reversal Network, consisting of an APR website (www.abortionpillreversal.com) and a telephone hotline (1-800-712-HELP), through which he promoted APR and sought to connect pregnant people who have initiated a medication abortion with providers willing to administer the APR protocol.  He collected data on individuals who contacted the hotline, especially those individuals who opted to pursue APR.

30.    Using this hotline patient data, in 2018, Delgado, Davenport, and others wrote an article ("2018 Report"), labeling it "an observational case series of 754 patients."[10]  According to the 2018 Report, 1,668 calls were received by the hotline from June 24, 2012 to June 21, 2016.  Of these 1,668 callers, 754 pregnant individuals initiated the experimental progesterone treatment.  The 2018 Report claimed to have tracked the pregnancy outcomes to ultimately conclude, "[t]he reversal effects of Mifepristone using progesterone is safe and effective."[11]

31.    As an AMA Journal of Ethics article explained, case series like the 2012 Case Series and the 2018 Report (which claimed to be a case series), "describe characteristics of patients with certain diseases and may help identify questions for future research" but "are ranked lower than other [study] designs because of associated bias, lack of random sampling, the absence

---

[9] (*Ibid.*)

[10] (George Delgado et al., *A case series detailing the successful reversal of the effects of mifepristone using progesterone* (2018) 33 Issues L. Med. 21-31.)

[11] (*Ibid.*)

of controls or a comparison group, and heterogeneity of subjects."[12]  Because case series provide only weak scientific evidence, they are not commonly used to make changes in how medications are used.  Instead, they are used to inform further studies with more rigorous methodologies.

32.    As Delgado and Davenport have acknowledged, the 2018 Report has serious design flaws that undermine classifying it even as a "case series," further underscoring that the report is not credible scientific evidence to support a conclusion that APR is either safe or effective as a treatment for the continuation of a pregnancy after administration of mifepristone.  These design flaws include, but are not limited to, the following:

a.    The 2018 Report did not report outcomes on all participants. This is a key failing.  The Report purported to observe "754 patients," but only included 547 patients in the analysis.  The Report explains that three groups were excluded:  (1) those who had taken misoprostol prior to taking progesterone or who had taken mifepristone more than 72 hours prior to initiating progesterone; (2) those with whom Delgado lost contact; and (3) those who ultimately chose to complete the medication abortion or opt for surgical abortion.  The Report did not observe or study the outcomes of these excluded groups (i.e. 207 patients).  That constitutes nearly *a third* of the total pregnant people observed.

b.    The Report used flawed data.  To show that APR was effective, the Report needed to show a more successful embryo survival rate with the use of progesterone than without the use of progesterone.  But, the Report used flawed data that made the rate of embryo survival without progesterone look artificially low, which in turn made the embryo survival rate with progesterone look misleadingly high.

_____

[12] (Opeyemi Daramola & John Rhee, *Rating Evidence in Medical Literature* (Jan. 2011) AMA J. Ethics, https://journalofethics.ama-assn.org/article/rating-evidence-medical-literature/2011-01.)

9

c.    The Report says nothing about whether APR had negative health effects on the pregnant person. Nothing in the Report suggests that Delgado tracked patients to see if they had such adverse effects. Without that tracking, the Report says nothing about—and therefore cannot be used to tout—the safety of the APR "protocol."

d.    The Report has misleading results. The Report differentiated the APR "success rates" based on the dosage of progesterone and how the drug was administered. The "success rates" range from an overall rate of 48% to 68% for oral progesterone to 64% for progesterone injections.[13] None of those rates account for different gestational ages of the pregnancies (i.e., pregnancy length determined by the number of weeks following the pregnant person's last menstrual period).[14] Mifepristone becomes less effective the longer an individual is pregnant, meaning that for further-along pregnancies, progesterone may not have made a difference to the embryo surviving. In short, it is misleading to lump into one "success rate" pregnancies that were at different stages.

33.    Due to its flaws and weaknesses, the 2018 Report does not establish causation between the APR protocol and the continuation of pregnancies for the women tracked in the Report. In other words, the study does not show whether their pregnancies were just as likely to have continued without the APR protocol as with it.

34.    In addition, Delgado and Davenport appear not to have timely secured the necessary institutional oversight to conduct their research on human subjects. Delgado and Davenport appear to have obtained institutional review board ("IRB") approval only *after* they

[13] The 68% statistic is from the highest dosage of oral progesterone, which only 31 individuals received out of the total 119 who received oral progesterone. The 64% statistic is from progesterone injections and was calculated by combining all individuals who received intramuscular injections into one category, regardless of the dosage received.

[14] The 2018 Report did track embryo survival rates by gestational age, but it did not factor gestational age into the survival rates attributed to each method of administering progesterone.

10

conducted their research, meaning there was no institutional oversight during the course of their experiment.[15]  Such oversight is important to secure *before* beginning medical experiments on human subjects because an IRB helps ensure ethical treatment of and reduction of risks to those human subjects.[16]

35.     The 2018 Report failed to adequately disclose Delgado's potential conflicts of interest.  The sources of the data in the 2018 Report were patient contacts to Delgado's Abortion Pill Reversal Network hotline and live chat, but the 2018 Report does not disclose that fact.  Instead, it states only that "[s]ubjects called an informational hotline linked to an informational website and staffed by nurses and a physician assistant," with no disclosure of Delgado's connection.[17]

36.     Delgado and Davenport knew about the flaws and weaknesses in the 2018 Report.  Even after Davenport and Delgado had collected the data from incoming calls to Delgado's hotline, Davenport acknowledged that a rat study provided stronger evidence than the hotline data.  That Davenport made this assessment after completing the data collection demonstrates that even the Report's authors understood that their data was not sufficient to make the claims in the Report.

37.     As a reflection of these flaws, three journals—the Annals of Emergency Medicine, the Journal of the American Board of Family Medicine, and the Annals of Pharmacotherapy—rejected the 2018 Report for publication.  The medical journal that ultimately published the 2018 Report—Issues in Law & Medicine—is a publication sponsored by two anti-abortion organizations and, as Delgado has admitted, is "not particularly well-known in the medical field."

---

[15] (Daniel Grossman & Kari White, *Abortion "Reversal" — Legislating without Evidence* (Oct. 18, 2018) 379 N. Eng. J. Med. 1491-93.)

[16] (See Off. for Human Res. Protections, U.S. Dept. of Health & Human Servs. (June 28, 2021) Human Research Protection Training, Lesson 3: What Are IRBs?, https://www.hhs.gov/ohrp/education-and-outreach/online-education/human-research-protection-training/lesson-3-what-are-irbs/index.html#:~:text=Membership%20%3E%20Quiz%20Questions-,Purpose%20of%20IRBs,and%20adequately%20protect%20research%20participants.)

[17] (George Delgado et al., *A case series detailing the successful reversal of the effects of mifepristone using progesterone* (2018) 33 Issues L. Med. 21-31.)

(*Planned Parenthood of Tenn. & N. Mississ. v. Slatery* (M.D. Tenn. 2021) 523 F.Supp.3d 985, 994.)

38.     Despite these acknowledged flaws and its failure to establish causation between the APR protocol and pregnancy continuation, the 2018 Report is the seminal "study" cited in support of the safety and efficacy of APR by Defendants HBI and RealOptions.

39.     Given its substantial deficiencies, the 2018 Report cannot be considered a study by any stretch.  It is certainly not a rigorous scientific study of the effectiveness and safety of APR. As described more fully below, the only rigorous study on APR suggested potentially significant health risks arising from stopping a medication abortion after taking mifepristone, an essential step in the APR "protocol."

### III.   SAFETY CONCERNS, CONTRARY EVIDENCE, AND CRITICISMS OF ABORTION PILL REVERSAL PROTOCOL

40.     Further underscoring the lack of credibility of Delgado and Davenport's 2012 Case Series and 2018 Report are multiple articles using rigorous scientific methodology, which call into question the conclusions that the 2012 Case Series and 2018 Report reached about the safety and effectiveness of APR.

