1  Charles S. LiMandri, SBN 110841
    cslimandri@limandri.com
2  Paul M. Jonna, SBN 265389
    pjonna@limandri.com
3  Jeffrey M. Trissell, SBN 292480
    jtrissell@limandri.com
4  LiMANDRI & JONNA LLP
   P.O. Box 9120
5  Rancho Santa Fe, CA 92067
   Telephone: (858) 759-9930
6  Facsimile: (858) 759-9938

   Thomas Brejcha, *pro hac vice**
     tbrejcha@thomasmoresociety.org
   Peter Breen, *pro hac vice**
     pbreen@thomasmorsociety.org
   THOMAS MORE SOCIETY
   309 W. Washington St., Ste. 1250
   Chicago, IL 60606
   Tel: (312) 782-1680
   *Application forthcoming

7

8

9  *Attorneys for Plaintiff Culture of Life
   Family Services, Inc.*

10

11

12                     UNITED STATES DISTRICT COURT

13                  SOUTHERN DISTRICT OF CALIFORNIA

14  CULTURE OF LIFE FAMILY
    SERVICES, INC. a California nonprofit      Case No.: 3:24-cv-1338-GPC-KSC
15  corporation,
                                               **REDLINE OF FIRST**
16              Plaintiff,                      **AMENDED COMPLAINT**
                                               **PURSUANT TO S.D. CAL.**
17       v.                                    **CIV. L.R. 15.1(C)**

18  ATTORNEY GENERAL ROB
    BONTA, in his official capacity as the     Judge:    Hon. Gonzalo P. Curiel
19  California Attorney General,                Location: Courtroom: 2D

20              Defendant.                      Action Filed: July 30, 2024

21

22

23

24

25

26

27

28

**TO: THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 15, 2024, Plaintiff Culture of Life Family Services, Inc. ("COLFS"), filed its First Amended Complaint in this action, Dkt. 19. Pursuant to S.D. Cal. Civ. L.R. 15.1(c), Plaintiff now files a "a version of that pleading that shows—through redlining, underlining, strikeouts, or other similarly effective typographic methods—how that pleading differs from the previously dismissed pleading." The redlined copy of the First Amended Complaint is attached hereto.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: November 15, 2024        By:

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Attorneys for Plaintiff Culture of Life Family Services, Inc.

**ATTACHMENT**

Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice**
  tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice**
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming

*Attorneys for Plaintiff Culture of Life
Family Services, Inc.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CULTURE OF LIFE FAMILY SERVICES, INC. a California nonprofit corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ATTORNEY GENERAL ROB BONTA, in his official capacity as the California Attorney General,<br><br>　　　　　Defendant. | Case No.: 3:24-cv-01338-GPC<br><br>**VERIFIED FIRST AMENDED COMPLAINT** ~~FOR DECLARATORY AND INJUNCTIVE RELIEF~~ |

## INTRODUCTION

1.      California Attorney General Rob Bonta, his Healthcare Rights and Access Section, and his Reproductive Rights Task Force have decided to target organizations that help women who have changed their minds about their abortions. In a flagrant constitutional overreach, Bonta seeks to prohibit doctors, nurses, or advocacy organizations from helping these women by forbidding them from telling women about a safe and effective treatment that is lawfully available across the country and around the world—"Abortion Pill Reversal." In lawfare initiated last year in California Superior Court, Bonta accused a group of five pro-life community medical clinics in the Bay Area of engaging in fraudulent business practices and misleading advertising by providing women with no-cost Abortion Pill Reversal ("APR") treatment. *See* Cal. Bus. & Prof. Code §§ 17200, 17500.[1] *See* Exhibit 1, Press Release;[2] Exhibit 2, Transcript of Press Conference;[3] Exhibit 3, Complaint.[4]

2.      The premises of the Abortion Pill and Abortion Pill Reversal ("APR") are quite simple. During a healthy pregnancy, a woman's body naturally produces a hormone called progesterone. Progesterone is so key to maintaining a healthy pregnancy that, as stated in the federal injunction blocking Colorado's attempt to

---

[1] *See* Press Release, *Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients*, Off. of the Att'y Gen. (Sept. 21, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-anti-abortion-group-five-california-crisis-pregnancy.

[2] Press Release, *Attorney General Bonta Sues Anti-Abortion Group, Five California Crisis Pregnancy Centers for Misleading Patients*, Off. of the Att'y Gen. (Sept. 21, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-sues-anti-abortion-group-five-california-crisis-pregnancy.

[3] Cal. DOJ, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, YouTube (Sept. 21, 2023), https://www.youtube.com/watch?v=_kOyqRQ9EtU.

[4] *The People of the State of California v. Heartbeat Int'l., Inc. and RealOptions, Inc.*, No. 23-cv-44940 (Cal. Super. Ct., Alameda Cnty., Sep. 21, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Complaint.pdf.pdf.

VERIFIED FIRST AMENDED COMPLAINT

restrict APR, supplemental progesterone is prescribed for 12% of all pregnancies. *See Bella Health & Wellness v. Weiser*, ~~No. 1:23-cv-939, 2023 WL 6996860, at \*2~~699 F. Supp. 3d 1189, 1197 (D. Colo. ~~Oct. 21,~~ 2023). One way to chemically cause an abortion is to block the body's natural supply of progesterone, most commonly through a drug called mifepristone, and then to induce expulsion of the uterine contents, typically through the use of misoprostol administered 24-48 hours after mifepristone. *See All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023), *rev'd on standing grounds*, 602 U.S. 367 (2024).

~~///~~

3.     The decision to end a pregnancy is often stressful and complicated and, unsurprisingly, some women initially choose to take mifepristone, but later decide that they wish to remain pregnant. Other women seek medical help because they were forced or deceived into taking mifepristone.[5] Upon seeking medical help to stop a mifepristone-induced abortion, experienced medical providers will prescribe supplemental progesterone to maintain the woman's pregnancy. Despite the simplicity and obviousness of APR treatment, and California's constitutional guarantee that "[t]he state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions," Cal. Const. art. I, § 1.1, Bonta is trying to deprive women of this life-saving treatment.

4.     Culture of Life Family Services, Inc. ("COLFS") is a Catholic non-profit that operates COLFS Medical Clinic, a state licensed community health clinic based in San Diego County. COLFS provides compassionate, high-quality, life-affirming, and holistic healthcare for patients with or without insurance. COLFS is a comprehensive community health clinic, providing family medicine, pediatric medicine, and women's healthcare. COLFS's comprehensive services for women include well woman care, STD testing and treatment, pregnancy testing, pregnancy options consultations,

---

[5] *See* Melanie Israel, *Abortion Pills, Coercion, and Abuse*, The Heritage Found. (Dec. 1, 2023), https://www.heritage.org/life/commentary/abortion-pills-coercion-and-abuse.

ultrasounds, prenatal care, and Abortion Pill Reversal treatment. Founded in 2001, COLFS Medical Clinic operates in three locations throughout San Diego County.

5.     On May 3, 2022, in response to the *Dobbs* leak the day prior, Bonta issued a press release to announce that he would be meeting with reproductive rights advocates throughout California and to confirm that he will use the full force of the California Department of Justice to protect Californians' reproductive rights. *See* However, Bonta's first action was to fight *against* reproductive rights. As both the U.S. Supreme Court and California Supreme Court have recognized, "reproductive rights" does not mean simply access to abortion. It means the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). "[T]he constitutional question before us does not involve a weighing of the value of abortion as against childbirth, but instead concerns the protection of either procreative choice from discriminatory governmental treatment." *Comm. to Defend Reprod. Rts. v. Myers*, 29 Cal. 3d 252, 256 (1981).

6.     On June 1, 2022, Bonta issued a "Consumer Alert," drafted by his Healthcare Rights and Access Section, advising women that "crisis pregnancy centers," i.e., pregnancy help resource organizations, do not provide abortions. *See* Exhibit 4, Press Release;[6] Exhibit 5, Transcript of Press Conference;[7] Exhibit 6, Consumer Alert.[8] At the end of his press conference—after giving a Planned

---

[6] Press Release, *Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care*, Off. of the Att'y Gen. (June 1, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-consumer-alert-warning-californians-crisis

[7] Cal. DOJ, *AG Bonta Provides Californians Seeking Abortion Care with Update on Reproductive Healthcare Options*, YouTube (June 1, 2022), https://www.youtube.com/watch?v=-lzCjC22zXc.

[8] Healthcare Rights and Access Section, *Consumer Alert: Know the Difference: Crisis Pregnancy Centers v. Reproductive Healthcare Facilities*, Cal. DOJ (June 1, 2022) https://oag.ca.gov/system/files/attachments/press-docs/Crisis%20Pregnancy%20Center%20Bulletin.pdf.

VERIFIED FIRST AMENDED COMPLAINT

Parenthood representative time to speak—Bonta announced that the California Department of Justice was setting up a website to receive complaints about pregnancy help organizations. *See* Exhibit 7.[9]

7. At the end of June—after issuance of the *Dobbs* decision on June 24, 2022—Bonta set up the "Reproductive Rights" page on the California Department of Justice website, to provide information about abortion rights and collect details on Bonta's fight to expand abortion access. Later, he also partnered with UCLA Law to set up a legal hotline for women to call if they believe that their reproductive rights have been violated.

8. In September 2022, Bonta also began the administrative investigation *In the Matter of the Investigation of Crisis Pregnancy Centers*, and issued administrative interrogatories and document requests to pro-life pregnancy help organizations across the state. Over the next year, his team also authored six amicus briefs in support of abortion access—and joined five others—and Bonta formed a Reproductive Rights Task Force to align his attorneys with local counsel throughout the state. Many of Bonta's amicus briefs are co-authored—not merely joined in—by New York Attorney General Letitia James.

9. But despite his investigations, and despite his website and hotline, Bonta could not find anybody to sue. Apparently pro-life pregnancy help organizations across the state are not nearly as fraudulent and misleading as he claimed. So, to justify the work of his Healthcare Rights and Access Section, on September 21, 2023, Bonta decided they would file their first and only Reproductive Rights lawsuit, *attacking the right of women to keep wanted babies* through APR treatment.

10. At its core, the lawsuit alleges that a pro-life medical clinic, in offering progesterone to women who have taken mifepristone, is fraudulently misrepresenting to them that Abortion Pill Reversal or APR is safe and effective at reversing the abortion

---

[9] *Crisis Pregnancy Center Complaint*, Cal. DOJ, https://oag.ca.gov/crisis-pregnancy-center-complaint.

1  pill. But the idea that the speech of purely charitable pregnancy help organizations
2  amounts to "fraudulent misrepresentation" by offering women no-cost services is
3  incongruous. The subtext of Bonta's argument is that pregnancy help organizations
4  may speak, but *only* if they speak the State's message.

