ROB BONTA
Attorney General of California
NELI N. PALMA (SBN: 203374)
Senior Assistant Attorney General
KATHLEEN BOERGERS (SBN: 213530)
KARLI EISENBERG (SBN: 281923)
Supervising Deputy Attorneys General
ERICA CONNOLLY (SBN: 288822)
HAYLEY PENAN (SBN: 313693)
LAUREN ZWEIER (SBN: 291361)
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7785
  Fax: (916) 324-5567
  E-mail: Hayley.Penan@doj.ca.gov
*Attorneys for Defendant Attorney General*
*Rob Bonta, in his official capacity as*
*California Attorney General*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Cultures of Life Family Services, Inc.,**<br><br>Plaintiff,<br><br>v.<br><br>**Attorney General Bonta, in his official capacity as the California Attorney General,**<br><br>Defendant. | 3:24-cv-01338-GPC-KSC<br><br>**ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Request for Judicial Notice, Declaration, and Objections to Evidence filed Concurrently herewith]<br><br>Date:        February 7, 2025<br>Time:        1:30 p.m.<br>Courtroom:  2D<br>Judge:       Hon. Gonzalo P. Curiel<br>Trial Date:  N/A<br>Action Filed: July 30, 2024 |

1

# TABLE OF CONTENTS

2

**Page**

3  Introduction ............................................................................................................ 1

4  Factual History ....................................................................................................... 1

5      I.    The Mechanisms of Mifepristone and Progesterone ........................... 1

    II.   Development of APR .......................................................................... 3

6          A.   2012 Case Series ...................................................................... 3

7          B.   2017 Literature Review ........................................................... 4

        C.   2018 Report ............................................................................. 5

8          D.   2019 U.C. Davis Medical School Study .................................. 7

9      III.  Criticisms of APR .............................................................................. 8

10      IV.  The Attorney General's Enforcement Action ..................................... 9

    V.   COLFS' APR-Related Speech ............................................................ 9

11  Procedural History ............................................................................................... 11

12  Legal Standard ..................................................................................................... 12

13  Argument ............................................................................................................. 12

14      I.    COLFS Cannot Show Irreparable Harm ........................................... 12

    II.   COLFS Cannot Show a Likelihood of Success on the Merits .......... 13

15          A.   COLFS Is Not Likely to Prevail on its Free Speech

16              Claims ................................................................................... 13

            1.   COLFS' Speech Is Commercial ................................ 14

17              2.   The APR-Related Statements Are False and

18                  Misleading ..................................................... 16

                a.   Effectiveness Statement, Thousands of Lives

19                      Statement, Birth Defects Statement .................... 16

20                  b.   Reversal Statement ................................................ 18

                c.   Success Rate Statement ......................................... 18

21                  d.   Non-Standard Situations Statements .................... 19

22                  e.   Side Effects Statements ......................................... 19

         B.   COLFS Is Not Likely to Prevail on its Free Exercise

23              Claim ..................................................................................... 20

24           C.   COLFS Is Not Likely to Prevail on its Substantive Due

            Process Claim ........................................................................ 22

25      III.  The Other *Winter* Factors Do Not Support COLFS' Preliminary

           Injunction Request ........................................................................... 24

26  Conclusion ........................................................................................................... 25

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*All-Options, Inc. v. Atty. Gen. of Ind.*
  546 F. Supp. 3d 754 (D. Ind. 2021) ................................................................ 8, 17

*Am. Med. Ass'n v. Stenehjem*
  412 F. Supp. 3d 1134 (D.N.D. 2019) ................................................................ 8

*Ariix, LLC v. NutriSearch Corp.*
  985 F.3d 1107 (9th Cir. 2021) ................................................................ 14, 15

*Bolger v. Youngs Drug Prods. Corp.*
  463 U.S. 60, 64-67 (1983) ................................................................ 14, 15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*
  447 U.S. 557 (1980) ................................................................ 13, 21

*Chern v. Bank of Am.*
  15 Cal. 3d 866 (1976) ................................................................ 13

*Comm. On Children's Tele., Inc. v. Gen. Foods Corp.*
  35 Cal. 3d 197 (1983) ................................................................ 13

*Cruzan by Cruzan v. Dir., Mo. Dept. of Health*
  497 U.S. 261 (1990) ................................................................ 23, 24

*Drakes Bay Oyster Co. v. Jewell*
  747 F.3d 1073 (9th Cir. 2014) ................................................................ 24

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*
  880 F.3d 450 (9th Cir. 2018) ................................................................ 16

*First Resort, Inc. v. Herrera*
  *860 F.3d 1263 (9th Cir. 2017)* ................................................................ 15

*Garcia v. Google, Inc.*
  786 F.3d 733 (9th Cir. 2015) ................................................................ 12

*Illinois v. Telemarketing Associates, Inc.*
  538 U.S. 600 (2003) ................................................................ 13

ii

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

4

*Kasky v. Nike*
   27 Cal. 4th 939 (2002) ....................................................................... 13

5

6

*Kennedy v. Bremerton Sch. Dist.*
   597 U.S. 507 (2022) ........................................................................... 20

7

8

*Lopez v. Brewer*
   680 F.3d 1068 (9th Cir. 2012) ........................................................... 12

9

*Lydo Enter., Inc. v. City of Las Vegas*
   745 F.2d 1211 (9th Cir. 1984) ........................................................... 12

10

11

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*
   179 F.3d 1244 (9th Cir. 1999) ........................................................... 21

12

13

*Maryland v. King*
   567 U.S. 1301 (2012) ......................................................................... 25

14

15

*Moss v. U.S. Secret Service*
   572 F.3d 962 (9th Cir. 2009) ............................................................. 23

16

17

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*
   9 Cal. 5th 279 (2020) ......................................................................... 13

18

19

*Pearson v. Shalala*
   164 F.3d 650 (9th Cir. 1999) ........................................................ 24, 25

20

21

*Planned Parenthood of Tenn. & N. Miss. v. Slatery*
   523 F. Supp. 3d 985 (M.D. Tenn. 2021) ....................................... 8, 17, 18

22

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149 (2014) ........................................................................... 13

23

24

*Tingley v. Ferguson*
   47 F.4th 1055 (9th Cir. 2022) ...................................................... 20, 21

25

26

*Trinkle v. Cal. State Lottery*
   71 Cal. App. 4th 1198 (1999) ............................................................ 21

27

28

*United States v. Alvarez*
   567 U.S. 709 (2012) ........................................................................... 13

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ................................................................. 12, 24, 25

**STATUTES**

California Business & Professions Code
   § 17200 ............................................................................ 13, 20
   § 17200 et seq. ............................................................... *passim*
   § 17500 ............................................................................ 13, 20
   § 17500 et seq. ............................................................... *passim*

**CONSTITUTIONAL PROVISIONS**

First Amendment ................................................................. 15, 21

Fourteenth Amendment ........................................................... 22

**INTRODUCTION**

Nearly fourteen months after Defendant Attorney General Rob Bonta ("Attorney General") (sued in his official capacity) filed a civil prosecution for false and misleading statements in advertisements about so-called "abortion pill reversal" or "APR" and more than three months after it filed this case, Plaintiff Culture of Life Family Services, Inc. ("COLFS") now claims that it needs preliminary injunctive relief. Specifically, COLFS asks the Court to enjoin the Attorney General from enforcing California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. ("UCL"), and False Advertising Law, *id.* § 17500 et seq. ("FAL") against its own false and misleading statements in APR advertisements. COLFS cannot show that it has suffered irreparable harm justifying its preliminary injunction request.