41.     For example, a 2015 systematic literature review ("2015 Literature Review") published in *Contraception*, a peer-reviewed medical journal, found that there was a lack of evidence that pregnancy continuation after administration of mifepristone was more likely after treatment with progesterone as compared with expectant management (i.e., not administering misoprostol and monitoring the pregnancy).  The 2015 Literature Review further found that in published studies the percentage of pregnancies that continued after only mifepristone administration (but no progesterone) ranged from 8-46%.[18]  This review, authored by experts in obstetrics, gynecology, and public health at the University of California, San Francisco, University of Alabama at Birmingham, University of Michigan, Johns Hopkins, Stanford University, and the University of North Carolina, concluded that "[i]n the rare case that a woman

_____

[18] (Daniel Grossman et al., *Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review* (2015) 92 Contraception 206-11.)

changes her mind after starting medical abortion, evidence is insufficient to determine whether treatment with progesterone after mifepristone results in a higher proportion of continuing pregnancies compared to expectant treatment [i.e., waiting for spontaneous miscarriage]."

42.     The 2015 Literature Review also included analysis of the 2012 Case Series, finding that the 2012 Case Series "was of poor quality and lacked clear information on patient selection."[19]

43.     A 2018 article published in the New England Journal of Medicine analyzed the 2018 Report in detail in the context of commenting on state laws requiring physicians to discuss APR with patients.  That article described APR as an "unmonitored research experiment" and observed:  "It is difficult to compare the results from [the 2018 Report] with data on mifepristone alone for several reasons," including the exclusions of patients by some of the providers because the embryo had died following the pregnant patient taking mifepristone and exclusions of patients who were lost to follow up before 20 weeks, both of which "probably exaggerated the treatment's reported success."[20]

44.     A 2019 comment published in *Contraception*, a peer-reviewed medical journal, by Dr. Mitchell Creinin, identified numerous flaws in the 2018 Report:  "lack of control groups, no confirmation of mifepristone ingestion, failure to establish viability prior to progesterone treatment, and providing experimental treatment without patient consent or institutional review board oversight."[21]

45.     In light of the lack of credible evidence on its safety and effectiveness, medical associations have highlighted concerns about APR:

---

[19] (*Ibid*.)

[20] (Daniel Grossman & Kari White, *Abortion "Reversal" — Legislating without Evidence* (Oct. 18, 2018) 379 N. Eng. J. Med. 1491-93.)

[21] (Mitchell D. Creinin & Melissa J. Chen, *Mifepristone antagonization requires real studies to evaluate safety and efficacy* (Nov. 14, 2019) 100 Contraception 427-29, https://www.contraceptionjournal.org/article/S0010-7824(19)30450-0/fulltext.)

a.  The American College of Obstetricians and Gynecologists ("ACOG") stated:  "Claims regarding abortion 'reversal' treatment are not based on science and do not meet clinical standards. The American College of Obstetricians and Gynecologists (ACOG) ranks its recommendations on the strength of the evidence, and does not support prescribing progesterone to stop a medical abortion."[22]

b.  In a challenge to North Dakota's law requiring physicians to tell patients that medication abortion may be "reversible," the American Medical Association ("AMA") stated that "[t]he Compelled Reversal Mandate forces physicians to tell their patients that medication abortions may be reversible, a claim wholly unsupported by the best, most reliable scientific evidence, contravening their ethical and legal obligations as medical providers."[23]

c.  The Society of Obstetricians and Gynaecologists of Canada has stated that it "does not support prescribing progesterone to stop a medical abortion" and that "[t]he claims regarding so-called abortion 'reversal' treatments are not based on scientific evidence."[24]

d.  The Royal College of Obstetricians and Gynaecologists, the Faculty of Sexual and Reproductive Healthcare, the Royal College of Midwives, and the British Society of Abortion Care Providers have stated that "[t]here are **no reputable national or international clinical guidelines that**

---

[22] (ACOG, Facts are Important: Medication Abortion "Reversal" Is Not Supported by Science, https://www.acog.org/advocacy/facts-are-important/medication-abortion-reversal-is-not-supported-by-science [as of Jan. 31, 2022, 2:29 PM].)

[23] (*Am. Med. Ass'n v. Stenehjem* (June 25, 2019, No. 1:19-cv-125) [412 F. Supp. 3d 1134] [complaint at 2], https://www.ama-assn.org/system/files/2019-06/ND-mife-reversal-complaint.pdf.)

[24] (Soc. Obstetricians and Gynaecologists of Canada, SOGC Statement on Abortion Medication "Reversal" (Mar. 19, 2021), https://sogc.org/en/content/featured-news/SOGC_Statement_on_Abortion_Medication_Reversal.aspx.)

**recommend the use of progesterone to reverse the effect of**

**mifepristone**, and no evidence that it increases the likelihood of continuing

pregnancy, compared to expectant management alone."[25]

46.    The first (and only) randomized clinical study to attempt to test the safety and

efficacy of APR was initiated at the University of California, Davis in 2019 but had to be halted

due to serious "safety concerns" after 3 of the 12 enrolled study participants "experienced severe

bleeding, requiring ambulance transport to an emergency department."[26]  Because the study was

cut short, the researchers were unable to "quantify the full extent of the hemorrhage risk."[27]  The

lead researcher, however, has cautioned that "[w]omen who use mifepristone for a medical

abortion should be advised that not following up with misoprostol could result in severe

hemorrhage, even with progesterone treatment."[28]

47.    In addition to the medical community's criticisms, three federal district courts,

having evaluated expert evidence from APR proponents and critics, have found that the 2018

Report does not establish causation between the APR protocol and pregnancy continuation.  (*See*

*All-Options, Inc. v. Atty. Gen. of Ind.* (D. Ind. 2021) 546 F.Supp.3d 754, 766; *Planned*

*Parenthood of Tenn. & N. Mississ.*, 523 F.Supp.3d at 1003-04; *Am. Med. Ass'n v. Stenehjem*

(D.N.D. 2019) 412 F.Supp.3d 1134, 1150.)

---

[25] (Royal College of Obstetricians & Gynaecologists, et al., Joint Statement on "Abortion Reversal" (July 7, 2022), https://www.rcog.org.uk/media/nbahkgvo/rcog-fsrh-abortion-reversal-position-statement.pdf.)

[26] (UC Davis Health, Can the abortion pill be reversed? A novel search for answers (Dec. 4, 2019), https://providervideos.ucdavis.edu/news/can-the-abortion-pill-be-reversed-a-novel-search-for-answers; see also Jessica Washington, *Study of "Abortion Reversal" Pill Halted Because It's Too Dangerous*, Mother Jones (Dec. 6, 2019), https://www.motherjones.com/politics/2019/12/study-of-abortion-reversal-pill-halted-because-its-too-dangerous/; Kayla Epstein, *Some lawmakers push 'abortion reversal' treatments. A study shows how dangerous they are*, Wash. Post (Dec. 24, 2019), https://www.washingtonpost.com/health/2019/12/24/some-lawmakers-push-abortion-reversal-treatments-new-study-shows-how-dangerous-they-are/.)

[27] (UC Davis Health, Can the abortion pill be reversed? A novel search for answers (Dec. 4, 2019), https://providervideos.ucdavis.edu/news/can-the-abortion-pill-be-reversed-a-novel-search-for-answers.)

[28] (*Ibid.*)

48.    The 2012 Case Series' and 2018 Report's failure to establish the efficacy of APR is even more problematic in light of the potential—albeit small—risks from the administration of supplemental progesterone.  As an expert in *American Medical Association v. Stenehjem* explained, supplemental progesterone is associated with maternal depression, cholestatic jaundice, and hypertension.  That expert also noted that certain studies have raised concerns (though not conclusively) about possible associations between certain progesterone preparations and second trimester miscarriages and stillbirths.  With no credible evidence showing that APR is effective, the treatment essentially exposes pregnant individuals to the risks of supplemental progesterone without any benefits.