5      11.    In argument, Bonta has stated that healthcare professionals can still offer
6  ~~APR~~Abortion Pill Reversal to women—so long as they do so "truthfully," by telling
7  women that have taken mifepristone that they *can* take progesterone, but that they must
8  also falsely tell women that it will not ~~biochemically~~actually reverse the abortion pill, is
9  ineffective at preserving pregnancy, is unstudied, and may kill them. None of this is
10 anywhere near accurate. Each of Bonta's proposed "true" statements is actually false,
11 and ~~the~~when put all together, has the practical effect of banning APR altogether. The
12 false choice Bonta offers to either not speak or else spread ~~an~~ unscientific ~~lie~~lies that he
13 prefers reveals his true motive—*find somebody to sue and find a way to discredit "Crisis*
14 *Pregnancy Centers."*

15     12.    Bonta's attack against APR is merely the latest development in his
16 politically motivated campaign against pregnancy help organizations in general.
17 Instead of celebrating the reproductive choice of pregnant women who have decided
18 to seek to preserve their pregnancies and bring their children to term—and celebrating
19 the work of California's pregnancy help organizations which empower them in the
20 exercise of their rights—Bonta has launched a public campaign of opprobrium against
21 the organizations and the APR protocol.

22     13.    This time, Bonta is targeting protected speech and activities engaged in
23 for the sole benefit of pregnant women who have ingested—whether voluntarily or via
24 trick or force—mifepristone. These pregnant women are at serious and imminent risk
25 of pregnancy termination because of the ingestion of mifepristone. They urgently seek
26 information and assistance to continue their pregnancies. Pregnancy help resource
27 organizations provide these women with necessary information, referrals, and even
28 access to free medical care to empower them to save the lives of their *wanted* babies.

14.    Bonta has no business butting into the intimate medical decision of an expectant mother, in consultation with the medical professional of her choice, to carry her pregnancy to term and save her unborn baby from the disastrous effects of mifepristone while there is still time to ~~undo~~reverse the effects of that powerful chemical. Yet Bonta is butting in, and is joined in that campaign by his political allies—Planned Parenthood and the abortion industry—in California *and nationally*. Indeed, shortly after filing his lawsuit, a similar one was initiated by New York Attorney General Letitia James against eleven pro-life pregnancy help organizations in her state.[10]

15.    Accordingly, to avoid an "enforcement [action] against nearly identical conduct," *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023), and to protect its constitutional rights, and the rights of its patients, COLFS brings this Complaint seeking declaratory and injunctive relief.

## JURISDICTION AND VENUE

16.    This action arises under 42 U.S.C. §§ 1983 in relation to Defendant's deprivation of Plaintiff's constitutional rights to freedom of religion and freedom of speech under the First Amendment to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. §§ 1988.

18.    The Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because Plaintiff resides here and because it is a District in which the Attorney General maintains an office.

---

[10] *See* Press Release, *Attorney General James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment*, N.Y. State Att'y Gen. (May 6, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-sues-anti-abortion-group-and-11-new-york-crisis-pregnancy.

1

## PARTIES

2    19.    Plaintiff CULTURE OF LIFE FAMILY SERVICES, INC. ("COLFS")
3  is a 501(c)(3) non-profit state licensed community health clinic. COLFS has its
4  principal place of business in San Diego County, and operates a full-service clinic at
5  three locations throughout the County. COLFS provides free Abortion Pill Reversal
6  Treatment and associated free medical services to women who come looking for
7  intervention after beginning the chemical abortion process. Chemical abortion is also
8  sometimes called the "abortion pill," "medical abortion," or "medication abortion."

9    20.    Defendant ROB BONTA is the Attorney General of the State of
10 California. The California Constitution vests the Attorney General with the duty "to
11 see that the laws of the State are uniformly and adequately enforced." Cal. Const. art.
12 V, § 13; *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943-
13 44 (9th Cir. 2013).

14                    ## FACTUAL ALLEGATIONS

15    **A.    CULTURE OF LIFE FAMILY SERVICES, INC. ("COLFS")**

16    21.    Plaintiff COLFS is a 501(c)(3) religious non-profit and state licensed
17 community health clinic. In accordance with its Catholic ~~mission~~identity, the "primary
18 mission of COLFS is to ensure that Christ-centered medical care and pregnancy clinic
19 services are available to all women regardless of ability to pay. This mission includes
20 access to Abortion Pill Reversal for women who have regret after starting a medication-
21 induced abortion."[11] "At COLFS Medical Clinic, [the] mission is deeply rooted in faith
22 and guided by traditional Christian ethics. [COLFS is] committed to providing
23 compassionate care that aligns with these principles, ensuring that [its] patients receive
24 respectful and dignified treatment throughout their healthcare journey."[12]

25    **B.    THE "ABORTION PILL"**

26

27

28

---

[11] *See About Us*, Friends of COLFS, https://friendsofcolfs.org/about-us/.

[12] *See About Us*, COLFS Medical Clinic, https://colfsclinic.org/about-us/.

VERIFIED FIRST AMENDED COMPLAINT

22.    When a woman becomes pregnant, the corpus luteum is formed within her ovary to secrete progesterone. "Progesterone is needed for the pregnancy to continue; it prepares and maintains the uterine lining and stimulates the production of nutrients." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 224 (5th Cir 2023) ("*All. for Hippocratic Med. II*"), *rev'd on standing grounds*, 602 U.S. 367 (2024) ("*All. for Hippocratic Med. III*").

23.    In the 1980s, Roussel Uclaf S.A.—a French pharmaceutical firm—developed a drug named RU-486, which acts as an antiprogesterone by occupying a pregnant woman's progesterone receptors and thus preventing progesterone from binding to those receptors. It "blocks the hormone progesterone, halts nutrition, and ultimately starves the unborn human until death." *All. for Hippocratic Med. v. FDA*, 668 F. Supp. 3d 507, 520 (N.D. Tex. 2023) ("*All. for Hippocratic Med. I*"), *rev'd on standing grounds*, 602 U.S. 367 (2024).

24.    In the mid-1990's, the Clinton administration worked with Roussel Uclaf S.A. to bring RU-486 to the American market. *All. for Hippocratic Med. I*, 668 F. Supp. 3d at 554. It negotiated the donation of RU-486 by Roussel Uclaf S.A. to a nonprofit called "the Population Council," *All. for Hippocratic Med. II*, 78 F.4th at 224 n.1, so that the latter could sponsor it as a new drug for approval by the FDA—under the generic name mifepristone and the brand name Mifeprex. *Id.* at 223-24. Ultimately, "the Population Council applied for FDA to approve mifepristone as a new drug, as part of a two-drug regimen designed to cause abortion." *Id.* at 223.

25.    "Mifepristone alone, however, is not fully effective in aborting an embryo," with a scientific "dispute as to just how effective mifepristone is alone." *Bella Health & Wellness v. Weiser*, ~~No. 1:23-cv-939, 2023 WL 6996860, at *26~~ 699 F. Supp. 3d 1189, 1197 (D. Colo. ~~Oct. 21,~~ 2023). "This is why patients also take the second drug—misoprostol—within a day or two of taking mifepristone to complete a medication abortion. Misoprostol dilates the cervix and induces muscle contractions, clearing the

uterus of the embryo." *Id.* "The full, two-drug regimen is highly effective at ending a pregnancy, causing 97% of early-term pregnancies to terminate." *Id.*

26.    Mifepristone was developed in France as an abortifacient because it competes with progesterone at the receptor level. Early in vitro animal studies demonstrated that raising progesterone concentrations led to a displacement of mifepristone from the progesterone receptor.[13] As a result, scientists concluded that mifepristone acts "reversibly."[14]

27.    "In 2000, FDA approved a new drug application for mifepristone tablets marketed under the brand name Mifeprex. FDA approved Mifeprex for use to terminate pregnancies, but only up to seven weeks of pregnancy." *All. for Hippocratic Med. III*, 602 U.S. at 375. In undertaking this review, the FDA performed its own Pharmacology Review where it undertook various animal studies. As a result of those studies, the FDA similarly concluded that "the abortifacient activity of RU 486 is antagonized by progesterone *allowing for normal pregnancy and delivery.*"[15] That is, the FDA itself confirmed and recognized that progesterone can neutralize the effects of mifepristone/RU 486 and allow for normal pregnancy and delivery.

28.    Notably, the FDA has never added termination of pregnancy to the misoprostol label, meaning that the use of misoprostol in the chemical abortion context is "off-label."[16]

---

[13] M. Moguilewsky & D. Philibert, *Biochemical Profile of RU 486, in* The Antiprogestin Steroid RU486 and Human Fertility Control 95-96 (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985).

[14] Etienne-Emile Baulieu, *RU 486: An Antiprogestin Steroid with Contragestive Activity in Women, in* The Antiprogestin Steroid RU486 and Human Fertility Control 1 (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985).

[15] Mifeprex Drug Approval Package, *Pharmacology Review(s)*, FDA 16-17 (Sept. 28, 2000) (emphasis added) https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_mifepristone.cfm; https://www.accessdata.fda.gov/drugsatfda_docs/nda/2000/20687_Mifepristone_phrmr_P2.pdf.

[16] *Label for Cytotec (misoprostol) Tablets*, FDA (2009), https://www.accessdata.fda.gov/

## C.    "Abortion Pill Reversal"

29.    "Some women regret their decision to start the medication abortion regimen after taking the first pill…. And others may have been coerced to start the regimen against their will." *Bella Health*, ~~2023 WL 6996860,~~699 F. Supp. 3d. at ~~*2~~1197. Some "doctors and medical professionals, however, have investigated whether treatment with progesterone can reverse the effects of mifepristone, the first abortion pill, better than just watchful waiting and avoiding use of the second abortion pill. This is commonly called 'abortion pill reversal' or 'medication abortion reversal.'" *Id.*

30.    Supplemental progesterone itself is indubitably safe, and accordingly is classified as a "Category B" drug for pregnant women—the same category as Tylenol, the most commonly used pain reliever during pregnancy.[17] Researchers estimate that "providers employ the use of progesterone in 5-12% of all pregnancies for a variety of reasons." *Bella Health*, ~~2023 WL 6996860,~~699 F. Supp. 3d. at ~~*2~~1197.

31.    The first known attempt to reverse the effects of mifepristone using bioidentical progesterone occurred in 2006. In that year, Dr. Matthew Harrison, MD, was approached by a woman who had taken mifepristone and wanted to reverse the effects of it. He treated her with progesterone, and she went on to deliver a healthy baby.

32.    Based on his own experience, a few years later, COLFS's medical director, Dr. George Delgado, devised the APR protocol for reversing the effects of mifepristone and began to advise doctors on APR.

33.    As stated above, the basic premise of APR is to counteract the effects of an antiprogesterone (mifepristone) with supplemental progesterone. Mifepristone is a

---

drugsatfda_docs/label/2009/019268s041lbl.pdf; *Misoprostol*, in StatPearls (2023), https://www.ncbi.nlm.nih.gov/books/NBK539873.

[17] *Label for Prometrium (progesterone) Capsules*, FDA (2011), https://www.accessdata. fda.gov/drugsatfda_docs/label/2011/019781s017,020843s011lbl.pdf; Emily Oster, Expecting Better 169 (2016) (discussing Tylenol use during pregnancy).

progesterone receptor antagonist that binds twice as aggressively to the progesterone receptors in the uterus as progesterone does, but not permanently.[18]

34.    The basic biochemical premise of APR is that the effect of a competitive receptor *antagonist* may be "reversed" by increasing the amount of the receptor *agonist*.[19] Stated differently, the effect of competitive inhibitors (*e.g.*, mifepristone) that block substrates (*e.g.*, progesterone) can be thwarted by adding more substrate.[20] APR is modeled on these basic principles of biochemistry and is supported by a long line of studies.