COLFS cannot satisfy any of the other three preliminary injunction requirements either. COLFS seeks to use false and misleading statements in its APR advertisements, and so it is unlikely to prevail on any of its claims. Nor do the balance of equities or the public interest support COLFS because it wants to prevent the Attorney General from protecting the public from those false and misleading advertisements. Accordingly, the Court should deny COLFS' motion for preliminary injunction.

**FACTUAL HISTORY**

**I.    THE MECHANISMS OF MIFEPRISTONE AND PROGESTERONE**

Central to this case is the interaction between the first drug in the two-drug medication abortion protocol—mifepristone—and the hormone progesterone. Decl. of Dr. Mitchell Creinin in Supp. of Att'y Gen. Rob Bonta's Opp'n to Pl.'s Mot. for Prelim. Inj. ("Creinin Decl.") ¶¶34-38. FDA has approved the combination of two drugs to terminate a pregnancy via medication (i.e., "medication abortion"): (1) oral administration of 200 mg of mifepristone; and (2) twenty-four to forty-eight hours later, 800 mg of misoprostol. *Id.* ¶16; *id.* Ex. N. The first drug—mifepristone—

1

1    blocks progesterone from acting on the uterus and the cervix. *Id.* ¶35. Progesterone,

2    which is essential to pregnancy continuation, ensures that the uterus is able to

3    sustain an implanted embryo. *Id.* ¶37. Progesterone binds to progesterone receptors

4    in the uterus and cervix so that both organs are ready for pregnancy. *Id.*

5        To accomplish that preparation, during pregnancy, a massive increase in

6    progesterone floods the body. *Id.* Mifepristone effectively blocks progesterone

7    because the uterus' and cervix's progesterone receptors prefer mifepristone over

8    progesterone, and mifepristone binds more tightly than progesterone to those

9    receptors. *Id.* ¶35. In other words, the ability to unseat mifepristone from the

10   progesterone receptors requires more than just more progesterone—especially

11   because a pregnant body is already flooded with the hormone. *Id.* ¶¶35, 38.

12       The result of mifepristone's progesterone blocking is that the uterus essentially

13   becomes inhospitable for embryo development, notably by preparing the uterus to

14   contract and remove pregnancy tissue. *Id.* ¶35. Misoprostol—the second drug—

15   actually triggers the contractions for which mifepristone has prepared the uterus. *Id.*

16   ¶36. Although the two-drug medication abortion protocol has a high rate of success

17   in terminating pregnancies, there is evidence that the chances of a pregnancy

18   continuing increases the longer into a pregnancy a person goes before starting a

19   medication abortion. *Id.* ¶51(h).

20       The percentage of pregnancies that will continue after a patient takes

21   mifepristone but not misoprostol is not clear. *Id.* ¶¶39-41. There are limited

22   scientific studies from decades ago that tested mifepristone's effect on pregnancies.

23   *Id.* ¶39. Those studies looked at higher doses of mifepristone (such as 600 mg and

24   800 mg) and during earlier periods in pregnancy (such as only until 49 days or 63

25   days) than the current FDA-approved medication abortion regimen, which is 200

26   mg of mifepristone (followed by misoprostol), which can be taken until 70 days

27   into pregnancy. *Id.* The differences in the mifepristone doses and the length of the

28   pregnancies when taken suggests that those studies likely found lower percentages

2

Atty. Gen. Rob Bonta's Opp. to Pl.'s Prelim. Inj. Mot. (3:24-cv-01338-GPC-KSC))

of pregnancies continuing after taking mifepristone than the percentages of continuing pregnancies that are likely to occur with the current FDA-approved dose of mifepristone. *Id.* In other words, a pregnant person starting a medication abortion today takes a lower dose of mifepristone, which is likely to be less effective at terminating a pregnancy on its own than the doses in those earlier studies. And, today, a pregnant person can start a medication abortion up to 70 days into their pregnancy, when mifepristone is less effective, and which those earlier studies do not consider. Given the lack of studies with comparable circumstances to the current method of medication abortion, according to one article, the percentage of pregnancies that will continue after taking just mifepristone may range from 8% to 46%. *Id.*; Decl. of Erica Connolly in Supp. of Att'y Gen. Rob Bonta's Opp'n to Pl.'s Mot. for Prelim. Inj. ("Connolly Decl.") Ex. 1 at 4.

## II.  DEVELOPMENT OF APR

The current understanding of mifepristone—that it effectively blocks progesterone but may not be very effective at pregnancy termination on its own—is essential context to understand the logical flaws and unreliability in the evidence that COLFS cites to support its statements about APR.

### A.  2012 Case Series

Dr. George Delgado, an anti-abortion physician with board certifications in family medicine and hospice and palliative medicine, theorized that increasing the supply of progesterone in the body would "out-compete" mifepristone. Connolly Decl. Exs. 1 at 6; *id.* Ex. 2 at 9; *id.* Ex. 3 at 16. Notably, Delgado's theory did not address two key issues: 1) pregnant individuals already have massively more progesterone in their bodies, and 2) mifepristone nevertheless works because it binds more tightly to the progesterone receptors and because those receptors prefer mifepristone over progesterone. Creinin Decl. ¶¶35, 38.

To try out his theory, Delgado and his co-author Dr. Mary Davenport (who is the RealOptions medical director) followed seven women who were treated with

3

supplemental progesterone after they had taken mifepristone ("2012 Case Series"). Connolly Decl. Ex. 2 at 10-11. The dosages and how the patients took the progesterone differed among the six reported cases (with one person lost to follow up). *Id.* Four of the patients delivered live babies. *Id.*

Notably, this first study from Delgado is a "case series," which the medical field uses to establish areas of inquiry for future research. Creinin Decl. ¶31; Connolly Decl. Ex. 4 at 29. Because case studies generally are small and do not have controls in place, the medical field does not use case studies to show that a particular treatment caused a particular outcome. Creinin Decl. ¶31; Connolly Decl. Ex. 4 at 29. That is the situation with this study: it had a small sample size and variables (i.e., different progesterone doses and ways of taking the progesterone) that prevented it from showing that supplemental progesterone caused a pregnancy to continue after taking mifepristone. The 2012 Case Series could only suggest further research into the safety and efficacy of Delgado's proposed treatment.[1] Creinin Decl. ¶¶31, 50; Connolly Decl. Ex. 4 at 29.