**IV.    HBI's MISLEADING REPRESENTATIONS**

49.    In April 2018, HBI acquired Delgado's Abortion Pill Reversal Network, including the www.abortionpillreversal.com website and the APR hotline.  Since then, HBI has operated both as part of its Abortion Pill Rescue Network ("APRN").  Delgado currently is a member of HBI's medical advisory team.

50.    HBI continues to operate the website and the hotline and to advertise and promote APR, despite long having knowledge of the unreliable scientific evidence supporting Delgado's "protocol."  In its April 2018 press release announcing its acquisition of the Abortion Pill Reversal Network, HBI acknowledged the existence of (and voiced its opposition to) criticisms of APR as being unproven and not backed by credible science.  And, in August 2019, HBI intervened in a federal lawsuit challenging a law mandating that abortion providers make disclosures about APR, where it received notice of the September 2019 preliminary injunction order outlining the flaws in the 2018 Report.

51.    HBI also has knowledge of the more recent studies and statements about the unreliability and potential risks of stopping a medication abortion halfway, an essential step in APR.  In September 2021, HBI issued a press release about a Center for Countering Digital Hate report that included excerpts from the American College of Obstetricians and Gynecologist's statement about APR; information about the 2018 New England Journal of Medicine article criticizing the 2018 Report; and information about the 2019 U.C. Davis study that was halted.

1   Also, in September 2021, APRN's medical director, Brent Boles, posted an entry on the HBI

2   website about Google's restrictions of advertisements about APR because the claims were

3   "unreliable."  In short, for years now, HBI has been fully aware of APR's lack of credible

4   scientific support as well as its risks.

5        **A.**     **Website Representations**

6        52.     In addition to www.abortionpillreversal.com ("APR Website"), HBI also operates

7   the website www.heartbeatinternational.org/our-work/apr ("HBI Webpage").  On both websites,

8   HBI uses misleading statements as it seeks to persuade pregnant people who have started the

9   medication abortion process to undergo APR.

10        *Abortionpillreversal.com*

11        53.     The purpose of the APR Website is to advertise APR to pregnant people, stating:

12   "Have you taken the first dose of the abortion pill?  Do you regret your decision and wish you

13   could reverse the effects of the abortion pill?  ***We're here for you!***"  (emphasis in original).  HBI

14   encourages potential patients to call its hotline and/or message through its live chat and explains

15   that its hotline and live chat will connect potential patients with medical professionals who will

16   "guide [the patient] towards reversing the effects of the abortion pill."

17        54.     Throughout its website, HBI misleadingly uses the terms "reverse" and "reversal."

18   The use of these terms is false and misleading because there is no credible scientific evidence

19   showing that APR "reverses" medication abortions.  The terms are also false and misleading

20   because "reverse" and "reversal" do not accurately convey even the theory underlying APR.

21        55.     Amidst its advertisements and attempts to persuade potential patients to undergo

22   APR, HBI makes additional misleading statements.  For example, on multiple pages, HBI states

23   that APR is an "effective process" because "APR has been shown to increase the chances of

24   allowing the pregnancy to continue."  HBI touts on multiple webpages that "initial studies have

25   shown" that the success rate for APR is 64-68%.  In its drop-down Frequently Asked Questions

26   page ("FAQs"), HBI also touts that "initial studies have found that the birth defect rate in babies

27   born after the APR is less or equal to the rate in the general population."

28

Complaint for Permanent Injunction, Civil Penalties, Abatement, and Other Equitable Relief

56.    These statements are misleading because, as described above, there is no credible support for them.

57.    HBI also misleadingly presents information about the risks from APR.  HBI does not provide an FAQ about the possible side effects from APR, such as the risk of severe bleeding. Instead, HBI provides a response to a question about the "possible side effects of progesterone" and lists only mild effects, such as "sleepiness, lack of energy, lightheadedness, dizziness, gastrointestinal discomfort and headaches."  The only location where HBI provides any warning about the potential risks of severe bleeding from stopping a medication abortion halfway—an essential step in APR—is in response to two FAQs about "cramping and spotting."

58.    This information is presented misleadingly because it does not adequately warn individuals of the risks from APR.

59.    As detailed above, HBI has known or should have known that these statements and presentation of information were misleading.

60.    HBI further advertises that potential patients should contact the hotline or live chat even if more than 72 hours have passed since they took mifepristone, stating "We are here to help.  It may not be too late."  This statement is likely to create the impression among potential patients that APR is effective and safe beyond the 72-hour window.

61.    This statement is misleading because there is no evidence to support it.  To the extent HBI relies on the 2012 Case Series and the 2018 Report, those publications looked only at the use of progesterone within a 72-hour window following administration of mifepristone, specifically excluding pregnant individuals who had taken progesterone more than 72 hours after taking mifepristone.

*Heartbeatinternational.org/our-work/apr*

62.    HBI also advertises APR on the Abortion Pill Rescue Network page on HBI's www.heartbeatinternational.org website ("HBI Webpage").  HBI encourages viewers to call its hotline and visit www.abortionpillreversal.com to obtain more information about APR.  HBI further touts "women can reach out to the Abortion Pill Rescue Network and be connected with a local medical provider who starts" APR.

18

63.     Throughout its website, HBI misleadingly uses the terms "reverse" and "reversal." The use of these terms is false and misleading because there is no credible scientific evidence showing that APR "reverses" medication abortions.  The terms are also false and misleading because "reverse" and "reversal" do not accurately convey even the theory underlying APR.

64.     HBI includes additional misleading statements within these advertisements.  For example, similar to its misleading statements on its APR Website, HBI touts that a "2018 peer-reviewed study showed positive results" and then repeats the 64-68% success rate statistic and that there was "no increase in birth defects."  HBI also claims that the referenced study showed "lower preterm delivery rate than the general population."

65.     Once again, HBI's statements are misleading because there is no evidence to support them.

66.     As detailed above, HBI has known or should have known that there was no credible support for its statements and that the statements were therefore misleading.

67.     HBI makes an additional misrepresentation that "thousands of lives have been saved" through the use of APR.  This statement is based primarily on two numbers.  First, HBI includes the number of pregnant people who undertook APR and that HBI can confirm remained pregnant at 13 weeks.  For those individuals that started APR but HBI cannot confirm remained pregnant at 13 weeks, HBI multiplies the number of those individuals by a 64% success rate, which it obtained from the 2018 Report, and which, as detailed above, is not a reliable statistic.[29] In other words, HBI's statement is speculation, not evidence.  As a result, HBI's statements are misleading.

**B.     Hotline and Live Chat**

68.     HBI has a "policies and procedures manual" that it provides to volunteers and employees that staff its APR hotline and live chat, through which HBI also advertises APR.  The manual includes outlines of information that hotline staff must provide to people who have called,

---

[29] The 64% statistic is unreliable for the additional fact that it relies on providers using oral or intramuscular administration of progesterone.  Many providers appear to use vaginal administration, which even the 2018 Report shows has a lower chance of a pregnancy continuing.

1    such as explanations of APR and potential side effects, information about misoprostol, the risk of

2    birth defects, and APR success rates.

3         69.    In this manual, HBI instructs APR hotline staff to make several misleading

4    statements when talking with hotline callers.  For example, HBI instructs hotline staff to use the

5    term "reverse" or "reversal" to describe APR.  HBI further instructs hotline staff to state that

6    "[i]nitial studies have shown that APR may have a 64-68% success rate."  HBI also instructs

7    hotline staff to state that "APR has been shown to increase the chances of allowing the pregnancy

8    to continue."  HBI further instructs hotline staff to state that "[i]nitial studies have found that the

9    birth defect rate in babies born after the APR is less than or equal to the rate in the general

10   population."  As explained above, however, there is no credible support for any of these

11   statements, and as a result, these statements are misleading.

12        70.    HBI also instructs its hotline staff to recommend APR for callers who have already

13   taken both mifepristone and misoprostol or who have taken methotrexate.  HBI includes this

14   instruction even though no study has even considered the use of APR for pregnant individuals

15   who had already taken misoprostol or methotrexate.  As a result, these statements advertising the

16   use of APR for pregnant people who have taken methotrexate or misoprostol are misleading.