35.    For example, in 1989, Japanese researchers studied "the role of progesterone in the maintenance of pregnancy" using a population of pregnant rats. After four days, only 33.3% of the rats who received mifepristone remained pregnant—but 100% of the rats who received progesterone simultaneously with mifepristone remained pregnant. The Yamabe study therefore indicated that progesterone can counteract the effects of mifepristone's blocking of progesterone receptors.[21]

36.    This was later confirmed by both the FDA (discussed above), and another animal study published by Christina Camilleri and Stephen Sammut in July 2023. Following up on the Yamabe study, researchers evaluated the "non-simultaneous, subsequent administration" of progesterone following mifepristone in rats. Vaginal impedance measurements and other parameters indicated that the abortion process began in all the rats given mifepristone. None of the rats who received mifepristone alone during the equivalent of the first trimester of a human pregnancy remained pregnant, while 81.3% of the rats who received mifepristone followed by progesterone

---

[18] George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018).

[19] Barbara J. Pleuvry, *Receptors, Agonists and Antagonists*, 5 Anaesthesia and Intensive Care Medicine 350, 350 (2004).

[20] John W. Pelley, Elsevier's Integrated Review Biochemistry 33-34 (2d ed. 2011).

[21] S. Yamabe, et al., *The Effect of RU486 and Progesterone on Luteal Function during Pregnancy*, 65 Nihon Naibunpi Gakkai Zasshi 497, 497 (1989).

at the same stage remained pregnant.[22] The study concluded that "[t]he administration and actions of the natural agonist, progesterone, in the presence of the antagonist, mifepristone, appears to be in concordance with the literature and our understanding of the pharmacological functioning of reversible competitive antagonism, where *sufficient levels of the agonist [progesterone] can override a given concentration of an antagonist [mifepristone].*"[23]

37.    In 2012 and 2017, two small human case studies were published. In 2012, Dr. Delgado and Dr. Mary Davenport published a small case series that followed seven women who had taken mifepristone and then received progesterone therapy after seeking medical assistance to maintain their pregnancies. Four of the six women (66%) who completed the study carried their pregnancies to term and delivered live infants, with no birth defects observed.[24]

38.    Then, in 2017, a similar small case series out of Australia (Garratt and Turner) was published. In that series, two out of three women (66%) who received progesterone therapy after ingesting mifepristone carried their pregnancies to term and delivered healthy live infants.[25]

39.    In follow-up to his small 2012 case series, Dr. Delgado then engaged in a much larger case series. His 2018 study analyzed the charts of 547 women who had ingested mifepristone and then received progesterone therapy within 72 hours. (207 women from the initial 754 were excluded for control purposes.) The study found an overall fetal survival rate of 48%. The study showed even higher survival rates when the

---

[22] Christina Camilleri & Stephen Sammut, *Progesterone-Mediated Reversal of Mifepristone-Induced Pregnancy Termination in a Rat Model: An Exploratory Investigation*, 12 Sci. Rep. 10942, at 4 (2023).

[23] *Id.* at 7 (emphasis added).

[24] George Delgado & Mary Davenport, *Progesterone Use to Reverse the Effects of Mifepristone*, 46 Ann. of Pharmacother. e36, 21 (2021).

[25] *See* Deborah Garratt & Joseph V. Turner, *Progesterone for Preventing Pregnancy Termination after Initiation of Medical Abortion with Mifepristone*, 22 Eur. J. Contracept. Reprod. Health Care 472 (2017).

VERIFIED FIRST AMENDED COMPLAINT

patients were divided into treatment subgroups. The subgroup that received progesterone intramuscularly showed fetal survival rates of 64%, and the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester had survival rates of 68%. The study concluded that these two subgroups represented two viable APR protocols for use moving forward.[26]

40.    A scoping review was also published in July 2023, which reviewed the existing scientific literature and concluded that there was "*no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy*," and that "mifepristone antagonization with progesterone is a *safe and effective treatment*."[27]

41.    Even Dr. Harvey Kliman, the director of the reproductive and placental research unit at the Yale School of Medicine, told the *New York Times* that using progesterone to reverse the effects of mifepristone "makes biological sense." Dr. Kliman further stated that "if one of his daughters came to him and said she had somehow accidentally taken mifepristone during pregnancy … he would tell her to take 200 milligrams of progesterone three times a day for several days, just long enough for the mifepristone to leave her system: 'I bet you it would work.'"[28]

42.    In light of the above studies, over a decade of widespread successful use of APR by licensed healthcare professionals, and given the irrefutable evidence of its biochemistry, APR has been endorsed by the American Association of Pro-Life

---

[26] *See* George Delgado, et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 27 & tb.1 (2018).

[27] Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, 402 (2023) (emphasis added).

[28] Ruth Graham, *A New Front in the War over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. Times Mag. ( July 18, 2017), https://www.nytimes.com/2017/07/18/magazine/a-new-front-in-the-war-over-reproductive-rights-abortion-pill-reversal.html.

1  Obstetricians & Gynecologists (over 7,000 members), the Catholic Medical
2  Association (2,500 members), and Canadian Physicians for Life (2,500 members).[29]

3     ~~ED~~. **THE ABORTION PILL RESCUE NETWORK**

4     43.    Given the demonstrable life-saving potential of APR, in May 2012,
5  COLFS's medical director, Dr. George Delgado, set up a website and hotline to educate
6  pregnant women who seek to reverse the effects of mifepristone about Abortion Pill
7  Reversal, provide them with practical support and resources, and connect them with
8  licensed medical professionals. This effort became known as the APR Network. This
9  APR Network consists of physicians or other medical providers who are willing to
10 assist a woman who wishes to try reversing the effects of mifepristone and prevent the
11 death of her unborn child.

12    44.    In April 2018, to ensure expansion of the APR Network and increased
13 public awareness of the APR protocol, COLFS transferred it for the nominal sum of $1
14 to a nationwide trade group that represents pro-life pregnancy help resource
15 organizations, called Heartbeat International.

16    45.    Upon acquiring the APR Network, Heartbeat International began
17 providing continuing education courses for nurses regarding Abortion Pill Reversal.
18 Heartbeat is a registered continuing education provider with the California Board of
19 Registered Nursing (because it is industry practice for nursing continuing education
20 providers to become registered by California). Most states accept California's
21 continuing education credits for nurses.

22    46.    On January 29, 2016, the Nursing Board sent Heartbeat an audit letter
23 seeking course outlines and instructor resumes for all continuing education courses

24

25 [29] *See, e.g.*, Am. Ass'n of Pro-Life Obstetricians & Gynecologists, *2019 AAPLOG*
26 *Position Statement on Abortion Pill Reversal* (Feb. 2019), https://aaplog.org/wp-content/uploads/2019/02/2019-AAPLOG-Statement-on-Abortion-Pill-
27 Reversal.pdf; Cath. Med. Ass'n, Press Release, *New Abortion Pill Reversal Study Shows*
   *a 68% Success Rate, Authors Include Catholic Medical Association Members* (Apr. 4, 2018),
28 https://www.cathmed.org/resources/new-abortion-pill-reversal-study-shows-a-68-success-rate-authors-include-catholic-medical-association-members/.

concerning Abortion Pill Reversal. COLFS is informed that, at that time, an advocacy group had lobbied State Senator Jerry Hill to call up and pressure the Nursing Board, which he did. On November 2, 2016, Heartbeat provided a comprehensive response with the relevant scientific literature. That same month, on November 29, the Nursing Board sent Heartbeat a letter stating simply that "[t]he audit is now closed."

47.    Two months later, the Nursing Board mailed Heartbeat a letter on January 17, 2017, stating that "content related to abortion medication reversal … does not meet the scientific knowledge required for the practice of nursing." This conclusion apparently flowed from a new statute introduced by Senator Hill which required that continuing nursing education courses be based on "generally accepted scientific principles." This bill was introduced by Senator Hill in February 2016 and signed into law in September 2016. *See* 2016 Cal. ~~Stats. 2016,~~Stat., ch. 799 § 16 (SB 1039) (amending Cal. Bus. & Prof. Code § 2811.5).

~~###~~

48.    On March 1, 2017, Heartbeat provided a response to the Nursing Board, requesting reconsideration of the conclusion. On July 28, 2017, the Nursing Board sent a short letter stating simply that "[t]he board has reconsidered its position and restores permission for Heartbeat International to offer APR related courses."

49.    In September 2017, the Nursing Board flip-flopped again, sending another letter to Heartbeat and ordering Heartbeat to cease and desist offering continuing education courses on APR. Heartbeat requested a conference with the Nursing Board, which occurred on December 11, 2017. In response to it, the Nursing Board reversed course again.

50.    Thus, in response to a years-long audit, the California Board of Registered Nursing confirmed that continuing education courses on Abortion Pill Reversal are indeed based on "generally accepted scientific principles."

51.    Since its founding in 2012, the APR Network has confirmed saves of over 1,000 babies. However, with respect to women who underwent APR treatment but did

1  not report their ultimate result, the APR Network estimates saves of over 5,000 babies.

2  Prior to COLFS handing over the APR Network to the national trade organization, it

3  had connected women and physicians for over 400 confirmed saves. To date, from its

4  location in San Diego County, COLFS has personally coordinated approximately 100

5  confirmed saves. As part of its pro-life mission, COLFS is 100% committed to providing

6  APR treatment to women regardless of their ability to pay.

7  ### ~~G~~E. The Failed Danco/Creinin Study

8  52.  Compared to the many studies supportive of APR, there is only one study

9  purportedly critical of its efficacy. That study was performed by Dr. Mitchell Creinin

10  and funded by Danco Laboratories, the principal manufacturer of mifepristone.[30] All

11  other criticisms of Abortion Pill Reversal come in the form of "policy statements" or

12  articles merely seeking to undermine the statistical analyses or methods of the APR-

13  supportive studies cited above. Those criticisms universally ignore the ethical concerns

14  with giving a placebo to a woman who wishes to save her pregnancy, and the

15  unremarkable and commonsensical biochemistry underlying Abortion Pill Reversal.

16  53.  The Danco/Creinin study was small, involving only twelve pregnant

17  women who were scheduled for abortions. All twelve took mifepristone, and then half

18  received progesterone while half received a placebo. Two women, one from the

19  progesterone group and one from the placebo group, left the study. First, the authors

20  of the Danco/Creinin study noted that "patients who receive high-dose oral

21  progesterone treatment do not experience side effects that are noticeably different than

22  placebo."[31]

23  54.  Of the five women who took progesterone, four (80%) were recorded to

24  have healthy pregnancies at the conclusion of the study period, with one who went to

25

26

---

27  [30] *See* Mitchell D. Creinin, et al., *Mifepristone Antagonization with Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstet. Gynecol. 158 (2020).