Nevertheless, Delgado established a hotline to connect individuals who had started a medication abortion but had changed their minds with providers willing to prescribe supplemental progesterone. Connolly Decl. Ex. at 3 18-18; Am. Compl. ¶43.

**B.    2017 Literature Review**

As explained above, it is not clear what percentage of pregnancies will continue if pregnant people took only 200 mg of mifepristone (and not misoprostol) or if they took mifepristone up to 70 days into their pregnancy. Knowing that

---

[1] The Turner and Raymond articles that COLFS and its experts reference also don't show that progesterone causes pregnancies to continue after taking mifepristone. Am. Compl. ¶38; Kraus Decl. ¶¶36-37. The Turner article consists of a small case series of three individuals. Am. Compl. ¶38; Kraus Decl. ¶37; Creinin Decl. ¶55. And the Raymond article looked at a completely different treatment: the administration of different hormone (a progestin-based contraceptive) simultaneously with mifepristone to test if future pregnancy could be prevented at the same time as termination. Kraus Decl. ¶37; Creinin Decl. ¶56; *id.* Ex. BB.

4

baseline percentage is essential, though, to determining whether giving someone progesterone will help the pregnancy continue. Progesterone is only effective if the percentage of pregnancies continuing after people receive progesterone is higher than the percentage of pregnancies continuing without progesterone.

In 2017, Davenport (Delgado's 2012 Case Series co-author) conducted a literature review to try to establish that baseline percentage. Connolly Decl. Ex. 5. Davenport looked at sixteen early studies of mifepristone with doses ranging from 200 mg to 1000 mg and pregnancy gestations less than 63 days, and with the percentage of continuing pregnancies ranging from 0% to 50%. *Id.* at 45. Only one study with 30 participants used the same dose as the current FDA recommendations: a single 200 mg dose. *Id.* But that study only looked at pregnancies up to 49 days. *Id.* Relying in large part on that study, Davenport concluded the appropriate baseline percentage for pregnancies that will continue after patients take mifepristone was less than 25%. *Id.* at 48.

The problem, however, is that a single 30-person study is not sufficient to show that baseline percentage. Creinin Decl. ¶¶40-41. As such, Davenport's determination is suspect.

## C.   2018 Report

Using Davenport's (suspect) baseline percentage of pregnancies that will continue after taking mifepristone, Delgado again tested his theory that supplemental progesterone could "outcompete" mifepristone and allow a pregnancy to continue ("2018 Report"). Connolly Decl. Ex. 3 at 16. Using data gathered from 1,668 patients who called his hotline, Delgado determined that only 754 patients had "actually initiated progesterone therapy." *Id.* at 18. From those 754 patients, Delgado excluded 207 more patients for three reasons: 1) more than 72 hours had elapsed between when they took mifepristone and when they took supplemental progesterone (38 patients); 2) there was a loss of contact with the patient before 20 weeks gestation (112 patients); or 3) the patient chose to complete the abortion (57

5

Atty. Gen. Rob Bonta's Opp. to Pl.'s Prelim. Inj. Mot. (3:24-cv-01338-GPC-KSC))

1    patients). *Id.* Delgado looked at the percentage of the 547 patients who had

2    continuing pregnancies at 20 weeks—48%—and, comparing that result to

3    Davenport's 25% baseline percentage, Delgado concluded that giving patients

4    progesterone would increase the chances that their pregnancy would continue. *Id.* at

5    19.

6        But there are several problems with the 2018 Report that undermine this

7    conclusion. First, the 2018 Report noted that medical providers likely had screened

8    at least some patients with ultrasounds to establish an ongoing pregnancy prior to

9    prescribing progesterone. *Id.* at 22. The practice of screening for viable pregnancies

10   via ultrasound was (as the 2018 Report admits) a "confounding variable" that likely

11   biased the results toward pregnancies that were already likely to continue even

12   without progesterone. *Id.* Unfortunately, the 2018 Report does not specify what

13   happened with the 914 patients who called but did not start progesterone therapy,

14   but it is reasonable to assume that some (maybe even most) of those patients were

15   screened out by the ultrasounds.

16       Second, the 547 patients that Delgado included had been treated with a variety

17   of progesterone dosages and through different methods. *Id.* at 20. How far along the

18   patients were in their pregnancies also varied. *Id.* Nor is this variety surprising

19   because 325 different medical professionals had treated the 547 patients. *Id*. at 17.

20   And there was no control group; Delgado relied on Davenport's baseline percentage

21   of pregnancies that would continue after taking mifepristone. *Id.* at 19. All of this

22   variability makes it not only difficult but essentially impossible to determine

23   whether progesterone actually had any effect at all on the likelihood that a

24   pregnancy would continue. Creinin Decl. ¶51.

25       Third, the 2018 Report did not track what happened to the pregnant patients

26   and whether they suffered any side effects or adverse reactions. Connolly Decl. Ex.

27   3 at 21. It looked only at pregnancy continuation and rate of birth defects. *Id*.

28

1    Finally, this kind of study—looking at patients' medical charts after the fact—

2  is not reliable to establish causation between a medical treatment and an outcome.

3  Creinin Decl. ¶¶30-31, 51. It doesn't employ rigorous standards to avoid or

4  eliminate bias or to control for other variables that may have affected outcomes. *Id.*

5  ¶¶30-31. In essence, the 2018 Report provides only anecdotes.

6    **D.    2019 U.C. Davis Medical School Study**

7    In 2019, Dr. Mitchell Creinin, a professor and researcher in the Department of

8  Obstetrics and Gynecology at the U.C. Davis Medical School, tried to test

9  Delgado's theory using the rigorous standards necessary to establish causation

10  between a medical treatment and an outcome. Dr. Creinin planned to conduct a

11  randomized controlled trial, the best form of scientific evidence ("2019 U.C. Davis

12  Study"). Creinin Decl. ¶¶61-62. The goal was to enroll forty patients who were 44-

13  63 days into their pregnancies; who intended to terminate the pregnancies; and who

14  all had viable fetuses. *Id.* ¶62. The patients would receive 200 mg of mifepristone

15  (the FDA recommended dose), followed twenty-four hours later by either a placebo

16  or 400 mg of oral progesterone, which would continue to be given at regular

17  intervals until their pregnancy ended either because of the mifepristone or through a

18  planned surgical abortion. *Id.*

19    But Creinin had to stop the study after only twelve patients enrolled. Two

20  patients dropped out because of their symptoms, and three of the remaining ten

21  patients experienced severe bleeding and had to be transported by ambulance to the

22  hospital for treatment. *Id.* ¶63. Of the three who experienced severe bleeding, one

23  had received progesterone and had a completed abortion; and two had received the

24  placebo, with both requiring surgical abortions. *Id.* As a result, Creinin could not

25  show whether supplemental progesterone could be effective at preventing

26  pregnancy termination after taking mifepristone. *Id.* ¶66. The study did suggest,

27  however, that there are safety risks associated with APR, particularly for

28  individuals whose pregnancies do not continue. *Id.*

7

1  **III.  CRITICISMS OF APR**

2      Delgado's APR theory and his articles have been the subject of significant

3  criticism. *See, e.g.*, Connolly Decl. Ex. 1 at 4 (2012 Case Series was "of poor

4  quality with few details"); *id.* Ex. 6 at 53 ("[A]ny use of reversal treatment should

5  be considered experimental."); *id.* Ex. 7 at 62 ("[B]ased on data from poorly

6  conducted studies that may not have undergone rigorous peer review, there is

7  insufficient evidence to recommend progesterone for individuals who change their

8  minds after initiating the medication abortion process.")