17        **C.    Training Kits**

18        71.    HBI sells to its affiliates an "APR Healthcare Professional Kit" that will allow

19   those affiliates to advertise and administer APR.  The kit consists of an overview of the APR

20   procedure; the progesterone protocols used in APR; frequently asked questions and answers about

21   APR for healthcare professionals and patients; and form templates, including consent forms and

22   outcome report forms.  HBI includes several misleading representations within this kit that it

23   encourages its affiliates to use in their advertisements about and administration of APR.

24             *Protocols*

25        72.    HBI provides a "protocol" to attempt reversing a methotrexate medication

26   abortion.  In that "protocol," HBI represents that "for women who have taken methotrexate,

27   prescribed progesterone may also be beneficial to support the pregnancy even though it is not an

28   antidote to methotrexate."  HBI includes this statement and encourages its affiliates to advertise

20

and administer APR in these circumstances even though no evidence supports the use of APR for pregnant individuals who have taken methotrexate.  HBI includes this protocol even as it acknowledges that the APR "is designed to serve women who have taken mifepristone (Mifeprex)," which shows that HBI knows that APR was not developed for pregnant people who have taken methotrexate.

73.    HBI also provides a "protocol" to attempt reversing a medication abortion after a pregnant person has taken both mifepristone and misoprostol.  In that protocol, HBI states that "progesterone may be beneficial to support the pregnancy even though it is not an antidote to misoprostol."  HBI includes this statement and encourages its affiliates to advertise and administer APR in these circumstances even though no evidence supports the use of APR for pregnant individuals who have taken misoprostol.  HBI includes this protocol even as it acknowledges that APR "is designed to serve women who have taken mifepristone (Mifeprex)," which shows that HBI knows that APR was not contemplated for pregnant people who have taken misoprostol.

### *Patient FAQs*

74.    In the kit, HBI also provides "APR Patient FAQs," with answers from Delgado, which are nearly identical to the "Reversal FAQs" appearing on HBI's website.  Like the "Reversal FAQs" on HBI's website, the "APR Patient FAQs" include several misleading statements.

75.    Similar to the APR Webpage, the APR Patient FAQs use the term "reverse" and "reversal" to describe APR.  The APR Patient FAQs also state that "[i]nitial studies of APR have shown that APR has a 64-68% success rate" and that "APR has been shown to increase the chances of allowing the pregnancy to continue."  The APR Patient FAQs also represent that "[i]nitial studies have found that the birth defect rate in babies born after the APR is less than or equal to the rate in the general population."  As explained above, these statements are misleading because there is no credible evidence to support them.

76.    Like the APR Website, the APR Patient FAQs state in response to the question "[i]s it too late to reverse the abortion pill," that "[t]here have been many successful reversals

when treatment was started within 72 hours of taking the first abortion pill. **Even if 72 hours have passed, it may not be too late."** (emphasis added). This statement implies that APR is effective and safe after a 72-hour window following mifepristone administration. This statement is misleading because no evidence supports the use of APR for pregnant individuals after 72 hours have passed.

77. Like the APR Website, the APR Patient FAQs misleadingly present the risks associated with APR. These FAQs do not provide an FAQ about the side effects of APR, instead only providing the potential (minor) side effects from progesterone. The FAQs misleadingly present the risk of severe bleeding only under a question about cramping and spotting.

### *"Informed" Consent Templates*

78. As part of its training kit, HBI provides template forms for use in securing consent from patients. HBI also provides consent forms based on these templates to pregnant individuals who contact HBI and decide to pursue APR. These consent forms include several misleading statements.

79. For example, the "Consent for Patients who took Mifepristone Only" form uses the misleading terms "reverse" and "reversal" and includes the misleading statements that "[i]nitial studies have found that the birth defect rate in babies born after the APR is less than or equal to the rate in the general population"; that "[i]nitial studies of APR have shown that APR has a 64-68% success rate"; and that "APR has been shown to increase the chances of allowing the pregnancy to continue." These statements are misleading because there is no credible evidence supporting any of these statements.

80. The "Consent for Patients who took both Mifepristone and Misoprostol" form uses the misleading terms "reverse" and "reversal" and includes the misleading statement that "**for women who have taken the first and second drugs of the medical abortion regimen, mifepristone on day one and misoprostol (Cytotec) 12-48 hours later, progesterone may be beneficial to support the pregnancy even though it is not an antidote to misoprostol.**" (emphasis in original). These statements are misleading because no evidence supports the use of APR for pregnant individuals who have already taken misoprostol.

81.     The "Consent for Patients who took Methotrexate" form uses the misleading terms "reverse" and "reversal" and includes the misleading statement that "**for women who have taken methotrexate, prescribing progesterone may also be beneficial to support the pregnancy even though it is not an antidote to methotrexate.**" (emphasis in original).  These statements are misleading because no evidence supports the use of APR for pregnant individuals who have taken methotrexate.

**D.     Media Appearances**

82.     HBI executives have made multiple media appearances within the course of their employment in which the executives advertised and made misleading statements about APR.

83.     For example, on or around May 28, 2020, during the course of their employment, HBI's Director of Medical Impact, Christa Brown, and HBI's Director of Communications and Marketing, Andrea Trudee, appeared on an episode of the Ohio Right to Life: The Push for the Abortion Pill.  During their appearance, Brown and Trudee regularly used the terms "reverse" and "reversal" and touted APR and encouraged pregnant people to visit the APR Website to "connect" them to providers.  Brown stated that APR is a "cutting edge application of a time-tested FDA-approved treatment that's been used for decades to help women who are at risk for preterm delivery or miscarriage."  HBI's statement—made through Brown in the course of her employment—misleadingly implies that APR is an FDA-approved treatment, which it is not, and which Brown knew it was not.

84.     For her part, Truddee stated that APR has resulted in over 1,000 lives "saved."  As explained above, however, representations about the number of lives "saved" are inherently misleading given the method HBI uses to reach that number.  In short, HBI's statements are based on speculation, not evidence.  As a result, HBI's statements—made through Trudee in the course of her employment—are misleading.

85.     In another example, on or around September 21, 2021, during the course of his employment, HBI President Jor-El Godsey appeared on an episode of the Help Her Be Brave podcast.  Multiple times during his appearance, Godsey advertised APR by encouraging listeners to visit the APR Website and to call HBI's hotline to speak with "a number of nurses" and

"hopefully connect [the pregnant person] to a local pregnancy center." As he was advertising APR, Godsey repeatedly used the terms "reverse" and "reversal," and cited the 2018 Report and repeated the claim that APR has a 64-68% success rate, going so far as to say "so almost 70, 7 out of 10 women that seek [APR] and get that progesterone in a timely fashion are able to reverse the effects of the abortion pill." As explained above, however, these statements are misleading because there is no credible evidence to support these statements.

86.    Godsey also made the misleading statement that "over 2,000 babies [] have been saved" via APR. As explained above, however, representations about the number of lives "saved" are based on speculation, not evidence. As a result, HBI's statements—made through Godsey in the course of his employment—are misleading.

## V.    REALOPTIONS' MISLEADING REPRESENTATIONS

87.    RealOptions advertises and administers APR. RealOptions uses HBI-created materials for its APR advertisements.

88.    Whereas HBI engages in widespread promotion of APR and equips its affiliates and providers with training and materials to administer it, RealOptions is an on-the-ground provider. Through its five clinics, RealOptions is advertising that it will provide APR to pregnant people.

89.    In the course of those advertisements and during its administration of APR, RealOptions has made and continues to make misleading statements.

### A.    Website Representations

90.    RealOptions operates the website www.realoptions.net, on which it advertises APR. Through its website, RealOptions seeks to persuade pregnant people who have started the medication abortion process to undergo APR, and in so doing, it makes multiple misleading statements.