28  [31] *Id.* at 162.

the hospital with "severe bleeding" that required no medical intervention.[32] Of the five women in the placebo group, two women (40%) were recorded to have healthy pregnancies at the conclusion of the study period, and *two* of the other women experienced severe bleeding, with one of the two requiring a blood transfusion.[33]

55.    Thus, the Danco/Creinin study, if its size allows for any conclusions, stands for the propositions that (1) administering progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of a healthy pregnancy over doing nothing (sometimes euphemistically called "watchful waiting") and (2) administering progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of avoiding severe bleeding over doing nothing. Any enhanced risk to a woman in this situation who wants to continue her pregnancy would arise from *not* receiving APR treatment. This is borne out by the FDA's required warning labels. *Mifepristone can cause severe bleeding.* Progesterone does not.[34]

## ~~H~~F.  COLFS'S CONSTITUTIONAL RIGHTS

56.    Bonta's attack on APR is chock full of constitutional implications. Under both the U.S. Constitution and the California Constitution, COLFS has free exercise of religion and free speech rights. U.S. Const. amend. I; Cal. Const. art. 1, §§ 2, 4. And under both the U.S. Constitution and the California Constitution, women have the right to make their own reproductive decisions—without interference by the government. U.S. Const. amend. XIV; Cal. Const. art. ~~1~~I, §§ 1, 1.1.

57.    While *Dobbs* allows states to ban abortion, longstanding constitutional precedent prohibits states from preventing reproduction. "Marriage and procreation

---

[32] *Id.* at 160.

[33] *Id.* at 160-61.

[34] Indeed, the recent scoping review performed by DeBeasi, discussed above, examined all the literature on APR safety, including Dr. Creinin's study, and found *no evidence* that APR is unsafe. *See* Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion*, 90 Linacr. Q. 395, at 8 (2024).

1 │ are fundamental to the very existence and survival of the race" and thus "one of the
2 │ basic civil rights of man." *Skinner v. Okla.*, 316 U.S. 535, 541 (1942). "The [Supreme]
3 │ Court has … describ[ed] the varied rights as a unified whole: '[T]he right to 'marry,
4 │ establish a home and bring up children' is a central part of the liberty protected by the
5 │ Due Process Clause.'" *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (quoting *Zablocki
6 │ v. Redhail*, 434 U.S. 374, 384 (1978)).

7 │ 58. The U.S. Constitution also protects the right to refuse "unwanted medical
8 │ treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citing *Jacobson v.
9 │ Mass.*, 197 U.S. 11, 24-30 (1905)), and the right "to bodily integrity." *Wash. v.
10 │ Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. Calif.*, 342 U.S. 165 (1952)). This
11 │ right protects against "'forced medical treatment' for the recipient's benefit." *Health
12 │ Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

13 │ 59. "[W]here a decision as fundamental as that whether to bear or beget a
14 │ child is involved, regulations imposing a burden on it may be justified only by
15 │ compelling state interests, and must be narrowly drawn to express only those interests."
16 │ *Carey v. Population Servs., Int'l*, 431 U.S. 678, 686 (1977); *accord Am. Acad. of Pediatrics
17 │ v. Lungren*, 16 Cal. 4th 307, 340-41 (1997). "When a fundamental right is at stake, the
18 │ Government can act only by narrowly tailored means that serve a compelling state
19 │ interest," i.e., "strict scrutiny." *Dep't of State v. Muñoz*, ~~144~~602 U.~~S. Ct. 1812, 1821-22~~
20 │ 899, 910 (2024). Here, in light of the actual science behind APR, Bonta cannot possibly
21 │ hope to show either a compelling state interest or narrow tailoring.

22 │ 60. With respect to COLFS's right to the free exercise of religion, under the
23 │ U.S. Constitution, if "challenged restrictions are not 'neutral' and of 'general
24 │ applicability,' they must satisfy 'strict scrutiny.'" *Roman Cath. Diocese of Brooklyn v.
25 │ Cuomo*, 592 U.S. 14, 18 (2020). Government "regulations are not neutral and generally
26 │ applicable … whenever they treat *any* comparable secular activity more favorably than
27 │ religious exercise." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82
28 │ F.4th 664, 688 (9th Cir. 2023) (en banc) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62

(2021)). In that context, there is no need to assess "whether a law reflects 'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible targeting' of religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.) (quoting *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534-35 (1993)).[35]

61. Bonta cannot hope to meet his burden to infringe on COLFS's right to the free exercise of religion. Last year, Colorado passed a statute prohibiting APR treatment. But as soon as it was issued, a federal district court enjoined it as a violation of the medical provider's free exercise rights. Allowing bioidentical progesterone to be prescribed for everything except APR treatment is not neutral and generally applicable, nor narrowly tailored to achieve a compelling government interest. *Bella Health & Wellness v. Weiser*, ~~No. 1:23-cv-939, 2023 WL 6996860, at *15-16~~ 699 F. Supp. 3d 1189, 1212 (D. Colo. ~~Oct. 21,~~ 2023).

62. Lastly, under free speech precedent, "[w]hile the law is free to promote all sorts of *conduct* in place of harmful behavior, it is not free to interfere with *speech* for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (emphasis added).

63. Government actions abridging speech based on its content or viewpoint, such as COLFS's statements concerning APR, are presumptively unconstitutional unless narrowly tailored to advance a compelling government interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That standard of review—strict scrutiny—is the most

---

[35] In contrast, the California Constitution uses a pre-1990 federal test. *Valov v. Dep't of Motor Vehicles*, 132 Cal. App. 4th 1113, 1126 & n.7 (2005); *Vernon v. Los Angeles*, 27 F.3d 1385, 1392-93 (9th Cir. 1994). Under this standard, there is an easier, "two-fold analysis which calls for a determination of, first, whether the application of the statute imposes any burden upon the free exercise of the defendant's religion, and second, if it does, whether some compelling state interest justifies the infringement." *Montgomery v. Bd. of Ret. of Kern Cnty. Emp. Ret. Ass'n*, 33 Cal. App. 3d 447, 451 (1973) (quoting *People v. Woody*, 61 Cal. 2d 716, 719 (1964)).

1   stringent in all of constitutional law and is satisfied only by government actions that
2   narrowly target "the gravest abuses, endangering paramount interests." *Thomas v.*
3   *Collins*, 323 U.S. 516, 530 (1945).

4          64.    That is because the First Amendment forbids the government from doing
5   precisely what Bonta is trying to do: "excise certain ideas or viewpoints from the public
6   dialogue." *303 Creative LLC v. Elenis*, 600 U.S. 570, 559 (2023) (cleaned up). A policy
7   "aim[ed] at the suppression of views" is flatly prohibited. *Iancu v. Brunetti*, 588 U.S.
8   388, 399 (2019) (cleaned up). The government "cannot attempt to coerce private
9   parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle*
10  *Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Thus, when the government's interest
11  is "related to the suppression of free expression, … it is not valid, let alone substantial."
12  *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (~~2004~~2024).

13         65.    The Supreme Court has further explained that "[p]rohibitions on speech
14  have the potential to chill, or deter, speech outside their boundaries." *Counterman v.*
15  *~~Colo.,~~Colorado,* 600 U.S. 66, 75 (2023). Thus, "an important tool to prevent that
16  outcome—to stop people from steering 'wide[] of the unlawful zone'—is to condition
17  liability on the State's showing of a culpable mental state." *Id.* Under this reasoning,
18  "some false statements are inevitable if there is to be an open and vigorous expression
19  of views in public and private conversation, expression the First Amendment seeks to
20  guarantee." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). But "[t]he First
21  Amendment requires that we protect some falsehood in order to protect speech that
22  matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).

23         66.    For example, "the solicitation of charitable contributions is protected
24  speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988). As the
25  Court memorably noted, "the passing of the collection plate in church [does not] make
26  the church service a commercial project." *Murdock v. ~~Penn.,~~Pennsylvania,* 319 U.S. 105,
27  111 (1943). Thus, to give the freedom of speech adequate "breathing room,"
28  *Counterman*, 600 U.S. at 75, under the First Amendment, a "[f]alse statement alone

1  does not subject a fundraiser to fraud liability." *Alvarez*, 567 U.S. at 719 (quoting

2  ~~Ill.~~*Illinois* v. *Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003)).

3      67.    Bonta has attempted to sidestep free speech principles through the

4  argument that the provision of APR treatment is *commercial*. This is absurd.

5  "Commercial speech is 'usually defined as speech that *does no more* than propose a

6  commercial transaction.'" *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal. App.

7  4th 322, 343 (2004) (emphasis added). And to provide adequate "breathing room," the

8  U.S. Supreme Court has been clear that speech does not "retain[] its commercial

9  character when it is inextricably intertwined with otherwise fully protected speech."

10 *Riley*, 487 U.S. at 796. But pregnancy help organizations "are not compensated by the

11 individuals they speak to, provide pregnancy tests for, or give baby supplies to. The

12 same is true for sidewalk counselors." *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F.

13 Supp. 3d 688, 705 (N.D. Ill. 2023), *permanent injunction entered*, 2023 WL 9325644

14 (N.D. Ill., Dec. 14, 2023). Like pregnancy help organizations generally, COLFS

15 provides free material and support to needy women. "[T]here is no economic

16 motivation of any kind." *Id.*

17     68.    In any event, a restriction on speech also "requires heightened scrutiny

18 whenever the government creates a regulation of speech because of disagreement with

19 the message it conveys," and "[c]ommercial speech is no exception." *Sorrell v. IMS

20 Health Inc.*, 564 U.S. 552, 566-67 (2011). Thus, where the government is "regulat[ing]

21 based on actor," especially when the actor has a "lack of economic motivation for [the]

22 speech," that implies the "conclusion that the regulated speech is not purely

23 commercial." *Nat'l Inst. of Fam. & Life Advocs. v. Clark*, No. 2:23-cv-229, 2024 WL

24 3027983, at *9 (D. Vt., June 14, 2024).

25     69.    In other words, California does not have freewheeling authority to police

26 the views of private citizens on medical issues touching on matters of public

27 importance because medical professionals "might have a host of good-faith

28 disagreements, both with each other *and with the government*, on many topics in their

respective fields." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 772 (2018) (emphasis added). Thus, the debate over ~~APR~~Abortion Pill Reversal—that is, *speech* about it, with no claim and no evidence that ~~APR~~Abortion Pill Reversal has harmed anyone—is simply none of Bonta's business.

## ~~H~~G. CALIFORNIA'S PROTECTION FOR REPRODUCTIVE PRIVACY

70.    In California, every woman enjoys "[t]he fundamental right … to choose whether to bear children," as part "of a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex." *People v. Belous*, 71 Cal. 2d 954, 963 (1969). As stated by the California Constitution, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying … liberty … and privacy," such that "[t]he state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions." Cal. Const. art. I, §§ 1, 1.1.

71.    As codified in California's Reproductive Privacy Act, "every individual possesses a fundamental right of privacy with respect to personal reproductive decisions, which entails the right to make and effectuate decisions about all matters relating to pregnancy." Cal. Health & Saf. Code § 123462. As a result, "[t]he state shall not deny or interfere with the fundamental right of a pregnant individual or an individual who may become pregnant to choose to bear a child." *Id.* at subd. (c).