9      The American College of Obstetricians and Gynecologists stated that

10  "[c]laims regarding abortion 'reversal' treatment are not based on science and do

11  not meet clinical standards." Connolly Decl. Ex. 8 at 66. The Society of

12  Obstetricians and Gynaecologists of Canada stated that "[t]he claims regarding so-

13  called abortion 'reversal' treatments are not based on scientific evidence." *Id.* Ex. 9

14  at 72. The Royal College of Obstetricians and Gynaecologists and its co-authors

15  stated that "[t]here are no reputable national or international clinical guidelines that

16  recommend the use of progesterone to reverse the effect of mifepristone, and no

17  evidence that it increases the likelihood of continuing pregnancy, compared to

18  expectant management alone." *Id.* Ex. 10 at 74.

19      Three lawsuits challenging state legislation that required abortion providers

20  tell patients that medication abortion could be "reversed" also criticized APR. In

21  each case, the courts held there was insufficient evidence to support that the

22  treatment was effective. *Planned Parenthood of Tenn. & N. Miss. v. Slatery*, 523 F.

23  Supp. 3d 985, 989 (M.D. Tenn. 2021) ("the mandated 'reversal' message is

24  misleading because it suggests progesterone therapy has reached a level of safety

25  and efficacy that is not supported by medical evidence"); *All-Options, Inc. v. Atty.

26  Gen. of Ind.*, 546 F. Supp. 3d 754, 766-68 (D. Ind. 2021) (APR "medical studies,

27  testimony about biological principles, and physicians' clinical experience . . . do[]

28  not establish causation"); *Am. Med. Ass'n v. Stenehjem*, 412 F. Supp. 3d 1134,

8

1150-51 (D.N.D. 2019) (APR is "unproven medical and scientific theory" and "devoid of credible scientific evidence."); *see also* Atty. Gen. Rob Bonta's Req. for J. Not. ("RJN"), Exs. D-M.

## IV.   THE ATTORNEY GENERAL'S ENFORCEMENT ACTION

On September 21, 2023, the Attorney General filed suit in Alameda Superior Court against Heartbeat International, Inc. ("HBI") and RealOptions ("RO") (collectively "HBI Defendants") for false and misleading advertising of APR ("Enforcement Action"). Decl. of William Goyette in Supp. of Pl.'s Prelim. Inj. Mot. ("Goyette Decl.") Ex. A ¶¶96-101. The Enforcement Action alleges two causes of action under the UCL and FAL. *Id.* It alleges that eight statements that the HBI Defendants use in their advertisements are false and misleading: (1) the use of the terms "reverse" or "reversal"; (2) that APR "has been shown to increase the chances of allowing the pregnancy to continue"; (3) that APR has a success rate of 64-68%; (4) that the rate of birth defects following APR "is less or equal to the rate in the general population"; (5) that "thousands of lives have been saved" through APR; (6) that APR may be effective beyond a 72-hour window following mifepristone administration; (7) that APR may be effective following administration of misoprostol and methotrexate; and (8) that APR can cause only non-life-threatening side effects, when in fact APR can cause severe, life-threatening bleeding. *Id.* Ex. A ¶¶97, 100.

Both HBI Defendants filed demurrers asking the state court to dismiss the action. On June 26, 2024, the state court overruled the demurrers, and on July 15, 2024, the HBI Defendants filed their joint answer. RJN Exs. A, B. The case is ongoing and trial is set for November 3, 2025. RJN Ex. C.

## V.   COLFS' APR-RELATED SPEECH

COLFS uses several of the statements at issue in the Enforcement Action in its own advertisements for APR:

9

1.  "The abortion pill can be reversed by a process called APR – Abortion Pill Rescue. COLFS Medical Clinic can perform the APR process, but you must contact us immediately." Goyette Decl. Ex. B 4.

2.  "Do you regret your decision and wish to reverse the effects of the abortion pill? We are here to help you! There is an effective process for reversing the abortion pill." *Id.* Ex. C.

3.  "Please call now! . . . IT MAY NOT BE TOO LATE, IF YOU CONTACT US IMMEDIATELY…THE ABORTION PILL CAN BE REVERSED! CALL US TODAY." *Id.*

4.  "An antidote is available to work to stop the effects of the abortion pill…At COLFS Medical Clinic we can help you learn everything you need to know about the APR procedure and where you can get the help you need in your local community." *Id.* Ex. H 2.

5.  "Initial studies of APR have shown that APR has a 64-68% success rate." *Id.* at 4.

6.  "Is it too late to reverse the abortion pill? . . . Even if 72 hours have passed, call the helpline at (877) 558-0333. It may not be too late." *Id.* at 3.

COLFS uses some of the statements targeted in the Enforcement Action in its fundraising efforts. Goyette Decl. ¶7; *id.* Exs. E, F, G. COLFS has produced videos with patient stories about APR as well as its APR-related research, which it broadcasts at its annual fundraising galas.[2] Goyette Decl. ¶7; *id.* Exs. E, F, G; Connolly Decl. Ex. 11. And on a page featuring a story about a patient undergoing APR, COLFS encourages viewers to "SUPPORT WOMEN LIKE STACY: DONATE NOW." Goyette Decl. Ex. D 1.

---

[2] Underscoring the close ties between COLFS and the HBI Defendants, counsel for all three entities in these cases was the chairperson for COLFS' 2024 annual fundraising gala. Connolly Decl. Ex. 11.

1    Wanting to continue to advertise APR, COLFS asks the Court to enjoin the

2   Attorney General from enforcing the UCL and FAL against it for its use of the

3   following statements: 1) that APR is "effective" ("Effectiveness Statement"); 2)

4   that APR "reverses" medication abortion ("Reversal Statement"); 3) that APR has

5   saved "thousands of lives" ("Thousands of Lives Statement"); 4) that APR has a

6   64-68% success rate ("Success Rate Statement"); 5) that APR has "no birth

7   defects" ("Birth Defects Statement"); 6) that APR "may still be effective in non-

8   standard situations (such as more than 72-hours after taking mifepristone, or after

9   taking misoprostol or methotrexate)" ("Non-Standard Situations Statements"); and

10  7) that COLFS can refuse to state that APR "may lead to life-threatening bleeding"

11  ("Side Effects Statements") (collectively "APR-Related Statements").