91.    Like HBI does on its websites, RealOptions advertises on its website that APR can "reverse" a medication abortion, that "[i]nitial studies of APR have shown it has a 64-68% success rate," and that "APR has been shown to increase the chances of allowing the pregnancy to

continue." As explained above, however, these statements are misleading because no credible evidence supports these statements.

92.     RealOptions similarly implies that APR is effective for continuing a pregnancy after a 72-hour window following mifepristone administration. In response to two different FAQs about timing for APR, RealOptions states that potential patients should nevertheless call because "[i]t may not be too late," misleadingly implying that APR is effective past the 72-hour period. This statement is misleading because there is no evidence supporting this statement.

93.     RealOptions licenses all five of its clinics with the California Department of Health. Dr. Mary Davenport, who is the medical director for two of RealOptions' clinics, was Delgado's co-author for both the 2012 Case Series and the 2018 Report. Davenport acknowledged that the data collected for the 2018 Report was insufficient for its ultimate conclusions.

## B.    Consent Forms

94.     In its form to obtain consent for what it calls "pregnancy sustaining progesterone therapy," RealOptions misleadingly omits that APR patients may experience severe bleeding as a result of undergoing the process, even though the 2019 U.C. Davis study found that there was a risk of that outcome. RealOptions instead states that patients may experience "side effects such as pain or swelling at the injection site, an increase in pregnancy/hormone symptoms (breast tenderness, nausea, and/or increased body or facial hair), weight loss, weight gain, acne, loss of scalp hair, drowsiness and/or dizziness." The failure to include the possibility of severe bleeding makes this statement materially misleading, in that patients are likely to believe that the side effects from APR are minor, when in fact they could be life threatening.

95.     In a June 2020 podcast, Davenport and Delgado spoke about APR, including discussing the 2019 U.C. Davis study, thereby demonstrating Davenport's knowledge of that study and the potentially life-threatening severe bleeding that resulted.[30] Given her role as a RealOptions' medical director, it is appropriate to impute her knowledge to RealOptions.

---

[30] (Mises Inst., *Mary Davenport and George Delgado on Reversing Medical Abortion* (June 18, 2020), https://mises.org/library/mary-davenport-and-george-delgado-reversing-medical-abortion.)

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (False or Misleading Statements)

### (Bus. & Prof. Code, § 17500 et seq.)

96.     The People reallege all paragraphs set forth above and incorporate them by reference as though they were fully set forth in this cause of action.

97.     From a date unknown to the People and continuing to the present, Defendants have engaged in and continue to engage in, aided and abetted and continue to aid and abet, and conspired to and continue to conspire to engage in acts or practices that constitute violations of Business and Professions Code section 17500 et seq., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to undergo APR. Defendants' untrue and misleading representations include, but are not limited to, the following:

        a.    that APR can "reverse" a medication abortion, as well as an "effective" process that "has been shown to increase the chances of allowing the pregnancy to continue," and that APR has a 64-68% success rate, even though no credible scientific evidence supports these claims;

        b.    that APR may be effective after a 72-hour window following administration of mifepristone by encouraging pregnant people to contact them "even if more than 72 hours have passed," even though no credible scientific evidence supports this claim;

        c.    that the rate of birth defects following APR "is less or equal to the rate in the general population," even though no credible scientific evidence supports these claims;

        d.    that "thousands of lives" have been saved via APR, even though no credible evidence supports this claim;

        e.    that APR may be effective following administration of misoprostol and methotrexate, even though no credible scientific evidence supports this claim; and

1            f.        that APR can cause only non-life-threatening side effects, when in fact

2                 APR can cause severe, life-threatening bleeding.

3       98.    Defendants knew or should have known that these statements were misleading.

4                               **SECOND CAUSE OF ACTION**

5              **(Unlawful, Unfair, and Fraudulent Business Practices)**

6                    **(Bus. & Prof. Code, § 17200 et seq.)**

7       99.    The People reallege all paragraphs set forth above and incorporate them by

8  reference as though they were fully set forth in this cause of action.

9       100.    From a date unknown to the People and continuing to the present, Defendants have

10  engaged in and continue to engage in, aided and abetted and continue to aid and abet, and

11  conspired to and continue to conspire to engage in unlawful, unfair, and/or fraudulent acts or

12  practices, which constitute unfair competition within the meaning of section 17200 of the

13  Business and Professions Code.  Defendants' acts or practices include, but are not limited to, the

14  following:

15            a.        Violating Business and Professions Code section 17500 et seq., as alleged

16                 in the First Cause of Action;

17            b.        Fraudulently representing the following:

18                i.        Via HBI and RealOptions, that APR can "reverse" medication

19                     abortions, is an "effective" process that "has been shown to increase

20                     the chances of allowing the pregnancy to continue," and that APR

21                     has a 64-68% success rate, even though no credible scientific

22                     evidence supports these claims;

23                ii.      Via HBI and RealOptions, that APR may be effective after a 72-

24                     hour window following administration of mifepristone by

25                     encouraging pregnant people to contact them "even if more than 72

26                     hours have passed," even though no credible scientific evidence

27                     supports this claim;

28               iii.     Via HBI, that the rate of birth defects following APR "is less or

27

1    equal to the rate in the general population," even though no credible

2    scientific evidence supports this claim;

3    iv.    Via HBI, that "thousands of lives" have been saved via APR, even

4    though no credible evidence supports that statement;

5    v.    Via HBI, that APR may be effective following administration of

6    misoprostol or methotrexate, even though no evidence supports this

7    claim; and

8    vi.    Via RealOptions, that APR can cause only non-life-threatening side

9    effects and omitting that APR can cause severe, life-threatening

10    bleeding.

11    101.    Each and every separate act, including, but not limited to:  each call to the APR

12    hotline and each chat initiated on the live chat, each training kit sold to affiliates, and each

13    consent form provided to pregnant individuals, constitutes an unlawful, unfair, and/or fraudulent

14    business practice.  Each time that the Defendants engaged in each separate unlawful, unfair,

15    and/or fraudulent act, omission, or practice is a separate and distinct violation of Business and

16    Professions Code section 17200.

17                                **PRAYER FOR RELIEF**

18    WHEREFORE, the People respectfully request that the Court enter judgment in favor of the

19    People and against Defendants, jointly and severally, as follows:

20    1.    That Defendants, their successors, agents, representatives, employees, assigns, and

21    all persons who act in concert with Defendants be permanently or preliminarily enjoined from

22    making any untrue or misleading statements in violation of Business and Professions Code

23    section 17500, including, but not limited to, the untrue or misleading statements alleged in this

24    Complaint, under the authority of Business and Professions Code section 17535;

25    2.    That Defendants, their successors, agents, representatives, employees, assigns, and

26    all persons who act in concert with Defendants be permanently or preliminarily enjoined from

27    engaging in unfair competition as defined in Business and Professions Code section 17200,

28    including, but not limited to, the acts and practices alleged in this Complaint, under the authority

of Business and Professions Code section 17203;

3. That the Court make such orders or judgments as may be necessary, including preliminary injunctive and ancillary relief, to prevent the use or employment by any Defendant of any practice which violates Business and Professions Code section 17500, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any such practice, under the authority of Business and Professions Code section 17535;

4. That the Court make such orders or judgments as may be necessary, including preliminary injunctive and ancillary relief, to prevent the use or employment by any Defendant of any practice which constitutes unfair competition or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition, under the authority of Business and Professions Code section 17203;

5. That the Court assess a civil penalty of up to $2,500 against each Defendant for each violation of Business and Professions Code section 17500, in an amount according to proof, under the authority of Business and Professions Code section 17536;

6. That the Court assess a civil penalty of up to $2,500 against each Defendant for each violation of Business and Professions Code section 17200, in an amount according to proof, under the authority of Business and Professions Code section 17206;

7. That the People recover their costs of suit;

8. That the People receive all other relief to which they are legally entitled; and That the Court award such other relief that it deems just, proper, and equitable.