72.    Further, "[a] person who aids or assists a pregnant person in exercising their rights under this article [the Reproductive Privacy Act] shall not be subject to civil or criminal liability or penalty, or otherwise be deprived of their rights, based solely on their actions to aid or assist a pregnant person in exercising their rights under this article with the pregnant person's voluntary consent." Cal. Health & Saf. Code § 123467(b). This provision flows naturally from California's longstanding acceptance that healthcare providers generally have standing to raise the "sexual privacy" interests of their patients. *Planned Parenthood Affiliates v. Van de Kamp*, 181 Cal. App. 3d 245, 256-57 (1986). Indeed, as stated by the California Supreme Court, in the context of "novel reproductive techniques, … [i]t is not the role of the judiciary to inhibit the use

1  of reproductive technology when the Legislature has not seen fit to do so." *Johnson v.*
2  *Calvert*, 5 Cal. 4th 84, 100-01 (1993).

3      73.    These provisions were added to the Reproductive Privacy Act in 2022.
4  When doing so, the California Legislature declared that "[r]eproductive justice is the
5  human right to control our bodies, sexuality, gender, work, and reproduction." 2022
6  Cal. ~~Stats. 2022,~~Stat., ch. 629, § 1(b) (AB 2223). Yet "pregnant people are under threat
7  of civil penalties for their actual, potential, or alleged pregnancy outcomes and civil
8  penalties have been threatened against people who aid or assist pregnant people in
9  exercising their rights." *Id.* at subd. (e). Thus, "[a] critical part of realizing reproductive
10  justice for people in California is clarifying that there shall be no civil and criminal
11  penalties for people's actual, potential, or alleged pregnancy outcomes." *Id.* at subd.
12  (c).

13      ~~I~~H.  **DEFENDANT BONTA'S ANIMUS**

14      74.    As California Attorney General, Rob Bonta has brazenly tethered his
15  office to the advancement of his militantly pro-abortion politics and corresponding
16  official harassment of pro-life pregnancy help organizations such as COLFS.

17      75.    As stated above, in response to the *Dobbs* leak, Bonta issued a press release
18  to announce that he would immediately begin "us[ing] the full force of the law to
19  defend Californians' reproductive rights."[36] He then held three livestreamed meetings
20  with various politicians to attack the Supreme Court.[37]

21

---

22  [36] Press Release, *Attorney General Bonta Reaffirms Commitment to Protecting*
23  *Reproductive Rights*, Off. of the Att'y Gen. (May 3, 2022), https://oag.ca.gov/news/
    press-releases/attorney-general-bonta-reaffirms-commitment-protecting-
24  reproductive-rights.

25  [37] *See* Cal. DOJ, *AG Bonta, Asm. Weber Convene Local Leaders to Discuss Reproductive*
    *Rights and Abortion*, YouTube (May 5, 2022), https://www.youtube.com/watch?v=
26  m8ybtYawPLI; Cal. DOJ, *AG Bonta, Sen. Gonzalez, Mayor Garcia, & Local Leaders*
    *Discuss Fight to Protect Reproductive Rights*, YouTube (May 6, 2022),
27  https://www.youtube.com/watch?v=MVYzNfx08Hg; Cal. DOJ, *AG Bonta, Leg.*
    *Leaders, & Reproductive Rights Advocates Discuss Fight to Protect Reproductive Rights*,
28  YouTube (May 10, 2022), https://www.youtube.com/watch?v=ZVFY06x6yyU.

76.    *As stated in the Introduction,* Bonta's first action, on June 1, 2022, was to have his Healthcare Rights and Access Section publish a "Consumer Alert" to advise women that "crisis pregnancy centers," i.e., pregnancy help organizations, do not provide abortions.[38] He then had the Department of Justice set up a website to receive complaints about pregnancy help organizations.[39]

77.    After the *Dobbs* decision was issued at the end of June 2022, Bonta displayed that he knows as little history as he does science by announcing in a press release that "[i]t blasts our nation back into the dark ages"—a historical era that ended nearly eight hundred years before the nation was even founded.[40] Bonta set up the "Reproductive Rights" page on the Department of Justice website, to provide information about abortion rights, provide a link for the public to file complaints, and to collect details on Bonta's fight to expand abortion access—showing just how many amicus briefs he'll have his office file.[41]

78.    One case in which Bonta filed numerous amicus briefs concerned attempts to restrict access to mifepristone. When the Supreme Court reversed the

---

[38] *See* Press Release, *Attorney General Bonta Issues Consumer Alert Warning Californians That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care*, Off. of the Att'y Gen. (June 1, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-consumer-alert-warning-californians-crisis; Healthcare Rights and Access Section, *Consumer Alert: Know the Difference: Crisis Pregnancy Centers v. Reproductive Healthcare Facilities*, Cal. DOJ (June 1, 2022) https://oag.ca.gov/system/files/attachments/press-docs/Crisis%20Pregnancy%20Center%20Bulletin.pdf; Cal. DOJ, *AG Bonta Provides Californians Seeking Abortion Care with Update on Reproductive Healthcare Options*, YouTube (June 1, 2022), https://www.youtube.com/watch?v=-lzCjC22zXc.

[39] *See Crisis Pregnancy Center Complaint*, Cal. DOJ, https://oag.ca.gov/crisis-pregnancy-center-complaint.

[40] Press Release, *Attorney General Bonta: California Won't Backslide, We'll Keep Fighting to Strengthen and Expand Access to Safe and Legal Abortion*, Off. of the Att'y Gen. (June 24, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-california-won%E2%80%99t-backslide-we%E2%80%99ll-keep-fighting-strengthen.

[41] *See Reproductive Rights*, Cal. DOJ, https://oag.ca.gov/reprorights.

---

underlying decisions on standing grounds, Bonta proudly announced, "At the California Department of Justice, we remain unwavering in our commitment to ensure that our state continues to be a safe haven for all individuals seeking reproductive healthcare services and medication."[42]

79.    Bonta also sponsored legislation. In the Fall of 2022, he sponsored AB 1242, which was quickly signed into law (2022 Cal. ~~Stats. 2022,Stat.,~~ ch. 627) and which prohibits California agencies from cooperating with states investigating illegally conducted

///

abortions.[43] Six months later, he joined Governor Newsom to announce a bevy of new abortion protections.[44]

80.    In the Fall of 2022, Bonta began an investigation into pregnancy help organizations titled *In the Matter of the Investigation of Crisis Pregnancy Centers*— sending subpoenas to dozens of organizations across the state. He also formed a Reproductive Rights Task Force to align his attorneys with local counsel throughout the state.[45] And on the one-year anniversary of the *Dobbs* leak, Bonta partnered with

---

[42] Press Release, *Attorney General Bonta: U.S. Supreme Court Overturns Decision on Medication Abortion, but the Fight for Reproductive Rights is Far from Over*, Off. of the Att'y Gen. (June 13, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-us-supreme-court-overturns-decision-medication-abortion.

[43] *See* Press Release, *Governor Newsom Signs Assemblymember Bauer-Kahan and Attorney General Bonta's Groundbreaking Legislation Protecting Digital Information on Abortion*, Off. of the Att'y Gen. (Sept. 27, 2022), https://oag.ca.gov/news/press-releases/governor-newsom-signs-assemblymember-bauer-kahan-and-attorney-general-bonta%E2%80%99s.

[44] *See* Cal. DOJ, *AG Bonta Joins Gov. Newsom & other Leaders to Highlight New Actions to Protect Reproductive Freedom*, YouTube (Apr. 18, 2023), https://www.youtube.com/watch?v=xtshHcQj_08; Press Release, *One Year After Roe v Wade Was Overturned, Attorney General Bonta Highlights Californians' Rights to Abortion, Birth Control*, Off. of the Att'y Gen. (June 24, 2023), https://oag.ca.gov/news/press-releases/one-year-after-roe-v-wade-was-overturned-attorney-general-bonta-highlights.

[45] *See* Press Release, *Attorney General Bonta Launches California Reproductive Rights*

UCLA Law School to set up a legal hotline for women to call if they believe that their reproductive rights have been violated.[46]

81.     In light of the above, one might be led to think that access to abortion in California is threatened. But, of course, this is not the case. As stated by the Guttmacher Institute (an abortion rights research and policy organization), California is "very protective" of abortion access.[47] According to the medical magazine *Verywell Health*, California is the second best state for abortion access—after only Maine.[48] Another policy group places New Jersey first—but still places California second.[49] Whichever way you slice it, Bonta has ensured that California is a "safe haven" for abortion access.[50]

---

*Task Force*, Off. of the Att'y Gen. (Oct. 25, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-launches-california-reproductive-rights-task-force; Cal. DOJ, *Attorney General Bonta Launches California Reproductive Rights Task Force*, YouTube (Oct. 25, 2022), https://www.youtube.com/watch?v=3ckIfo0Ukmg.

[46] *See* Press Release, *Attorney General Bonta: As Attacks on Reproductive Rights Persist, California Will Continue to Lead Nationwide Defense*, Off. of the Att'y Gen. (May 2, 2023), https://oag.ca.gov/news/press-releases/attorney-general-bonta-attacks-reproductive-rights-persist-california-will; Cal. DOJ, *AG Bonta Highlights Efforts of SoCal Legal Alliance for Reproductive Justice, Announces New Hotline*, YouTube (May 2, 2023), https://www.youtube.com/watch?v=jVImjAAzW-A.

[47] *See Interactive Map: US Abortion Policies and Access After Roe*, Guttmacher Inst. (as of June 7, 2024), https://states.guttmacher.org/policies/california/abortion-policies.

[48] *See* Jennifer Welsh, *A Verywell Report: Abortion Access Ranked By State*, VeryWell Health (Sept. 27, 2021), https://www.verywellhealth.com/abortion-access-ranking-states-5202659.

[49] *See* C. Nicole Mason, et al., *IWPR Reproductive Rights Index: A State-by-State Analysis and Ranking*, Inst. for Women's Policy Res. (July 2022), https://iwpr.org/wp-content/uploads/2022/07/Reproductive-Rights-Index-2022_FINAL_website.pdf.

[50] *See* Press Release, *Attorney General Bonta: From Idaho to Arizona, We Welcome Abortion Care Providers Willing to Practice in California*, Off. of the Att'y Gen. (Apr. 23, 2024), https://oag.ca.gov/news/press-releases/attorney-general-bonta-idaho-arizona-we-welcome-abortion-care-providers-willing.

82. But despite his investigations, and despite his website and hotlines, Bonta ***could not find anybody to sue***. For over a full year, their Healthcare Rights and Access Section and Reproductive Rights Task Force found that abortion access was not actually threatened in California. So, to justify their existence, on September 21, 2023, they decided to file their first and only Reproductive Rights lawsuit, *attacking the right of women to keep wanted babies through APR treatment even after they have revoked their consent to abortion.*[51]

83. As shown above, there is no evidence to support Bonta's allegation that pregnancy resource help organizations have misled women about APR. Yet he and his Healthcare Rights and Access Section have chosen to commence an *in terrorem* lawsuit for injunctive relief, ancillary relief, restitution, and civil penalties. Bonta is motivated by retaliatory animus against pro-life speech and expressive association of all pro-life pregnancy help resource organizations.

## II. Defendant Bonta's Viewpoint Discrimination

84. While Bonta has chosen to prosecute pro-life pregnancy help organizations, despite lacking any evidence of fraud, deception, or injury to anyone, Bonta has taken no action regarding the demonstrably false and misleading statements of providers of chemical abortion as described above—a risky procedure that uses two powerful drugs to end a pregnancy in its early stages. *All. for Hippocratic Med. II*, 78 F.4th at 229-32.