12                          **PROCEDURAL HISTORY**

13    On July 30, 2024, COLFS, represented by the same counsel as the HBI

14  Defendants, filed this case. ECF No. 1. On August 21, 2024, the Attorney General

15  filed a motion to dismiss, or alternatively stay, COLFS' complaint. ECF No. 4. On

16  November 5, 2024—over one year after the Attorney General filed the Enforcement

17  Action and over three months after COLFS filed its initial complaint—COLFS filed

18  a preliminary injunction request. ECF No. 13.

19    On November 12, the Court granted the Attorney General's motion to dismiss,

20  holding that COLFS had not sufficiently alleged pre-enforcement standing, and

21  granted COLFS leave to amend. ECF No. 17. On November 13, the Court denied

22  COLFS' preliminary injunction request as moot. ECF No. 18. On November 15,

23  2024, COLFS filed its amended complaint and re-filed its preliminary injunction

24  motion. ECF No. 13. The Attorney General has filed a motion to dismiss COLFS'

25  amended complaint simultaneously with his opposition to COLFS' preliminary

26  injunction request.

27

28

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Plaintiffs "must establish" four elements: (1) that they are "likely to suffer irreparable harm in the absence of preliminary relief"; (2) that they are "likely to succeed on the merits"; (3) that "the balance of equities tip[] in [their] favor"; and (4) that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (quotation omitted).

**ARGUMENT**

**I.    COLFS Cannot Show Irreparable Harm**

COLFS waited nearly fourteen months after the Attorney General filed the Enforcement Action to seek a preliminary injunction. *Compare* ECF No. 1 *with* Goyette Decl. Ex. A. That delay undercuts COLFS' claims of needing immediate interim relief. "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights," but "[b]y sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enter., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quotations omitted); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (delay of "months" "undercut" plaintiff's "claim of irreparable harm").

Nor can COLFS claim it was unaware earlier of its claimed need for immediate relief. The Attorney General filed the Enforcement Action on September 21, 2023, announcing it via press release and press conference. Am. Compl. Exs. 1, 2. Delgado, COLFS' medical director, discussed the Enforcement Action within days after it was filed. Connolly Decl. Ex. 12 at 93. And along with COLFS' and the HBI Defendants' counsel, Delgado discussed the Enforcement Action in a May

2024 podcast. Connolly Decl. Ex. 13 at 114:10-19. Even after COLFS initiated this lawsuit, it waited over three months to request a preliminary injunction. *Compare* ECF No. 1 *with* ECF No. 13. COLFS' delay shows preliminary injunctive relief is unwarranted.

## II.    COLFS Cannot Show a Likelihood of Success on the Merits

### A.    COLFS Is Not Likely to Prevail on its Free Speech Claims

COLFS cannot show likelihood of success on the merits of its Free Speech claim. COLFS wants to use false and misleading statements in its APR advertisements.[3] But "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).[4] COLFS free speech claim is unlikely to succeed.

---

[3] COLFS cannot rely on allegations about general APR speech because it lacks pre-enforcement standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). As this Court recognized, the Attorney General is not prosecuting HBI and RealOptions for APR speech writ large. ECF 17 at 12; Goyette Decl. ¶¶97, 100. And the UCL and FAL only prohibit speech that qualifies as an "advertisement" or "fraudulent representation." *See* Cal. Bus. & Prof. Code § 17200 ("fraudulent business act[s] or practice[s]" prohibited); *Id.* § 17500 ("untrue or misleading" statements to "induce public to enter into any obligation relating thereto" prohibited).

[4] Contrary to COLFS' argument, Pl.'s Memo. P. & A. in Supp. of Prelim. Inj. Mot. ("PI MPA") at 15:21-24, neither *United States v. Alvarez*, 567 U.S. 709, 718 (2012), nor *Illinois v. Telemarketing Associates, Inc.*, 538 U.S. 600, 621 (2003), applies. In a UCL/FAL civil prosecution, the Attorney General has the burden to show that the targeted statements are likely to deceive the public and that statements are either advertisements (FAL) or business practices (UCL). *See Kasky v. Nike*, 27 Cal. 4th 939, 951 (2002). Those elements also establish the harm that an action by the Attorney General seeks to address: deception of the public in advertisements and business practices. *See Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 305 (2020) ("The FAL has been accurately described as the major California legislation designed to protect consumers from false or deceptive advertising."); *Comm. On Children's Tele., Inc. v. Gen. Foods Corp.* 35 Cal. 3d 197, 209 (1983) (UCL is "directed toward the right of the public to protection from fraud and deceit"); *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (1976) (FAL "affords protection against the probability or likelihood as well as the actuality of deception or confusion").

13

### 1. COLFS' Speech Is Commercial

Although "[c]ommercial speech is usually defined as speech that does no more than propose a commercial transaction," "[c]ourts view this definition as just a starting point…and instead try to give effect to a common-sense distinction between commercial speech and other varieties of speech." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quotations omitted). "[W]here [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation,'" there is strong support that the speech is commercial. *Id.* (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-67 (1983)). COLFS' use of the APR-Related Statements satisfies all three factors.

First, COLFS uses the APR-Related Statements in advertisements. *See, e.g.,* Am. Compl. ¶¶4, 15, 19, 21, 97, 102, 104; Goyette Decl. ¶¶5-6, 8; *id.* Ex. B 4 ("COLFS Medical Clinic can perform the APR process, but you must contact us immediately."), Ex. C ("Do you regret your decision and wish to reverse the effects of the abortion pill? We are here to help you! There is an effective process for reversing the abortion pill…Please call now!"), Ex. H 2 ("At COLFS Medical Clinic we can help you learn everything you need to know about the APR procedure and where you can get the help you need in your local community."); *id.* 2-3, 5-6 (referring patients in numerous spots to the hotline and website).

Second, those advertisements are about a particular product or service: APR treatment. *See, e.g., id.* Ex. H 2 ("Abortion Pill Rescue FAQs"); *id.* Ex. C ("THE ABORTION PILL CAN BE REVERSED! CALL US TODAY."); *id.* Ex. B 4 ("The abortion pill can be reversed by a process called 'APR'…COLFS Medical Clinic can perform the APR process, but you must contact us immediately.").

Third, COLFS has economic motivation: "[E]very year, COLFS holds an annual fundraising gala," and "[e]very year [it] mention[s] [its] work, including Abortion Pill Reversal." *Id.* ¶7; *see also id.* Exs. E, F, G; Connolly Decl. Ex. 11.