1    Dated:  September 21, 2023                              Respectfully submitted,

2                                                            ROB BONTA
                                                             Attorney General of California
3                                                            RENU GEORGE
                                                             Senior Assistant Attorney General
4                                                            KARLI EISENBERG
                                                             KATHLEEN BOERGERS
5                                                            Supervising Deputy Attorneys General

6

7

8                                                            ERICA CONNOLLY
                                                             HAYLEY PENAN
9                                                            Deputy Attorneys General
                                                             *Attorneys for Defendant Rob Bonta, in his*
10                                                           *official capacity as Attorney General of the*
                                                             *State of California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Permanent Injunction, Civil Penalties, Abatement, and Other Equitable Relief

**EXHIBIT 4**

11/8/23, 1:08 PM    Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Co…

Case 3:24-cv-01338-GPC-KSC   Document 19   Filed 11/15/24   PageID.1002   Page 93 of 117



Subscribe to Our Newsletter    [ Enter your ]    Subscribe



## ROB BONTA

### *Attorney General*

# Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care

Press Release    /  *Attorney General Bonta Issues Consumer Alert Warning Califor…*

Wednesday, June 1, 2022

Contact: (916) 210-6000, agpressoffice@doj.ca.gov

**SAN DIEGO** – In the face of unprecedented threats to reproductive freedom, California Attorney General Rob Bonta today issued a consumer alert warning Californians seeking reproductive health services about the limited and potentially misleading nature of the services provided by crisis pregnancy centers. Crisis pregnancy centers attempt to discourage people facing unintended pregnancies from accessing abortion care. While crisis pregnancy centers may advertise a full range of reproductive health services, they do not

provide abortion or abortion referrals, and usually do not provide birth control or other forms of contraceptives. In today's alert, Attorney General Bonta urges Californians to do their research before going to a pregnancy clinic, especially if they are seeking information about abortion care.

"Crisis pregnancy centers often work to attract pregnant Californians into their facilities through vague claims about the information and services they offer," **said Attorney General Bonta.** "While crisis pregnancy centers may claim to offer comprehensive reproductive healthcare services, their mission is to discourage people from accessing abortion care. As reproductive freedom nationwide comes under threat, my message to Californians is simple: Know your rights. Do your research. Connect with programs that will provide you with truthful information and timely reproductive healthcare. Because in California, your right to reproductive healthcare includes the right to safe and legal abortion."

There are more crisis pregnancy centers in California than abortion care clinics. At first glance, crisis pregnancy centers may look like an abortion care clinic or reproductive health clinic. Crisis pregnancy centers are often located near reproductive health clinics and advertise full reproductive health services. However, a recent study by The Alliance found that none of the 179 crisis pregnancy centers in California offer abortion care, and only one offers contraceptive care. The Alliance also found that most crisis pregnancy centers do not even offer pre-natal care or have a licensed physician on staff. Instead, crisis pregnancy centers in California have been reported to make misleading or unsubstantiated claims about abortions to persuade people to continue their pregnancy.

11/8/23, 1:36 AM    Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Co…

Case 3:24-cv-01338-GPC-KSC    Document 1-10    Filed 11/15/24    PageID.104    Page 95 of 117

California has strong laws in place protecting reproductive freedom, including the right to safe and legal abortion. In today's alert, Attorney General Bonta urges Californians seeking reproductive health services to do research before going to a clinic to learn about their abortion options. Importantly, Californians who are pregnant or believe they may be pregnant should know that:

- Crisis pregnancy centers do not provide abortion or abortion referral, and often times do not provide birth control or other forms of contraceptives;
- Crisis pregnancy centers may not be licensed medical clinics or be required to keep medical records private;
- Crisis pregnancy centers may attempt to delay appointments or provide misinformation about the legality or safety of abortions;
- Crisis pregnancy centers may provide inaccurate health information about a person's pregnancy and other aspects of reproductive healthcare; and
- Crisis pregnancy centers often look like and are located near reproductive healthcare facilities that provide abortion.

There are a number of programs that assist Californians in accessing abortion care, including:

- ACCESS Reproductive Justice, which connects people to free and low-cost programs that pay for reproductive healthcare for people living in, traveling to, or traveling from California to receive an out-of-state abortion.
- Women's Reproductive Rights Assistance Project, which provides direct and logistical support, transportation assistance, abortion appointment navigation, and other resources.

- The National Abortion Federation, which maintains a list of abortion
  providers.

Californians who believe they have been the victim or target of deceptive,
misleading, unfair, or unlawful conduct should immediately file a complaint
at oag.ca.gov/crisis-pregnancy-center-complaint.

# # #

Office of the Attorney General    Accessibility    Privacy Policy    Conditions of Use    Disclaimer

© 2023 DOJ

**EXHIBIT 5**

**Culture of Life Family Services, Inc. v. Bonta**
USDC Case No.: 24CV1338 GPC

### BONTA PRESS CONFERENCE JUNE 1, 2022

R. BONTA:      Well, good morning, everyone. Thank you for, uh, joining today. Rob Bonta, California Attorney General. And I'm honored to be joined here with two leaders for reproductive freedom in San Diego, San Diego County Supervisor Nora Vargas and Vernita Gutierrez, Planned Parenthood of the Pacific Southwest, Vice President of External Affairs. I'd also like to thank a few members of my incredible team, uh, who joined me today, Renuka George, Senior Assistant Attorney General; Karli Eisenberg, Supervising Deputy Attorney General; Darcie Tilly, Deputy Attorney General and James Toma, Special Assistant Attorney General. And before we get to this morning's announcement, I want you to briefly put yourselves in the shoes of a young woman for a moment. Let's call her Hannah. Hannah is 19. She just started college. She's working hard to get ahead for herself and her family. One day last February, Hannah found out she was pregnant. She immediately knew she wanted an abortion. She just started college and wasn't ready to be a mom, wasn't ready to start a family. Like many women, Hannah Googled abortion care services near me. She found a, quote, women's clinic, end quote, that seemed perfect. They could squeeze her in quickly. And, heck, their website said they wouldn't even charge for services. So Hannah drove an hour and hastily went to the facility. But, unfortunately, Hannah was deceived. Once inside, she realized she wasn't at an abortion clinic at all. She was at a so called crisis pregnancy center, a, quote, health center, end quote, that may advertise a full range of reproductive health

1  services but does not provide abortion care or abortion referrals.
2  Hannah's experience was real. It was detailed in recent coverage in
3  Miss Magazine in Massachusetts. But, unfortunately, similar
4  experiences are happening right here in California. In San Diego,
5  for example, when you search abortion clinic, a number of these
6  crisis pregnancy centers pop up right alongside real abortion
7  providers. In fact, there are more crisis pregnancy centers in
8  California than there are abortion care clinics. One recent study
9  found that none of the 179 crisis pregnancy centers in California
10  offer, actually offer abortion care, and only one of that 179 offers
11  contraceptive care. That is why, in the face of unprecedented
12  threats to reproductive freedom, I'm urging Californians to be on
13  the alert. Today, I'm issuing a consumer alert warning Californians
14  about the limited and potentially misleading services provided by
15  crisis pregnancy centers. In today's alert, my message to California
16  is simple: Know your rights, do your research, connect with
17  programs that will provide you with truthful information and timely
18  reproductive healthcare. Specifically, Californians who are
19  pregnant or believe they may be pregnant should know the
20  following: Crisis pregnancy centers do not, do not provide abortion
21  or abortion referral and, nearly across the board, do not provide
22  birth control or other forms of contraceptives. Crisis pregnancy
23  centers may not be licensed medical clinics or be required to keep
24  medical records private. Crisis pregnancy centers may attempt to
25  delay appointments or provide information, uh, mis-, excuse me,
26  provide misinformation about the legality or safety of abortions.
27  Crisis pregnancy centers may provide inaccurate health
28  information about a person's pregnancy and other aspects of

San Diego
Transcription

2.