85. For example, for at least the past six years, Planned Parenthood has made false and misleading statements about both Abortion Pill Reversal and abortion pill administration under the chemical abortion regimen.

---

[51] *See* Cal. DOJ, *Attorney General Bonta Announces Legal Action to Protect Reproductive Freedom and Transparency*, YouTube (Sept. 21, 2023), https://www.youtube.com/watch?v=_kOyqRQ9EtU.

86.     As to APR, Planned Parenthood has falsely claimed on its website that APR has never "been tested for safety, effectiveness, or the likelihood of side effects."[52] Much more than just a misleading statement about the safety or efficacy of APR treatment, Planned Parenthood's claim is an objective falsehood. The misrepresentation deceives visitors to Planned Parenthood's website, interfering with the reproductive rights of those who will be misled into believing that they have no option but to finish their unwanted abortions.

87.     In addition to lying about APR, Planned Parenthood misleads vulnerable women about the serious risks involved in the chemical abortion regimen, consisting of two powerful drugs: first mifepristone, which blocks progesterone, literally starving the unborn child, and then off-label misoprostol, which forcibly expels the child from the uterus. For example, Planned Parenthood has for years falsely advised vulnerable women, with no mention of risks, that "Medication abortion – also called the abortion pill – is a *safe and effective* way to end an early pregnancy."[53]

88.     Further misleading women, Planned Parenthood, which charges for administration of the second drug in the chemical abortion regimen, misoprostol, states that "the Abortion Pill" merely "causes cramping and bleeding that can last several hours or more. You can be at home, or wherever is comfortable for you. Plan on taking it easy for the day." [54]

89.     Even more egregiously, in answer to the specific question: "What can I expect after I take the abortion pill?," Planned Parenthood—again avoiding any

---

[52] Emily, *Ask the Experts: Can the Abortion Pill Be Reversed after You Have Taken It?*, Planned Parenthood (Sept. 14, 2017), https://www.plannedparenthood.org/blog/can-the-abortion-pill-be-reversed-after-you-have-taken-it.

[53] *The Abortion Pill*, Planned Parenthood, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill.

[54] *How does the abortion pill work?*, Planned Parenthood, https://www.~~plannedparenthood~~plannedparenthood.org/learn/abortion/the-abortion-pill/how-does-the-abortion-pill-work.

mention of potential risks or serious side effects, states on its website that "You may feel tired or crampy for a day or so, and you'll have bleeding and spotting for awhile [sic]. Most people go back to normal activities the day after a medication abortion."[55]

90.    Planned Parenthood fails to disclose that the FDA estimates that more than 4,000 women who completed the two-drug medication regimen have suffered serious adverse medical events, including hemorrhage, septic shock, ruptured ectopic pregnancies, and at least 28 deaths.[56] Also not disclosed is the far greater risk of emergency hospitalization due to chemical versus surgical abortion.[57]

91.    In contrast, as shown above, APR is entirely safe with no such history of adverse outcomes. For over 50 years, medical professionals have used bioidentical progesterone to support healthy pregnancies and prevent miscarriage when a pregnant woman naturally produces too little of the hormone for a pregnancy to continue.[58] In 1998, the FDA gave the administration of bioidentical progesterone the agency's formal approval to support healthy pregnancies.[59]

92.    The FDA based that approval, in part, on a pharmacology/toxicology review that found that the bioidentical progesterone produced the same pharmacologic

---

[55] *What can I expect after I take the abortion pill?*, Planned Parenthood, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/what-can-i-expect-after-i-take-the-abortion-pill.

[56] Susan Jaffe, *Drug Developers Caution Against US Mifepristone Ban*, 401 The Lancet 1325, 1326 (2023).

[57] Maarit Niinimaki, et al., *Immediate Complications After Medical Compared with Surgical Termination of Pregnancy*, 114 Obstet. Gynecol. 795 (2009) (finding that "overall incidence of adverse events was fourfold higher in the medical compared with surgical abortion cohort (20.0% compared with 5.6%, P<.001)").

[58] Gian Carlo Di Renzo, et al., *Progesterone: History, Facts, and Artifacts*, 69 Best Pract. & Res. Clinical Obstet. & Gynecol. 78 (2020).

[59] *See Drug Approval Package: Prometrium*, FDA (Dec. 26, 1998), https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/020843_s000_PrometriumTOC.cfm.

1  responses as naturally occurring progesterone and is thus not at all harmful.[60] Today,
2  bioidentical progesterone treatment is commonly used worldwide to reduce the risk of
3  miscarriage.[61]

4      93.    Bioidentical progesterone treatment is also used to help prevent
5  uninduced abortion that would occur from IVF patients' bodies rejecting embryos
6  trying to implant.[62] Multiple peer-reviewed medical studies have found that this same
7  kind of progesterone supplementation treatment discussed above can save about two-
8  thirds of unborn children from death if given within three days of when mifepristone
9  was administered.[63]

10     94.    The APR protocol is a legitimate reproductive health procedure, fully
11 legal in California, the advocacy and promotion of which are protected by the U.S.
12 Constitution and the California Constitution as a matter of public concern in which
13 government has no right to interfere by attempts to impose, through lawfare or
14 otherwise, Defendant Bonta's preferred perspective in favor of abortion-on-demand or
15 his view of what constitutes "credible scientific evidence."

16     95.    Yet, despite the medical facts showing the serious risks of chemical
17 abortion versus the safety of progesterone therapy to reverse the effects of chemical
18 abortion, including the off-label use of misoprostol, Defendant Bonta has not noticed a
19 proposed lawsuit against Planned Parenthood for its misleading statements and
20 omissions relating to the safety and efficacy of pregnancy-destroying chemicals.

21

22 [60] *See* FDA, Center for Drug Evaluation and Research, Application No. NDA 2-843,
23 p.4 (Feb. 25, 1998), https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/
   020843_S000_PROMETRIUM%20CAPSULES_PHARMR.PDF.

24 [61] Line Rode, et al., *Systematic Review of Progesterone for the Prevention of Preterm Birth*
25 *in Singleton Pregnancies*, 88 Acta Obstet. et Gynecol. Scandinavica 1180 (2009).

26 [62] Am. Soc'y for Reprod. Med., *Fact Sheet: Progesterone Supplementation During IVF*
27 (2016), https://www.reproductivefacts.org/news-and-publications/fact-sheets-and-
   infographics/progesterone-supplementation-during-ivf/.

28 [63] *See, e.g.*, George Delgado, et al., *A Case Series Detailing the Successful Reversal of the*
   *Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21 (2018).

96.    Rather, precisely because APR *saves* lives instead of ending them in the womb, Bonta has decided to target pro-life pregnancy help organizations in California, with *in terrorem* litigation with no evidence of harm to anyone from the administration of a pregnancy-protecting hormone approved by the FDA for that very purpose. Defendant Bonta thus reveals his intent to impose viewpoint-discriminatory censorship and other restrictions on COLFS's protected speech and expressive conduct and association. This is blatantly unconstitutional. Debates over the Abortion Pill and Abortion Pill Reversal should "be left to the political and democratic process"—not the courts. *All. For Hippocratic Med. III*, 602 U.S. at 396.

## ~~Thus~~J.    COLFS's Need for Pre-Enforcement Relief

97.    COLFS has provided Abortion Pill Reversal as a treatment option for patients since its medical director, George Delgado, first treated a woman in COLFS's offices seeking help in maintaining her pregnancy after taking mifepristone in 2010. COLFS continues to provide Abortion Pill Reversal as a treatment option today. This includes both describing Abortion Pill Reversal as acting to "reverse" the effects of a chemical abortion, and accurately describing what various scientific studies report about APR, both on COLFS's website, in individual interactions with patients, and in other contexts.

98.    Defendant Bonta's civil enforcement action against Heartbeat International and RealOptions has caused concern at COLFS because it is a religious nonprofit and is morally obligated to provide life-affirming care to any woman who requests it from COLFS. This includes offering Abortion Pill Reversal. Because of the religious nature of the COLFS organization, it is obligated to help any woman who is at risk of losing her pregnancy—for any reason whatsoever—to the best of its ability. COLFS is committed to this obligation despite the risk of staggering fines which the Attorney General is potentially seeking in his prosecution of Heartbeat International and RealOptions.

99.    The civil enforcement action does not allege that any woman has been deceived or harmed by Heartbeat's or RealOptions's purely charitable speech about Abortion Pill Reversal, and thus does not seek restitution or damages. Rather, the Complaint solely seeks civil penalties for unfair business practices and misleading advertising—up to $5,000 per incident. *See* Cal. Bus. & Prof. Code §§ 17206(a), 17500; *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) (same conduct can receive separate $2,500 fines under the UCL and FAL).

100.    The civil enforcement action contains several discrete categories of information that AG Bonta contends are fraudulent to repeat either on websites or in individual interactions with patients. *See* Exhibit 3, Complaint, ¶¶97, 100-01. These include: (1) that Abortion Pill Reversal is "effective" at "revers[ing]" a medical abortion, leading to thousands of lives saved; (2) that the standard Abortion Pill Reversal protocol has been shown to have a 64-68% success rate and no increased risk of birth defects (via primarily the 2018 Delgado study); and (3) that Abortion Pill Reversal may still be effective in non-standard situations (such as more than 72-hours after taking mifepristone, or after taking misoprostol or methotrexate). The Complaint also alleges that it is fraudulent to fail to mention (4) that Abortion Pill Reversal may lead to life-threatening bleeding. *See id.* The Complaint alleges that Heartbeat and RealOptions made these misrepresentations on their websites, in individual interactions with clients or patients, and on pro-life podcasts. *See id.* at ¶¶49-95.

101.    In determining an appropriate fine for these alleged violations, the court must consider a host of equitable factors, and compare the total fine against the seriousness of the defendant's misconduct and against its assets. *See* Cal. Bus. & Prof. Code § 17206(b); *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 318 (2022) ($302 million); *People v. Overstock.com, Inc.*, 12 Cal. App. 5th 1064, 1087-88 (2017) ($6.8 million). Weighing against a lenient fine is a defendant's choice to continue with his allegedly illegal conduct during the litigation. *San Francisco v. Sainez*, 77 Cal. App. 4th 1302, 1316 (2000) (referencing $9.5 million fine). In light of these cases, COLFS is

1    potentially subject to very significant fines.

2        102.    Despite COLFS's significant concerns, it has decided to not pull down the

3    information about Abortion Pill Reversal from its websites. COLFS continues to have

4    generic webpages which mention as a matter of course that "[t]he abortion pill can be

5    reversed."[64] COLFS also has webpages that discuss successful reversals, including

6    personal testimony pages. Those webpages imply—contrary to the Attorney General's

7    belief—that Abortion Pill Reversal is effective.[65]

8        103.    COLFS also frequently discusses Abortion Pill Reversal in other contexts

9    that are not unlike the podcast appearances through which the Attorney General

10    accuses Heartbeat of engaging in fraudulent business practices. For example, every

11    year, COLFS holds an annual fundraising gala. Every year COLFS mentions its work,

12    including Abortion Pill Reversal.[66]

13        104.    Also, on COLFS's website is a detailed FAQ page describing much of the

14    science underlying Abortion Pill Reversal. This includes reference to Dr. Delgado's

15    2018 case series, and its conclusion that viable APR protocols have a 64-68% success

16    rate and no birth defects. That page also tells women to reach out to COLFS even if

17    they have a non-standard situation since COLFS will always do what it can to provide

18    them with care, and because "[i]t may not be too late" or "[y]ou may still be pregnant."[67]

19    _____

20    [64] *Are there Different Types of Abortion?*, COLFS Medical Clinic,
      https://colfsclinic.org/abortion-consultation/types-of-abortion/; *Abortion Pill Rescue*,
21    COLFS Medical Clinic, https://colfsclinic.org/abortion-consultation/abortion-pill-
22    rescue/.