14

1   COLFS also uses patient stories about APR to solicit donations. Goyette Decl. Ex.

2   D 1. To wit: COLFS uses the APR-Related Statements in APR advertisements,

3   thereby generating patient stories, which it uses to obtain fundraising revenue. This

4   form of economic motivation qualifies to render speech commercial. *See First*

5   *Resort v. Herrera*, 860 F.3d 1263, 1273 ("solicitation of a non-paying client base

6   directly relates to [plaintiff's] ability to fundraise" thereby providing "economic

7   motivation").

8       COLFS nevertheless argues that its use of the APR-Related Statements is not

9   commercial because it "provides numerous free services, including…free APR

10  treatment," and its "provision of APR is solely a charitable enterprise to providing

11  needy women with necessary care." Memo. of P. & A. in Supp. of Pl.'s Prelim. Inj.

12  Mot. ("PI MPA") at 13:17-18, 13:21-22. First, COLFS ignores its own allegations

13  about its economic motivation.

14      Second, COLFS too narrowly construes the kind of speech that qualifies as

15  "commercial" under the First Amendment. The three *Bolger* factors "are important

16  guideposts, but they are not dispositive." *Ariix, LLC*, 985 F.3d at 1115. COLFS'

17  APR-Related Statements are "placed in a commercial context and are directed at

18  the providing of services rather than toward an exchange of ideas." *Id.* at 1276

19  (quotations omitted). COLFS acknowledges as much with its own statements

20  explaining that patients may have to pay for—or have insurance cover—their

21  supplemental progesterone prescription. *See* Goyette Decl. Ex. H 5 ("How much

22  will this cost? Costs of treatment varies depending on the progesterone used.

23  Insurance plans may cover treatment. COLFS Medical Clinics will cover expenses

24  for our APR patients who do not have insurance or financial means to pay for

25  treatment.").

26      COLFS' use of the APR-Related Statements is unquestionably commercial.

27

28

### 2. The APR-Related Statements Are False and Misleading

Because COLFS' use of the APR-Related Statements is commercial, if those statements are false and misleading, COLFS has no First Amendment protection to use them. *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 460 (9th Cir. 2018) ("[I]f the regulated speech…is misleading, the First Amendment extends no protection and the analysis ends."). The Attorney General's evidence shows that each of the statements is false and misleading.

#### a. Effectiveness Statement, Thousands of Lives Statement, Birth Defects Statement

The accuracy of the Effectiveness Statement, the Thousands of Lives Statement, and the Birth Defects Statement depends on whether Delgado's 2018 Report shows that progesterone increases the chances of a pregnancy continuing after taking mifepristone.[5] But, the problems with the study undermine its conclusions. *See* Factual History.II.C, *supra*.

First, Delgado relied on Davenport's suspect baseline percentage that less than 25% of pregnancies will continue after taking mifepristone. Connolly Decl. Ex. 3 at 19. Davenport based her result on a single 30-person study, which was too small to be reliable for her purposes. Creinin Decl. ¶40. Other studies suggest a rate ranging between 8% and 46%. *Id.* ¶39. Ultimately, there is not enough evidence to say for certain what percentage of pregnancies will continue after taking mifepristone. *Id*.

Second, as the 2018 report acknowledges, some (unknown) number of patients received an ultrasound to screen for viable pregnancies before they were prescribed supplemental progesterone, and that biased the data toward pregnancies already likely to continue after taking mifepristone, even without progesterone. Connolly Decl. Ex. 3 at 22; *see All-Out Options*, 546 F. Supp. 3d at 766 (A "substantial

---

[5] Although COLFS' experts refer to the 2018 Report to support their opinions, Kraus Decl. ¶39; Valley Decl. ¶¶36, 53, 54, neither individual is qualified to be an expert on the subject of APR or mifepristone. *See* Att'y Gen. Rob Bonta's Obj. to Pls. Evid. ISO Prelim. Inj. Mot.

1    limitation of the 2018 study is that it did not treat at some of those cases as 'failed
2    reversals.'").

3        Third, the report did not connect how far along each pregnancy was with how
4    each pregnant patient took the progesterone or how much progesterone each patient
5    received. That lack of connection is problematic because mifepristone is less
6    effective at terminating pregnancies when taken further along in pregnancy.
7    Connolly Decl. Ex. 3 at 19; Creinin Decl. ¶51(h). So, there is no way to know from
8    the 2018 Report whether the rate of continuing pregnancies for a particular dose or
9    way of taking progesterone is because of the progesterone or because the patients
10    were further along in their pregnancies. Fourth, and relatedly, the 2018 Report did
11    not have any controls to establish that supplemental progesterone actually "caused"
12    pregnancies to continue, especially because the 547 patients whose data Delgado
13    looked at were treated by 325 different medical providers. *See All-Options, Inc.*,
14    546 F. Supp. 3d at 766 (2018 Report "mak[es] it impossible to assess whether the
15    difference in outcomes was 'due to the treatment or some other factor'").

16        In short, the 2018 Report does not qualify as a rigorous scientific study
17    necessary to establish that progesterone "caused" pregnancies to continue. Creinin
18    Decl. ¶¶31-32, 51; *see also* Connolly Decl. Ex. 7 at 62 ("[B]ased on data from
19    poorly conducted studies that may not have undergone rigorous peer review, there
20    is insufficient evidence to recommend progesterone for individuals who change
21    their minds after initiating the medication abortion process.").

22        COLFS also points to animal studies and a couple of small human case
23    studies, but those do not show causation either. Animal studies can only suggest
24    areas of future research; they cannot establish that treatments work in humans.
25    Creinin Decl. ¶57. Case series likewise provide only support for future research
26    because they involve small numbers of patients, do not have controls, and are likely
27    to suffer from bias influencing the results. *Id.* ¶31; Connolly Decl. Ex. 4 at 29; *see
28    also Slatery*, 523 F. Supp. 3d at 993 ("Delgado admitted that…neither biologic

17

logic nor animal studies are sufficient to prove the safety and efficacy of his progesterone therapy on humans" and that while a case series can "suggest causation, it cannot prove causation.").

Because the 2018 Report does not support its conclusions (nor does any of the other evidence COLFS offers), there is no support that APR is "effective" (and thus saved "thousands of lives") or that the rate of birth defects following APR are no greater than the rest of the population. The Effectiveness Statement, the Thousands of Lives Statement, and the Birth Defect Statement, therefore, are false and misleading.