reproductive healthcare. And crisis pregnancy centers often look like and are located near real reproductive healthcare facilities. It's important that Californians looking for a wide range of reproductive health services are aware of these clinics that may look like health clinics. To assist Californians, there are a number of programs that exist to help patients access abortion care including Access Reproductive Justice, which connects people to free and low cost programs; Women's Reproductive Rights Assistance Project, which provides direct and logistical support for abortion services and the National Abortion Federation, which maintains a list of real abortion providers. Avail yourself of these resources and trusted clinic networks like Planned Parenthood. California has strong laws in place protecting reproductive freedom. Your right to reproductive healthcare includes the right to safe and legal abortion. And don't let anyone tell you otherwise. If you believe you have been the victim or target of deceptive, misleading, unfair or unlawful conduct, immediately file a complaint with my office at oag.ca.gov/report. We want to know about your experience. If a law has been broken, we won't hesitate to hold fake clinics accountable. As your Attorney General, I'm going to continue to use the full force of the law and the full authority of my office to defend your rights. And I guarantee you that those who attempt to get in the way of this, those who attempt to illegally mislead or circumvent the law, they will face consequences. California is a proud reproductive freedom state and we are going to continue to defend that freedom including through today's action, helping Californians access the quality healthcare they are legally entitled to. Thank you. And with that, I'd like to

3.

| | | |
|---|---|---|
| 1 | | now introduce a local champion for reproductive justice, |
| 2 | | Supervisor Nora Vargas. |
| 3 | N. VARGAS: | Thank you. Good morning and thank you. Uh, I'm grateful to the |
| 4 | | Attorney General, uh, Rob Bonta for issuing this consumer ala-, |
| 5 | | alert and warning here in San Diego, to San Diego County |
| 6 | | residents. The County of San Diego, um, actually considers itself |
| 7 | | now a champion of reproductive freedom but it's not enough. And |
| 8 | | so we thank the Attorney General for issuing this alert for our |
| 9 | | communities because during this really important time, it is critical |
| 10 | | that our communities understand that it's not okay, it's not okay, |
| 11 | | uh, for our communities, uh, not to have the correct information. |
| 12 | | This alert warning for San Diego County residents about the |
| 13 | | limited and potential misleading nature of the services provided by |
| 14 | | c-, uh, crisis pregnancy centers is critical. As a healthcare advocate |
| 15 | | of reproductive justice, uh, advocate for nearly 30 years prior to |
| 16 | | becoming a supervisor, I have per-, personally seen the deception |
| 17 | | and harmful impact that crisis pregnancy centers have had on our |
| 18 | | communities, particularly our communities of color. These centers |
| 19 | | have a malicious agenda and are detrimental to the health of |
| 20 | | patients before they find much needed care that they are seeking. It |
| 21 | | is heartbreaking to me to see that people seeking reproductive |
| 22 | | healthcare and information during a time of need must deal with |
| 23 | | these kinds of centers that are being deceptive. At a time when |
| 24 | | reproductive rights of women are under attack, we must be vigilant |
| 25 | | and ensure that those seeking reproductive healthcare not only have |
| 26 | | access to it, but are not misled by unethical and dangerous crisis |
| 27 | | pregnancy centers. As a le-, as legislators and policymakers, we are |
| 28 | | responsible for removing barriers and we are also responsible for |

San Diego
Transcription

4.

1    ensuring that those providing those services are held accountable

2    to ensure the best interests of their patients. These centers are

3    clinics that look like real health centers but are ha-, harmful because

4    they have agendas to scare, scheme and pressure our communities

5    out of getting an abortion. They provide misleading information

6    about birth control, sexual health and abortion. They do not provide

7    abortions or even offer a full range of healthcare and they won't

8    give you honest facts about sexual healthcare or pregnancy. Their

9    sole goal is to s-, uh, mis-, send misinformation and propaganda

10   and are, uh, dangerous to the patients. Now more than ever, it is our

11   responsibility to stay vigilant and to not only protect the rights of

12   those seeking safe and legal abortion, but we must also fight

13   misinformation about reproductive healthcare and the healthcare of

14   abortion because that misinformation is creating a public healthcare

15   crisis. Thank you, uh, Attorney General Bonta, for your leadership.

16   I commend you for issuing this consumer alert b-, on behalf of all

17   residents in San Diego County. [Spanish not transcribed.] Again,

18   thank you again to, um, our Attorney General Rob Bonta for this

19   alert for our communities. It is extremely important during these

20   difficult times. Is now my pleasure to introduce someone that is a

21   great ally and advocate for reproductive rights and a good friend.

22   Uh, please welcome Vernita Gutierrez from Planned Parenthood,

23   the Pacific Southwest.

24   V. GUTIERREZ: Thank you, Supervisor Vargas. Good morning. I'm Vernita

25   Gutierrez, Vice President of External Affairs at Planned

26   Parenthood of the Pacific Southwest. I'm grateful to be here with

27   Attorney General Rob Bonta to shed some light on this issue and

28   how we can support people in getting access to the healthcare and

medically accurate information they need and deserve. Crisis pregnancy centers do not provide the medically accurate information that pregnant people deserve about all their options. Their goal is to steer people away from accessing abortion care through misinformation and in service of their own political agenda. Everyone should have access to the high quality healthcare and medically accurate information they need to make the best decisions for their health, their lives and their futures. Interfering with a person's decision about whether or when to start a family denies their right to self-determination, undervalues their moral agency and potentially endangers their physical and emotional wellbeing. We are grateful that Attorney General Bonta is issuing this alert, warning that crisis pregnancy centers do not offer comprehensive reproductive care and may mislead people who are in need of healthcare services. Honest, nonjudgmental communication and authentic and compassionate care needs to be at the heart of any medical interaction. And in the face of unprecedented threats to reproductive freedom, it's more important than ever that we protect everyone's right to safe and legal abortion and give people factual information about all their options. California has strong laws in place protecting reproductive freedom including the right to safe and legal abortion. And we are grateful to all our elected officials who champion access to critical care and who support everyone's fundamental right to decide if and when to start a family. Planned Parenthood of the Pacific Southwest Health Centers throughout San Diego, Riverside and Imperial Counties are here to provide routine and preventative sexual and reproductive care, including annual checkups, STI testing and

6.

treatment, safe and legal abortion, cancer screenings, contraception and more. Planned Parenthood's doors are open to all. And we will always be here to provide the care, education and information that people need to make informed decisions in a safe and supportive environment. If you need access to sexual and reproductive healthcare in San Diego, you can go to plan.org to make an appointment with us or go to another licensed provider in the region. To find a qualified abortion provider near you, you can also visit abortionfinder.org. Planned Parenthood will always be here to provide compassionate care free from stigma.

[End of recording]

# PROOFREADER'S CERTIFICATE

I, Erica Lowther, owner of San Diego Transcription, certify that on November 14, 2024, I proofread all the transcript of the above-referenced recording, while listening to the recording from which the same was transcribed, and that said transcript as typed accurately reflects the spoken word, to the best of my ability to hear those recorded words and identify the persons speaking.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 14, 2024, at San Diego, California.

ERICA LOWTHER

San Diego
Transcription

8.

**EXHIBIT 6**

**CALIFORNIA DEPARTMENT OF JUSTICE**
OFFICE OF THE ATTORNEY GENERAL

**CONSUMER ALERT**

# KNOW THE DIFFERENCE: CRISIS PREGNANCY CENTERS V. REPRODUCTIVE HEALTHCARE FACILITIES

**WARNING: CRISIS PREGNANCY CENTERS (CPC) DO NOT PROVIDE COMPREHENSIVE REPRODUCTIVE HEALTHCARE.**

- CPCs are organizations that seek to discourage people facing unintended pregnancies from accessing abortion care.

- CPCs often advertise a full range of reproductive healthcare services, but they **do not** provide abortion or abortion referral, and usually do not provide birth control or other forms of contraceptives.

**IF YOU ARE LOOKING TO UNDERSTAND YOUR ABORTION OPTIONS, BE AWARE OF THE LIMITS TO THE INFORMATION AND CARE A CPC PROVIDES.**

- Some CPCs are not licensed medical clinics.
    - o You have the right to know whether a facility is a licensed medical clinic and whether the facility will perform or refer you for an abortion *before* you go to the clinic.
    - o Unlicensed CPCs staffed by non-medical personnel are not required to keep your medical records private.