      [65] *Stacy's Testimony: Saving Baby Brayleigh*, Friends of COLFS (July 22, 2022),
23    https://friendsofcolfs.org/stacys-testimony-saving-baby-brayleigh/.

24    [66] COLFS, *8th Annual Pro-Life is Good Gala Promotional Video*, YouTube (Oct. 10, 2017),
25    https://www.youtube.com/watch?v=G1IS35gJXVs; COLFS, *7th Annual Pro-Life is
      Good Gala Promotional Video*, YouTube (Oct. 11, 2016), https://www.youtube.
26    com/watch?v=ax8_DK2vsaE; COLFS, *6th Annual Pro-Life is Good Gala Promotional
      Video*, YouTube (Nov. 5, 2015), https://www.youtube.com/watch?v=M-HKXf8ydqY.
27
28    [67] *Abortion Pill Rescue FAQs*, COLFS Medical Clinic, https://colfsclinic.org/abortion-
      pill-rescue-faqs/.

VERIFIED FIRST AMENDED COMPLAINT

Although COLFS does not include any specific representations about non-standard situations on its websites, its religious mission requires it to provide care to any woman who presents for care.

97.105.    Worried that it too may be subject to civil enforcement actions, and unwilling to cease offering to help women despite the threat of ruinous fines, Plaintiff Culture of Life Family Services, Inc. now brings this complaint for declaratory and injunctive relief, and nominal and actual damages.

///

# FIRST CAUSE OF ACTION
### Violation of the Free Speech Clause of the U.S. Constitution:
### Content & Viewpoint Discrimination: U.S. Const. amend. I; 42 U.S.C. § 1983

98.106.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

99.107.    The First Amendment to the U.S. Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

100.108.    "The Free Speech Clause of the First Amendment … protect[s] the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)). Under the First Amendment, "governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). When the government's interest is "related to the suppression of free expression, … it is not valid, let alone substantial." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (20042024).

101.109.    Government action is content-based if it "on its face draws distinctions based on the message a speaker conveys" or if it "cannot be justified without reference to the content of the regulated speech, or [was] adopted by the

1  government because of disagreement with the message the speech conveys." *Reed v.*
2  *Town of Gilbert*, 576 U.S. 155, 164 (2015) (cleaned up).

3      102.110.   Viewpoint discrimination is "an egregious form of content
4  discrimination," in which "the government targets not subject matter, but particular
5  views taken by speakers on a subject." *Rosenberger v. Univ. of Va.*, 515 U.S. 819, 829
6  (1995). A restriction is viewpoint-based "when the specific motivating ideology or the
7  opinion or perspective of the speaker is the rationale for the restriction." *Id.*

8  ###

9      103.111.   Even within a proscribed category of speech, the government may
10 not engage in content or viewpoint discrimination within that proscribed category.
11 *R.A.V. v. St. Paul*, 505 U.S. 377, 384 (1992) ("[T]he government may proscribe libel;
12 but it may not make the further content discrimination of proscribing *only* libel critical
13 of the government.").

14     104.112.   Restricting speech about APRAbortion Pill Reversal is a content-
15 based restriction on speech. California seeks to punish advertising for Abortion Pill
16 Reversal, and truthful descriptions of it, and to prohibit COLFS from truthfully
17 counseling patients in connection with APRthe safety, efficacy, and side-effects of
18 Abortion Pill Reversal.

19     105.113.   This proposed restriction is content-based because, "on [their]
20 face," each "draws distinctions based on the message a speaker conveys" and "cannot
21 be justified without reference to the content of the regulated speech, or [was] adopted
22 by the government because of disagreement with the message the speech conveys."
23 *Reed*, 576 U.S. at 163-64 (cleaned up).

24     106.114.   This proposed restriction is also viewpoint-discriminatory because
25 it "targets … particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at
26 829.

27     107.115.   There is no prospect that the government can demonstrate that
28 restricting APRspeech about Abortion Pill Reversal actually furthers a compelling

government interest, let alone an "exceedingly persuasive" one. *Students for Fair Admissions, Inc. v. Harvard Coll.*, 600 U.S. 181, 217 (2023).

108.116.    First, given that there is no evidence of a single woman harmed by Abortion Pill Reversal, California cannot show an "actual problem in need of solving." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). Indeed, in light of the fact that APR treatment has actually been proven effective, and because of California's strong protection for reproductive privacy, there is no problem in need of solving.

109.117.    Second, restricting ~~APR~~speech about Abortion Pill Reversal is vastly underinclusive, in that it does not reach the majority of situations in which pregnant women take progesterone to ward off threatened miscarriage. Nor does it address countless other examples of off-label drug use (like misoprostol itself). A government fails to show a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993); *see also Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

110.118.    Third, the response of California's own purported experts in the field—the California Board of Registered Nursing—belies any claim that anything remotely approaching a compelling interest exists here. If the interest in saving women from Abortion Pill Reversal were so strong, and the science so clear, then why did the Nursing Board audit ~~APR~~Abortion Pill Reversal and then approve including it in continuing education courses? California cannot pretend to have a compelling interest in prohibiting a practice its own regulators deemed fine.

111.119.    Nor can California hide behind the single failed randomized trial conducted by Dr. Creinin. As stated above, the Danco/Creinin study, if its size allows for any conclusions at all, stands merely for the propositions that (1) administering

progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of a healthy pregnancy over doing nothing (sometimes euphemistically called "watchful waiting") and (2) administering progesterone after mifepristone (i.e., APR) gives a pregnant woman a better chance of avoiding severe bleeding over doing nothing. Any enhanced risk to a woman in this situation who wants to continue her pregnancy would arise from *not* receiving ~~APR~~Abortion Pill Reversal treatment.

112.120.    Nor can California plausibly carry their burden of showing that restricting ~~APR~~Abortion Pill Reversal is narrowly tailored to any valid interest, much less a compelling one. The same underinclusivity that dooms the compelling interest argument also forecloses narrow tailoring, because a law that is "underinclusive in substantial respects" demonstrates an "absence of narrow tailoring" that "suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546.

113.121.    Bonta's assertion that ~~APR~~speech about Abortion Pill Reversal must be restricted violates COLFS's right to aid women in exercise of their reproductive privacy rights as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

114.122.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict ~~APR~~Abortion Pill Reversal.

115.123.    COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION
**Violation of the Right to Free Exercise of Religion Under the U.S. Constitution
U.S. Const. amend. I; 42 U.S.C. § 1983**

1   ~~116.~~124.      Plaintiff incorporates by reference all allegations contained in the
2   preceding paragraphs as though fully set forth herein.

3   ~~117.~~125.      The First Amendment to the U.S. Constitution provides that
4   "Congress shall make no law respecting an establishment of religion, or prohibiting the
5   free exercise thereof." U.S. Const. amend. I. The Free Exercise clause applies to the
6   states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v.*
7   *~~Conn.,~~Connecticut,* 310 U.S. 296 (1940).

8   ~~118.~~126.      The Free Exercise Clause "protects not only the right to harbor
9   religious beliefs inwardly and secretly. It does perhaps its most important work by
10  protecting the ability of those who hold religious beliefs of all kinds to live out their
11  faiths in daily life through 'the performance of (or abstention from) physical acts.'"
12  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *~~Employment~~*
13  *~~Division~~Emp. Div.* v. *Smith*, 494 U.S. 872, 877 (1990)).

14  ~~119.~~127.      Under the Free Exercise clause, if "challenged restrictions are not
15  'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this
16  means that they must be 'narrowly tailored' to serve a 'compelling' state interest."
17  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

18  ~~120.~~128.      "A government policy will fail the general applicability requirement
19  if it 'prohibits religious conduct while permitting secular conduct that undermines the
20  government's asserted interests in a similar way.'" *Kennedy*, 597 U.S. at 526 (quoting
21  *Fulton v. Philadelphia*, 593 U.S. 522, 534 (2021)). Government "regulations are not
22  neutral and generally applicable ... whenever they treat *any* comparable secular activity
23  more favorably than religious exercise." *Fellowship of Christian Athletes v. San Jose*
24  *Unified Sch. Dist.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc) (quoting *Tandon v.*
25  *Newsom*, 593 U.S. 61, 62 (2021)).

26  ~~121.~~129.      In that context, there is no need to assess "whether a law reflects
27  'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible
28  targeting' of religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717

(2021) (Statement of Gorsuch, J.) (quoting *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534-35 (1993))

122.130.    Consistent with its underlying commitment to the dignity of every human life, COLFS provide life-affirming medical care to every woman at risk of miscarriage—whether that risk arises biologically, due to physical trauma, or because she has willingly or unwillingly ingested the first abortion pill. As a matter of conscience, COLFS cannot refuse to administer progesterone to a woman who desires to continue her pregnancy simply because she first took mifepristone. COLFS is therefore religiously obligated to offer Abortion Pill Reversal. As part of offering Abortion Pill Reversal, and counseling women with respect to it, COLFS is similarly religiously bound to make truthful and accurate statements regarding its safety, efficacy, and side-effects.

131.    California's asserted interest in restricting speech about Abortion Pill Reversal is to protect women from a dangerous and deceptive practice. But California's restriction of speech about Abortion Pill Reversal is not neutral and generally applicable for three reasons.

132.    First, the statutes which California seeks to enforce are themselves not generally applicable. Cal. Bus. & Prof. Code §§ 17200, 17500, expressly do not apply to "public entit[ies]" regardless of their "involvement in commercial activity." *Cal. Med. Ass'n, Inc. v. Univ. of Cal.*, 79 Cal. App. 4th 542, 551 & n.14 (2000) (citing Cal. Bus. & Prof. Code §§ 17201, 17506; Cal. Gov. Code § 811.2); *see also Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198, 1203-04 (1999) (rejecting policy argument that state is "competing" in business). Thus, hospitals operated by public universities can offer Abortion Pill Reversal, and engage in speech regarding it, with no fear of prosecution under Cal. Bus. & Prof. Code §§ 17200, 17500.

133.    The statutes also only apply to *commercial* activity. *See O'Connor v. Superior Ct.*, 177 Cal. App. 3d 1013, 1019 (1986). Thus, they do not apply to political campaigns which send out fraudulent campaign advertisements, *Chavez v. Citizens for a Fair Farm*

*Lab. Law*, 84 Cal. App. 3d 77, 79 n.2 (1978), or even use fraudulent election fundraising practices. *Nat'l Comm. of Reform Party of U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 363 (9th Cir. 1999). Even if COLFS's provision of APR treatment was "commercial," which it is not, it is sufficiently similar to non-commercial activities that are categorically exempted to be comparable to them.