### b.    Reversal Statement

Delgado's theory, which COLFS adopts, states that supplemental progesterone can "outcompete" mifepristone to counteract, or "reverse," the effects of the mifepristone. Connolly Decl. Ex. 3 at 16. That theory, however, does not account for two things: 1) mifepristone binds preferentially and more tightly to progesterone receptors in the uterus and cervix; and 2) during pregnancy the amount of progesterone is already massively greater. Creinin Decl. ¶35, 37-38. And those failures matter, because COLFS has not pointed to evidence showing that higher concentrations of progesterone can unseat mifepristone from progesterone receptors—i.e., "reverse" the mifepristone. Creinin Decl. ¶¶35, 38. Indeed, "the word 'reverse' does not accurately describe to patients the medical research on progesterone therapy." *Slatery*, 523 F. Supp. 3d at 1002.; *see also* Creinin Decl. ¶¶35, 38, 46. "Reverse" and "reversal" promise something COLFS' own theory of APR does not deliver. The Reversal Statement is therefore false and misleading.

### c.    Success Rate Statement

COLFS' statements that APR has a 64-68% success rate is false and misleading for two reasons. First, as explained above, the 2018 Report does not support its own conclusions about progesterone increasing the percentages of pregnancies that will continue after mifepristone. Second, even if the 2018 Report

18

did support its conclusions, those conclusions were an overall "reversal" rate of 48%, not 64-68%. Connolly Decl. Ex. 3 at 19-20. COLFS' 64% to 68% statistic appears to come from the 2018 Report's result that "high dose oral" administration of supplemental progesterone had a 68% "reversal" rate and that the collective "intramuscular" injection administration of supplemental progesterone had a 64% "reversal" rate. *Id.* at 20. But, as COLFS' APR FAQs reveal, most patients will receive supplemental progesterone "orally or vaginally" and only "possibly by intramuscular injection." Goyette Decl. Ex. H 4. The Success Rate Statement therefore is false and misleading.

### d.    Non-Standard Situations Statements

Nor does the 2018 Report (or any of the other evidence COLFS offers) show that APR is effective after administration of misoprostol or methotrexate or after the 72-hour window following mifepristone administration. The 2018 Report actually eliminated patients who had received misoprostol or who had taken mifepristone longer than 72 hours prior to supplemental progesterone administration. Connolly Decl. Ex. 3 at 18. The Non-Standard Situations Statements, which suggest that APR is effective in those circumstances, therefore are false and misleading.

### e.    Side Effects Statements

Neither the 2018 Report nor the other evidence that COLFS offers shows that APR only has non-life-threatening side effects.[6] Other than the UC Davis Study, none of the other studies that COLFS or its experts cite appears to even track health or safety outcomes for the pregnant individual. Connolly Decl. Ex. 7 at 62 ("Another limitation of the studies included in this analysis is that only one study

---

[6] Also, although supplemental progesterone during pregnancy is low risk, it is not zero risk. Creinin Decl. ¶¶67-69. In situations where progesterone treatment actually benefits patients, risking those rare side effects is appropriate. *Id.* ¶¶67-69. But because there is nothing that actually shows supplemental progesterone increases the chance of pregnancy continuing after taking mifepristone, even that low risk is not justified. *Id.* ¶68.

19

1   reported treatment side effects and complications."). And the 2019 U.C. Davis

2   Study, which did track those outcomes, included three individuals who had

3   significant bleeding after they took mifepristone but not misoprostol. Creinin Decl.

4   ¶¶63, 66; Connolly Decl. Ex. 14 at 142. Stating that APR can cause only non-life-

5   threatening side effects while not also disclosing the possibility of severe bleeding

6   is therefore false and misleading.

7       Because COLFS uses the APR-Related Statements as commercial speech and

8   because those statements are false and misleading, COLFS is not likely to prevail

9   on its Free Speech claim.

10      **B.    COLFS Is Not Likely to Prevail on its Free Exercise Claim**

11      To prevail on its Free Exercise claim, COLFS must show that the Attorney

12  General has "burdened [its] sincere religious practice pursuant to a policy that is not

13  'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507,

14  525 (2022). "If the purpose of the law is to restrict practices *because of* the religious

15  motivations of those performing the practices, the law is not neutral." *Tingley v.*

16  *Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022). The UCL and FAL protect

17  consumers by prohibiting false and misleading advertisements, regardless of

18  motivation, and therefore are neutral. *See* Cal. Bus. & Prof. Code §§17200, 17500;

19  *see Tingley*, 47 F.4th at 1085.

20      As to the "generally applicable" prong, "there are two ways a law is not

21  generally applicable": 1) "if there is a formal mechanism for granting exceptions

22  that invite[s] the government to consider the particular reasons for a person's

23  conduct"; or 2) "if the law prohibits religious conduct while permitting secular

24  conduct that also works against the government's interest in enacting the law." *Id.*

25  at 1088. Neither the UCL nor the FAL has a "formal mechanism" that allows

26  "individual exceptions"; all false and misleading advertising is prohibited under the

27  laws. *See* Cal. Bus. & Prof. Code §§17200, 17500; *Tingley*, 47 F.4th at 1088. Nor

28  does the UCL or FAL—or the Attorney General's enforcement of the UCL and

20

FAL—treat "any comparable secular activity more favorably than religious exercise." *Tingley*, 47 F.4th at 1088. The UCL and the FAL both prohibit false and misleading advertisements, regardless whether the actor has secular or religious motives. *Cf. Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249-50 (9th Cir. 1999) (UCL applied to religious organizations because of its "neutral principles"). And the Attorney General regularly enforces the UCL and FAL against secular entities. *See* Am. Compl. ¶101 (listing two cases featuring secular defendants).

COLFS claims that because the UCL and FAL do not apply to public entities or to political speech, the laws exempt "comparable" secular activity and therefore are not "generally applicable." PI Mot. at 19:15-20:8. "Whether secular and religious activity are 'comparable' is evaluated against the asserted government interest that justifies the regulation at issue and requires looking at the risks posed, not the reasons for the conduct." *Tingley*, 47 F.4th at 1088.

California law exempts public entities from the UCL and FAL because "[t]he state is neither a natural person, partnership, corporation, association, nor other 'organization [] of persons'"; instead the state "is a sovereign entity representing the people." *Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198, 1203 (1999). As such, state entities have different mechanisms—such as elections and constitutional obligations—by which they can be held accountable for their commercial conduct.

The failure of the UCL and FAL to apply to political speech fares no better. False and misleading commercial speech involves no constitutional protection; political speech, in contrast, enjoys heightened protection under the First Amendment. *See Cent. Hudson*, 447 U.S. at 563 ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). And, as with public entities, there are other mechanisms for accountability for false and misleading political speech, such as elections. In short, the risks from public entities and political actors engaging in false and

21

1   misleading speech are distinct from the risks arising from false and misleading

2   commercial speech by private actors who are not accountable to the public.

3       Nor can COLFS rely on its assertion that the Attorney General has not

4   enforced the UCL and FAL against Planned Parenthood. *See, e.g.*, Am. Compl.