- Some CPCs offer ultrasounds even though they may not have a healthcare professional on staff or onsite.
    - o Only a licensed healthcare professional, like a doctor, nurse, or ultrasound specialist can accurately tell you how many weeks pregnant you are.

**DO YOUR RESEARCH AND ASK THE RIGHT QUESTIONS BEFORE GOING TO A PREGNANCY CLINIC TO LEARN ABOUT YOUR ABORTION OPTIONS.**

- Research the clinic online, or call the clinic, before making an appointment. Online reviews sometimes provide information about prior patient experiences that may be helpful.

- When researching a clinic, questions you might ask include:
    - o Is the facility licensed? If yes, what type of license?
    - o Will you be seen by a licensed provider? If yes, what type of licensed provider (nurse, doctor, etc.)?
    - o Does the facility perform or refer persons for abortions?
    - o What is the cost of a visit? Does the clinic take insurance?



- o Will the clinic keep your information confidential and not disclose your visit to anyone?

- If a clinic does not provide clear answers to your questions, consider going to a different clinic.

- Be wary of clinics that attempt to delay your appointments. If you are considering or seeking an abortion, timing is important.

- Contact programs to assist you with locating a provider that meets your needs:

  - o ACCESS Reproductive Justice connects people to free and low-cost programs that pay for reproductive healthcare for people living in, traveling to, or traveling from California to receive an out-of-state abortion.

  - o Women's Reproductive Rights Assistance Project provides direct and logistical support, transportation assistance, abortion appointment navigation, and other resources.

  - o The National Abortion Federation maintains a list of abortion providers.

  - o To access additional services, look for a Title X family planning clinic near you. Title X family planning clinics are state and federally funded facilities that provide access to a broad range of family planning and preventive health services, such as contraception, pregnancy testing, sexually transmitted disease testing, breast and cervical cancer screening, regardless of your ability to pay. Locate a Title X clinic near you at https://opa-fpclinicdb.hhs.gov/.

- When you arrive for your appointment, make sure you are at the correct clinic. CPCs are sometimes located near a reproductive healthcare clinic that provides abortion care.

If you believe you have been the victim or target of deceptive, misleading, unfair, or unlawful conduct, please immediately file a complaint at oag.ca.gov/crisis-pregnancy-center-complaint.

*****

This bulletin was issued by the Healthcare Rights and Access (HRA) Section of the California Department of Justice. HRA works proactively to increase and protect the affordability, accessibility, and quality of healthcare in California. HRA attorneys monitor and contribute to various areas of the Attorney General's healthcare work, including consumer rights; anticompetitive consolidation in the healthcare market; anticompetitive drug pricing; nonprofit healthcare transactions; privacy issues; civil rights, such as racial equity and discrimination in healthcare, reproductive rights and LGBTQ healthcare-related rights; and public health work on tobacco, e-cigarettes, and other products.

**EXHIBIT 7**

11/13/24, 10:07 AM                    Crisis Pregnancy Center Complaint | State of California - Department of Justice - Office of the Attorney General

 **Subscribe to Our Newsletter**    [ Enter your email... ]    Subscribe

 **ROB BONTA**
*Attorney General*

# Crisis Pregnancy Center Complaint

## Providing Personal Information Is Voluntary.

You do not have to provide the personal information requested. If you do not wish to provide personal information, such as your name, home address, or home telephone number, you may remain anonymous. In that case, however, we may not be able to contact you or help resolve your complaint. (Information Collection, Use and Access - Consumer Complaint Against a Business/Corporation (ca.gov))

## Confidentiality.

We will not share any information provided with non-governmental third parties unless required to do so by court order or with your permission.

\* Indicates a Required Field

| Business Information (Complaint Against): |
|---|

Company Name \*

[                                                        ]

Company Address

[                                                        ]

[                                                        ]

11/13/24, 10:07 AM                    Crisis Pregnancy Center Complaint | State of California - Department of Justice - Office of the Attorney General

Company City

Company State

Zip Code

(+4)

Area Code

Phone Number

Email Address

Website

Complaint

Briefly describe your complaint, including:*

- The product or service at issue and what the issue is

- The date(s) the issue occurred

- The names of the representative you dealt with

- If the product or service was not as advertised, what did the advertisement say, and when and where did you see it

Did you receive an ultrasound?

○ Yes

○ No

Briefly state what you would consider a reasonable resolution from the company

If you need legal advice or representation, we suggest that you consult with an attorney. The Attorney General cannot provide you with legal advice or represent you in personal legal actions.

Date of last contact

Communication means

☐ E-mail

☐ In-person

☐ Phone

☐ Postal mail

☐ Other...

Person communicated with

Results of communication

Have you previously contacted our Office or other agencies about this issue?

○ Yes

○ No

Do any of the following apply to you?

- You are represented by a lawyer about this issue
- You have sued the company or the company has sued you
- There is a legal proceeding pending that involves this issue

○ Yes

○ No

---

## Documents

Do you want to upload supporting documents? *

○ Yes

○ No

---

## Your Information (Optional)

First Name

[                                        ]

Middle Initial

[                                        ]

Last Name

[                                        ]

Address Line

[                                        ]

Address Line 2

City

State

CA

Zip Code

(+4)

Email Address

Confirm Email Address

Area Code

Phone Number

Are you submitting this complaint on behalf of someone else? *

○ Yes

○ No

Additional Information About You (optional)

Are you 65 years or older?

○ Yes

○ No

Do you have a disability?

○ Yes

○ No

What is your annual household income?

| - None - ▾ |
| --- |

Are you a current member of the U.S. Armed Forces or the immediate family of a service member?

○ Yes

○ No

Are you a former member of the U.S. Armed Forces?

○ Yes

○ No

Do you have limited English ability?

○ Yes

○ No

---

Statement

I affirm that the foregoing information is true and accurate *

● Yes

○ No

Case 3:24-cv-01338-GPC-KSC    Document 19    Filed 11/15/24    PageID.1025    Page 116 of 117

11/13/24, 10:07 AM                    Crisis Pregnancy Center Complaint | State of California - Department of Justice - Office of the Attorney General

## Attorney General's Role

**In sending this consumer complaint, I understand that the Attorney General cannot answer legal questions or give legal advice to me and cannot act as my personal lawyer.**

**I also understand that the Attorney General may need to refer my complaint to a more appropriate agency.**

---

| ☐ | I'm not a robot | |
| --- | --- | --- |
| | | reCAPTCHA |
| | | Privacy - Terms |

Submit

---

Office of the Attorney General    Accessibility    Privacy Policy    Conditions of Use    Disclaimer    © 2024 DOJ

**CERTIFICATE OF SERVICE**

*Culture of Life Services v.  Attorney General Ron Bonta*

USDC Court Case No.: 3:24-cv-1338-GPC-KSC

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

•    **VERIFIED FIRST AMENDED COMPLAINT.**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Rob Bonta, Attorney General of California
Renu George, Senior Assistant Attorney General
Karli Eisenberg, Supervising Deputy Attorney General
Kathleen Boergers, Supervising Deputy Attorney General
Erica Connolly, Deputy Attorney General
Hayley Penan, Deputy Attorney General
1300 "I" Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Tel: (916) 210-7755
Fax: (916) 327-2319
E-Mail: Erica.Connolly@doj.ca.gov
E-Mail: karli.eisenberg@doj.ca.gov
E-Mail: kathleen.boergers@doj.ca.gov
E-Mail: hayley.penan@doj.ca.gov
**Attorney for Defendant Attorney General of California**
**Rob Bonta**

__X__    **(BY ELECTRONIC MAIL)** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

__X__    **(BY ELECTRONIC FILING/SERVICE)** I caused such document(s) to be Electronically Filed and/or Service using the ECF/CM System for filing and transmittal of the above documents to the above-referenced ECF/CM registrants.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.  Executed on November 15, 2024, at Rancho Santa Fe, California.

_____
Kathy Denworth