134.    Both the government and political campaigns can engage in unfair competition and injure consumers, and so exemptions for them are relevantly comparable to exemptions for religious organizations, triggering strict scrutiny. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212-13 (D. Colo. 2023).

135.    Second, general applicability also "requires, among other things, that the laws be enforced evenhandedly." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). A government regulation is not generally applicable when it "results in a pattern of selective enforcement favoring comparable secular activities." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc); *accord Ward v. Polite*, 667 F.3d 727, 739 (6th Cir. 2012). This can include the failure of civil enforcement authorities to enforce a statute against comparable secular conduct. *See Soos v. Cuomo*, 470 F. Supp. 3d 268, 282-83 (N.D.N.Y. 2020); *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 647-54 (2018) (Gorsuch, J., concurring).

136.    Here, as stated above, Planned Parenthood makes false statements regarding the Abortion Pill and Abortion Pill Reversal. Specifically, Planned Parenthood makes the categorically false statement that Abortion Pill Reversal has never "been tested for safety, effectiveness, or the likelihood of side effects." Planned Parenthood also misleads women about the safety, efficacy, and side-effects of the Abortion Pill. These statements are relevantly comparable to COLFS's statements regarding Abortion Pill Reversal. Yet Defendant Bonta has not sought to enforce Cal. Bus. & Prof. Code §§ 17200, 17500, against Planned Parenthood, making the statutes not generally applicable.

123.137.    Third, Defendant Bonta's attempted restriction on truthful speech about the safety, efficacy, and side-effects of Abortion Pill Reversal will have the cumulative and practical effect of restricting provision of that service. But Abortion Pill Reversal is nothing more than supplemental progesterone. And there are a multitude of off-label uses of progesterone, which has been widely prescribed to women—including pregnant women—for more than 50 years. Yet California makes no attempt to regulate—much less outright prohibit—the off-label use of progesterone (or any other drug) in any other circumstance. That omission renders California's attempted restriction of APR not generally applicable. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1212-13 (D. Colo. 2023).

124.138.    For the same reasons as stated in the First Cause of Action, Bonta cannot show that restricting APRspeech about Abortion Pill Reversal as a fraudulent business practice or false advertising is narrowly tailored to achieve a compelling state interest.

125.139.    Bonta's assertion that APRspeech about Abortion Pill Reversal must be restricted violates COLFS's right to aid women in exercise of their reproductive privacy rights as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS has no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

126.140.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict APRAbortion Pill Reversal.

127.141.    113.    COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

# THIRD CAUSE OF ACTION

**Violation of the Free Speech Clause of the U.S. Constitution:**
**Right to Receive Information: U.S. Const. amend. I; 42 U.S.C. § 1983**

~~128.~~142.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

~~129.~~143.    The First Amendment to the U.S. Constitution provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The Free Speech Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

~~130.~~144.    The First Amendment protects not only the right to disseminate information but also the "reciprocal right to receive" information. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976~~)~~). "[T]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own right[] of speech." *Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). Under the "right to listen," the listener must have "a concrete, specific connection to the speaker." *Murthy v. ~~Mo.~~, ~~144 S. Ct. 1972, 1996~~Missouri, 603 U.S. 43, 75* (2024).

~~131.~~145.    Physicians have third-party standing to assert the interests of their patients so long as the physician has also suffered injury himself. *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015); *All. for Hippocratic Med. III*, 602 U.S. at 393 n.5 (third-party standing denied in absence of any injury to physician).

~~132.~~146.    Restricting speech about APR is a content-based restriction on speech. California seeks to punish advertising for Abortion Pill Reversal and to prohibit COLFS from counseling patients in connection with APR.

~~133.~~147.    This proposed restriction is content-based because, "on [their] face," each "draws distinctions based on the message a speaker conveys" and "cannot be justified without reference to the content of the regulated speech, or [was] adopted

by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163-64 (cleaned up).

~~134.~~148.    This proposed restriction is also viewpoint-discriminatory because it "targets … particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829.

~~135.~~149.    For the same reasons as stated in the First Cause of Action, Bonta cannot show that restricting ~~APR~~speech about Abortion Pill Reversal as a fraudulent business practice or false advertising is narrowly tailored to achieve a compelling state interest.

~~///~~

~~136.~~150.    Bonta's assertion that ~~APR~~speech about Abortion Pill Reversal must be restricted violates COLFS's patients' right to receive information as guaranteed by the Free Speech Clause of the First Amendment to the U.S. Constitution. COLFS's patients have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

~~137.~~151.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict ~~APR~~Abortion Pill Reversal.

~~138.~~152.    ~~113.~~ COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

*///*

*///*

*///*

# FOURTH CAUSE OF ACTION

**Violation of the Substantive Due Process Rights of the U.S. Constitution
U.S. Const. amend. XIV; 42 U.S.C. 1983**

~~139.~~153.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

~~140.~~154.    Under the Due Process Clause of the Fourteenth Amendment, all Americans have a "right of privacy," which means "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). This includes the "right to decide independently, with the advice of [her] physician, to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

~~141.~~155.    The U.S. Constitution also protects the right to refuse "unwanted medical treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citing *Jacobson v. Mass.*, 197 U.S. 11, 24-30 (1905)), and the right "to bodily integrity." *Wash. v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. Calif.*, 342 U.S. 165 (1952)). This right protects against "'forced medical treatment' for the recipient's benefit." *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

~~142.~~156.    "[W]here a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey v. Population Servs., Int'l*, 431 U.S. 678, 686 (1977); *accord Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 340-41 (1997). "When a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest," i.e., "strict scrutiny." *Dep't of State v. Muñoz*, ~~144~~602 U.~~S. Ct. 1812, 1821-22~~ 899, 910 (2024).

~~143.~~157.    Physicians have third-party standing to assert the interests of their patients so long as the physician has also suffered injury himself. *McCormack v. Herzog*,

788 F.3d 1017, 1027 (9th Cir. 2015); *All. for Hippocratic Med. III*, 602 U.S. at 393 n.5 (third-party standing denied in absence of any injury to physician).

144.158.    Here, California's attempt to restrict APRspeech about Abortion Pill Reversal violates the Fourteenth Amendment rights of pregnant women to not be forced to undergo or continue an abortion.

145.159.    Bonta's assertion that APRspeech about Abortion Pill Reversal must be restricted violates COLFS's patients' rights to procreation, reproductive privacy, and to reject unwanted medical treatment as guaranteed by the Substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. COLFS's patients have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights absent declaratory and injunctive relief providing that COLFS may provide Abortion Pill Reversal treatment.

146.160.    Pursuant to 42 U.S.C. § 1983, COLFS is entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of Bonta's attempt to restrict APRAbortion Pill Reversal.

///

147.161.    113.  COLFS has engaged the services of private counsel to vindicate its rights under the law. COLFS is therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///

///

///

///

///

///

1   ///

2                         **PRAYER FOR RELIEF**

3       WHEREFORE, Plaintiff respectfully requests the entry of an Order and

4 Judgment, as applicable, for the following relief:

5        A.     An order and judgment declaring that Defendant, his agents and

6                employees, and all those acting in concert with them, may not enforce Cal.

7                Bus. & Prof. Code §§ 17200 or 17500, or any substantively similar statute,

8                against Plaintiff's provision of Abortion Pill Reversal treatment to

9                pregnant women, which includes truthful statements regarding the

10               safety, efficacy, and side-effects of Abortion Pill Reversal;

11        B.     An order temporarily, preliminarily, and permanently enjoining and

12                prohibiting Defendant, his agents and employees, and all those acting in

13                concert with them, may not enforce Cal. Bus. & Prof. Code §§ 17200 or

14                17500, or any substantively similar statute, against Plaintiff's provision of

15                Abortion Pill Reversal treatment to pregnant women, which includes

16               truthful statements regarding the safety, efficacy, and side-effects of

17               Abortion Pill Reversal;

18        C.     Nominal and actual damages;

19        D.     Attorneys' fees pursuant to statute;

20        E.     Litigation costs and expenses; and

21        F.     Such other and further relief as the Court deems appropriate and just.

22

23                       Respectfully submitted,

24                       LiMANDRI & JONNA LLP

25

26 Dated: ~~July 30~~November 15, 2024    By: _____

27                       Charles S. LiMandri
                         Paul M. Jonna

28                       Jeffrey M. Trissell

Attorneys for Plaintiff Culture of Life Family Services, Inc.

## VERIFICATION OF WILLIAM R. GOYETTE

I, William R. Goyette, am the CEO and Chairman of the Board of Culture of Life Family Services, Inc., a plaintiff in this action. I have read the above Verified First Amended Complaint and know its contents. The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my staff, attorneys, or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my staff, attorneys, or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 29th15th day of JulyNovember 2024, at San Marcos, California.

_____

William R. Goyette

1

2

## VERIFICATION OF GEORGE DELGADO, M.D.

3

4

I, George Delgado, am the Medical Director of Culture of Life Family Services,

5

Inc., a plaintiff in this action. I have read the above Verified First Amended Complaint

6

and know its contents. The information supplied in the foregoing is based on my own

7

personal knowledge or has been supplied by my staff, attorneys, or other agents or

8

compiled from available documents. The information in the foregoing document is true

9

to the extent of my personal knowledge. As to the information provided by my staff,

10

attorneys, or other agents or compiled from available documents, including all

11

contentions and opinions, I do not have personal knowledge but made a reasonable and

12

good faith effort to obtain the information by inquiry to other natural persons or

13

organizations, and believe it is true.

14

Thus, I am informed and believe that the matters stated in the foregoing

15

document are true and on that ground certify or declare under penalty of perjury under

16

the laws of the United States and the State of California that the foregoing is true and

17

correct.

18

Executed this 30th15th day of JulyNovember 2024, at Escondido, California.

19

20

_____
George Delgado, M.D.

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

***Culture of Life Services v.  Attorney General Ron Bonta***

USDC Court Case No.: 3:24-cv-1338-GPC-KSC

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

• **REDLINE OF FIRST AMENDED COMPLAINT PURSUANT TO S.D. CAL. CIV. L.R. 15.1(C).**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Rob Bonta, Attorney General of California
Renu George, Senior Assistant Attorney General
Karli Eisenberg, Supervising Deputy Attorney General
Kathleen Boergers, Supervising Deputy Attorney General
Erica Connolly, Deputy Attorney General
Hayley Penan, Deputy Attorney General
1300 "I" Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Tel: (916) 210-7755
Fax: (916) 327-2319
E-Mail: Erica.Connolly@doj.ca.gov
E-Mail: karli.eisenberg@doj.ca.gov
E-Mail: kathleen.boergers@doj.ca.gov
E-Mail: hayley.penan@doj.ca.gov
**Attorney for Defendant Attorney General of California**
**Rob Bonta**

  X    **(BY ELECTRONIC MAIL)** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

  X    (**BY ELECTRONIC FILING/SERVICE**) I caused such document(s) to be Electronically Filed and/or Service using the ECF/CM System for filing and transmittal of the above documents to the above-referenced ECF/CM registrants.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.  Executed on November 15, 2024, at Rancho Santa Fe, California.

_____
Kathy Denworth