5   ¶136; PI MPA at 20:16-26. First, the Attorney General's evidence supports that

6   Planned Parenthood's statements about APR are accurate. Arg.II.A.1, *supra*.

7   Second, Planned Parenthood's speech about medication abortion is not comparable

8   to APR: Planned Parenthood speaks about an FDA-approved medical procedure,

9   Am. Compl. ¶27, whereas COLFS speaks about a medical treatment lacking

10  evidence to show its effective or safe, Arg.II.A.1, *supra*. *See also* Creinin Decl.

11  ¶¶16-17, 45-46; *id.* Exs. L, M, N. Third, COLFS cherry picks information from

12  Planned Parenthood's website, Am. Compl. ¶¶87-90, ignoring that Planned

13  Parenthood lists the rare but potentially serious complications that can occur with

14  medication abortion. Connolly Decl. Ex. 15. In short, the Attorney General has not

15  brought an enforcement action against Planned Parenthood because there is no

16  evidence that Planned Parenthood is engaged in conduct that violates either the

17  UCL or the FAL.

18      COLFS' cannot rely on its argument that the Enforcement Action "will have

19  the cumulative and practical effect of restricting provision" of APR. PI MPA at

20  20:27-21:1. First, COLFS has not provided facts or evidence showing that the

21  Enforcement Action will have that effect. Second, as explained below, Arg.II.C,

22  *infra*, COLFS has displayed in its own Amended Complaint that it can successfully

23  discuss APR without using the APR-Related Statements.

24      Accordingly, COLFS is not likely to prevail on its Free Exercise claim.

25  ### C.  COLFS Is Not Likely to Prevail on its Substantive Due Process Claim

26

27      For its substantive due process claim, COLFS must show that the Enforcement

28  Action infringes on a liberty interest protected by the Fourteenth Amendment and,

22

if such an infringement exists, that the "balanc[e]" of "liberty interests against relevant state interests" tips in its favor. *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 279 (1990). COLFS fails at the first step.

COLFS claims in its amended complaint that the Attorney General seeks to "restrict speech about Abortion Pill Reversal."[7] Am. Compl. ¶¶148-149. But as this Court recognized, "the Enforcement Action makes it clear that eight specific statements, rather than APR-related speech writ large is being challenged." ECF No. 17, at 12. And, those statements (which are nearly identical to the APR-Related Statements) are false and misleading and used by the HBI Defendants and COLFS to advertise APR. Goyette Decl. Ex. A ¶¶97, 100; Arg.II.A.1, *supra.*

Nor can COLFS rely on its allegations that the restriction of the APR-Related Statements will have "the practical effect of banning APR altogether." Am. Compl. ¶¶11, 137. First, COLFS does not explain how the restriction of the statements will have the effect COLFS claims. *See Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (court can reject "conclusory allegations" and must accept only "reasonable inferences"). Indeed, COLFS amended complaint contains numerous statements describing APR that do not include any of the eight false and misleading statements, including referring to APR as "progesterone therapy." *See, e.g.*, Am. Compl. ¶¶33, 34, 37, 38. COLFS has and can speak about APR beyond the eight false and misleading statements.

---

[7] The Attorney General draws from COLFS' amended complaint because its preliminary injunction motion does not explain how the Attorney General is infringing on the liberty interests of COLFS' patients. *See* PI Mot. at 23:17-24:17. To the extent COLFS still claims that the Enforcement Action restricts APR (rather than targeting eight false and misleading statements about APR), the Enforcement Action—and the Attorney General's repeated statements to COLFS' counsel—make clear that the case does not restrict or target the provision of APR. Goyette Decl. Ex. A; *see also* RJN Ex. B 42 ("Defendants' attack on the pleadings fails because the complaint is attacking Defendants' allegedly false advertising and not anyone's reproductive freedom.").

Second, to the extent that COLFS is right and the only way for it to successfully persuade individuals to undergo APR is by using the APR-Related Statements, the result that it can no longer attract patients (and thereby will not be providing APR) stems from the lack of scientific evidence supporting that APR is safe and effective, not from the Enforcement Action. To hold otherwise would be to suggest substantive due process permits false and misleading advertisements about medical care; that result is not only illogical but dangerous.

Even if COLFS had shown the infringement of a liberty interest, the "relevant state interests" outweigh that infringement. *See Cruzan*, 497 U.S. at 279. The purported liberty interest presumably would be the ability of individuals to avoid "unwanted" medical care—i.e., completing a medication abortion—via access to supplemental progesterone after taking mifepristone. *See* Am. Compl. ¶¶11, 137. But the evidence COLFS provides does not show that supplemental progesterone "reverses" mifepristone or otherwise causes pregnancy to continue after patients take mifepristone. *See* Creinin Decl. ¶45-46; Connolly Decl. Ex. 7 at 62. In other words, restrictions on APR—which the Attorney General is not pursuing—would not affect individuals' ability to avoid unwanted medical treatment. In contrast, California has a significant state interest in protecting consumers from false and misleading health advertisements. *See Pearson v. Shalala*, 164 F.3d 650, 656 (9th Cir. 1999) ("[T]he government's interest in preventing consumer fraud/confusion may well take on added importance in the context of a product . . . that can affect the public's health."). California's interest far outweighs any potential liberty interest that could be infringed.

Accordingly, COLFS is unlikely to succeed on this claim.

## III. THE OTHER *WINTER* FACTORS DO NOT SUPPORT COLFS' PRELIMINARY INJUNCTION REQUEST

"When the government is a party," the balance of equities and public interest "factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.

24

1  2014). "[A]ny time a State is enjoined by a court from effectuating statutes enacted

2  by representatives of its people, it suffers a form of irreparable injury." *Maryland v.*

3  *King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) (quotations omitted).

4  Here, the balance of equities and the public interest tip sharply in favor of the

5  Attorney General who would, if COLFS is successful, be unable to protect the

6  public against false and misleading statements in advertisements for a medical

7  procedure. *Cf. Pearson*, 164 F.3d at 656. Accordingly, these factors also weigh

8  against issuing preliminary injunctive relief.

9  **CONCLUSION**

10      None of the *Winter* factors support COLFS' request for a preliminary

11  injunction. The Court should deny COLFS' motion.

12

13

14  Dated: December 10, 2024        Respectfully submitted,

15                          ROB BONTA

16                          Attorney General of California
                        NELI N. PALMA

17                          Senior Assistant Attorney General
                        KATHLEEN BOERGERS

18                          KARLI EISENBERG
                        Supervising Deputy Attorneys

19                          General

20

21                          */s/ Erica Connolly*
                        ERICA CONNOLLY

22                          HAYLEY PENAN
                        LAUREN ZWEIER

23                          Deputy Attorneys General
                        *Attorneys for Defendant Attorney*

24                          *General Rob Bonta, in his official*
                        *capacity as California Attorney*

25  SA2024303420                      *General*

26

27

28

25

Atty. Gen. Rob Bonta's Opp. to Pl.'s Prelim. Inj. Mot. (3:24-cv-01338-GPC-KSC))