1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   CULTURE OF LIFE FAMILY              Case No. 3:24-cv-01338-GPC-KSC
     SERVICES, INC., a California nonprofit
12   corporation,                         **ORDER DENYING IN PART AND**
                                          **GRANTING IN PART THE MOTION**
13                          Plaintiff,    **TO DISMISS**

14   v.                                   **[ECF No. 25]**

15   ATTORNEY GENERAL ROB BONTA,
     in his official capacity as the California
16   Attorney General,

17
                            Defendant.
18

19

20        Plaintiff Culture of Life Family Services, Inc. ("COLFS" or "Plaintiff") brings a

21   pre-enforcement action against California Attorney General Rob Bonta ("AG Bonta" or

22   "Defendant") seeking declaratory and injunctive relief.  In its Amended Complaint,

23   COLFS alleges that several statements it makes about abortion pill reversal treatment is

24   constitutionally protected, and that AG Bonta's alleged "attack against APR [abortion pill

25   reversal]" puts COLFS at risk of incurring enforcement actions by the State.  ECF No. 19

26   ¶ 12.

27
                                     1
28
                                                        24-cv-01338-GPC-KSC

Before the Court is Defendant's motion to dismiss, or alternatively stay, the Amended Complaint. ECF No. 25.

Based on the reasons below, the Court DENIES in part and GRANTS in part Defendant's motion to dismiss.

## FACTUAL BACKGROUND[1]

### I.    Abortion Pill Reversal treatment

COLFS is a Catholic community health clinic in San Diego County that provides free abortion pill reversal ("APR") treatment.[2]  ECF No. 19 ("Am. Compl.") ¶ 4, 19, 21. APR is a medical procedure designed for pregnant women who have started the chemical abortion process by ingesting mifepristone, the first pill out of two[3], and who later decide to keep the unborn child.  *Id.* ¶ 2.  APR consists of taking the hormone progesterone in order to counteract mifepristone's blocking of the body's natural supply of progesterone. *See id*. ¶¶ 2, 3, 33-34.

COLFS alleges that "[s]upplemental progesterone itself is indubitably safe." *Id*.  ¶ 30.  The "first known attempt to reverse the effects of mifepristone using bioidentical progesterone" was in 2006, and the woman "went on to deliver a healthy baby."  *Id.* ¶ 31. A few years later, COLFS's medical director, Dr. George Delgado "devised the APR protocol for reversing the effects of mifepristone and began to advise doctors on APR." *Id.* ¶ 32.  In 2012 and 2017, two small human case studies on progesterone therapy were

---

[1] The factual background of this case was detailed in the Court's Order dated November 12, 2024, ECF No. 17, and is, for the most part, incorporated herein.

[2] The Court recognizes the term, "abortion pill reversal treatment," itself is contested, since AG Bonta alleges that "reverse" or "reversal" are in fact fraudulent statements for describing the supplemental progesterone treatment that is at issue here.  Putting that aside, the Court will refer to this medical treatment as "abortion pill reversal treatment" or "APR treatment" throughout this Order, because that is the treatment's common name.

[3] The first pill contains mifepristone, the second misoprostol.  Am. Compl. ¶ 25.

2

published, one of which was co-authored by Dr. Delgado.  *Id.* ¶¶ 37, 38.  Dr. Delgado then did a follow-up to his study in 2018, analyzing the charts of 547 women who had ingested mifepristone and then received progesterone therapy within 72 hours.  *Id.* ¶ 39. The overall fetal survival rate was 48%, but was higher for the subgroup that received progesterone intramuscularly (64%) and the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester (68%).  *Id.*  The study concluded that these were two viable APR protocols.  *Id.*

Based on these studies and a "scoping review" published in July 2023 and "over a decade of widespread successful use of APR," COLFS alleges that APR has been endorsed by the American Association of Pro-Life Obstetricians & Gynecologist, the Catholic Medical Association, and Canadian Physicians for Life.  *Id.* ¶ 42.

As COLFS acknowledges, there have been criticisms of APR, including one study that was performed by Dr. Mitchell Creinin and funded by Danco Laboratories, the principal manufacturer of mifepristone ("Danco/Creinin Study"), which looked at severe bleeding resulting from APR.  *Id.* ¶ 52.  The study involved twelve pregnant women who took mifepristone.  Half then took progesterone, and the other half took a placebo.  One woman who took progesterone went to the hospital with "severe bleeding" while two women who took the placebo experienced severe bleeding.  *Id.* ¶ 54.  COLFS argues that the Danco/Creinin study actually therefore lends support to the conclusion that administrating progesterone after mifepristone "gives a pregnant woman a better chance of avoiding severe bleeding over doing nothing."  *Id.* ¶ 55.

## II.    Heartbeat International and the Enforcement Action

In light of what were viewed as successful APR interventions, COLFS's medical director, Dr. George Delgado, set up a website and hotline in May 2012 to educate pregnant women seeking to counteract the effects of mifepristone and to connect them with licensed medical professionals.  *Id.* ¶ 43.  This became known as the "APR

Network." *Id.* In 2018, to "ensure expansion of the APR Network and increased public awareness of the APR protocol," COLFS transferred the Network for the nominal sum of $1 to Heartbeat International, a nationwide trade group that represents pro-life pregnancy resource organizations. *Id.* ¶ 44.

On September 21, 2023, Rob Bonta, the California Attorney General and the Defendant in this case, filed a complaint in California state court seeking a permanent injunction, civil penalties, and other equitable relief against Heartbeat International et al. for false and misleading advertising of APR treatment. ECF No. 25-2, Request for Judicial Notice ("RJN"), Ex. 1. AG Bonta's complaint against Heartbeat International et al. ("Enforcement Action" or "Action") alleges that there is no credible scientific evidence that supports the theory that progesterone counteracts mifepristone without harmful effects or that APR is safe. RJN Ex. 1 ¶¶ 32, 33, 37, 40-45.

The Enforcement Action alleged two causes of action under California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200 *et seq.*, and False Advertising Law ("FAL"), Business and Professions Code section 17500 *et seq. Id.* ¶¶ 96-101. The Action alleged that Heartbeat International et al. promulgated eight statements in their APR advertisements and communications that are false and misleading because they are unsupported by credible scientific evidence: (1) the use of the terms "reverse" and "reversal"; (2) that APR "has been shown to increase the chances of allowing the pregnancy to continue"); (3) that APR has a success rate of 64-68%; (4) that the rate of birth defects following APR is "less or equal to the rate in the general population"; (5) that "thousands of lives have been saved" through APR; (6) that APR may be effective beyond a 72-hour window following mifepristone administration; (7) that APR may be effective following administration of misoprostol and methotrexate; and (8) that APR can cause only non-life-threatening side effects, even though it can cause severe bleeding. *Id.* ¶¶ 97, 100.

1    Heartbeat International and the other defendant RealOptions, Inc. filed demurrers

2    asking the state court to dismiss the action, based on constitutional grounds.  In June

3    2024, the state court overruled the demurrers. RJN Ex. 3.  The defendants filed their joint

4    answer, including as part of their affirmative defenses that the Action is unconstitutional

5    under the First Amendment's Free Exercise and Free Speech Clauses and under the

6    Fourteenth Amendment's Substantive Due Process Clause.  RJN Ex. 2.

7    **III.    COLFS and the current complaint**

8    There are a number of ties between COLFS and Heartbeat International.  Dr.

9    Delgado, the medical director of COLFS who devised the APR protocol and published

10    two articles studying APR's effectiveness, *see* Am. Compl. ¶ 31-32, 37, 39, is on the

11    Heartbeat International's Medical Advisory Board, *id.* ¶ 44.  COLFS also sold to

12    Heartbeat International the APR Network that Dr. Delgado created, which included a

13    website, a hotline, and a network of providers willing to provide APR treatment.  *Id*. ¶¶

14    43-44.  Heartbeat International et al. and COLFS have the same counsel representing

15    them in these litigation matters.  *Id.* at 1; RJN Exs. B, C, D, E.

16    COLFS has characterized the Enforcement Action against Heartbeat International

17    et al. as "lawfare," Am. Compl. ¶ 1, or an "*in terrorem* lawsuit" that is "motivated by

18    [AG Bonta's] retaliatory animus against pro-life speech and expressive association of all

19    pro-life pregnancy help resource organizations," *id*. ¶ 83.  COLFS alleges the

20    Enforcement Action is an "attempt to restrict APR," *see id*. ¶ 114.  COLFS alleges that

21    the Enforcement Action has created its need for pre-enforcement relief from AG Bonta

22    because COLFS alleges it makes same or similar statements as those targeted in the

23    Enforcement Action against Heartbeat International.  *See id.* ¶¶ 97, 100, 102-05.

24    In bringing this claim against AG Bonta, COLFS alleges that "Bonta's attack on

25    APR is chock full of constitutional implications" that infringe on COLFS's and their

26    patients' rights. *Id.* ¶ 56.  These "constitutional implications" involve violations of the

27

28

free exercise of religion, the right to free speech, and the right to make reproductive decisions.  *Id.*

Specifically, COLFS alleges that the Enforcement Action constitutes a content-based restriction on speech about APR and thus violates the Free Speech Clause.  *Id.* ¶ 112.  COLFS also alleges that the Enforcement Action violates the Free Speech Clause's protection of patients' "right to receive information."  COLFS alleges that doctors have "third-party standing to assert the interests of their patients so long as the physician has also suffered injury himself."  *Id.* ¶ 145 (citing *McCormack v. Herzog*, 788 F.3d 1017, 1027 (9th Cir. 2015)).

Furthermore, COLFS alleges that the Enforcement Action violates the Free Exercise Clause because it is not a generally applicable policy, since the Action does not apply to off-label uses of progesterone.  *Id*. ¶ 137.[4]

Finally, COLFS alleges that the Enforcement Action violates the Substantive Due Process Clause of the 14th Amendment, because "Bonta's assertion that APR must be restricted violates COLFS's patients' right to "procreation, reproductive privacy, and to reject unwanted medical treatment."  *Id*. ¶ 159.

## PROCEDURAL HISTORY

On July 30, 2024, COLFS filed its original complaint.  ECF No. 1.  On August 21, 2024, AG Bonta filed a motion to dismiss, or alternatively stay, COLFS's complaint.  ECF No. 4.  On November 5, 2024, COLFS filed a motion for preliminary injunction.  ECF No. 13.

---

[4] COLFS feels "religiously obligated to offer Abortion Pill Reversal" by nature of its religious mission, so the provision of APR treatment, according to COLFS, is an exercise of religious freedom and expression that is protected under the First Amendment. *See* Am. Compl. ¶ 122.

On November 12, 2024, this Court granted AG Bonta's motion to dismiss, based on the finding that COLFS had not sufficiently alleged pre-enforcement standing, and granted COLFS leave to amend.  ECF No. 17.  The following day, the Court denied COLFS's preliminary injunction request as moot.  ECF No. 18.  On November 15, 2024, COLFS filed its amended complaint and re-filed its preliminary injunction motion.  ECF Nos. 19, 21. On December 10, 2024, AG Bonta filed a motion to dismiss COLFS's amended complaint simultaneously with his opposition to COLFS's preliminary injunction request.  ECF Nos. 25 ("Motion" or "Mot."), 27.  On January 3, 2025, COLFS responded to the motion to dismiss, ECF No. 29, and filed a reply in support of its motion for preliminary injunction, ECF No. 30.  On January 17, 2025, AG Bonta filed a reply in support of his motion to dismiss.  ECF No. 31.

The Court now considers AG Bonta's Motion to Dismiss.

## LEGAL STANDARDS

### I.    Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a court must grant a motion to dismiss for lack of subject-matter jurisdiction, including lack of Article III standing.  Fed. R. Civ. P. 12(b)(1); *see In re Apple iPhone Antitrust Litigation*, 846 F.3d 313, 319 (9th Cir. 2017).   A motion to dismiss under Rule 12(b)(1) may be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the movant asserts that the allegations in the complaint are insufficient on their face to invoke federal jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  For a factual attack, the movant disputes the truth of the allegations, which if true would otherwise invoke federal jurisdiction.  *Id.* This facial/factual distinction has certain implications for how the Court should approach the motion to dismiss: the "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)" (accepting plaintiff's allegations as true and drawing reasonable inferences in the plaintiff's favor), while factual attacks require the plaintiff to

1    "support her jurisdictional allegations with 'competent proof.'"  *Leite v. Crane Co*., 749

2    F.3d 1117, 1121 (9th Cir. 2014).

3    **II.     Federal Rule of Civil Procedure 12(b)(6)**

4         A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint and

5    whether it has "state[d] a claim upon which relief can be granted."  Fed. R. Civ. P.

6    12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a

7    cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See*

8    *Balistreri v. Pacifica Police Dep't*., 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean*

9    *Witter Reynolds, Inc*., 749 F.2d 530, 534 (9th Cir. 1984).

10        A complaint may survive a motion to dismiss only if, taking all well-pleaded

11   factual allegations as true, it contains factual matter that "state a claim to relief that is

12   plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

13   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A claim is facially plausible when the

14   factual allegations allow "the court to draw the reasonable inference that the defendant is

15   liable for the misconduct alleged."  *Id.*

16        Where a motion to dismiss is granted, "leave to amend should be granted 'unless

17   the court determines that the allegation of other facts consistent with the challenged

18   pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc*.,

19   957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture*

20   *Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)).

21   **III.   Abstention**

22        The Ninth Circuit has "not squarely held whether abstention is properly raised

23   under Rule 12(b)(6), Rule 12(b)(1), both, or neither."  *Courthouse News Serv. v. Planet*,

24   750 F.3d 776, 779 n.2 (9th Cir. 2014).  However, several courts in this circuit consider

25   motions seeking dismissal on abstention grounds under the framework of Rule 12(b)(1),

26   *e.g., Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 923 (E.D. Cal. 2021);

27

28

1  *Willamette Family, Inc. v. Allen*, 643 F. Supp. 3d 1180, 1188 (D. Or. 2022); *Green v.*
2  *Aranas*, 775 F. App'x 310, 311 (9th Cir. 2019).

3       In the instant case, the distinction between Rule 12(b)(1) and (6) is immaterial,
4  since all documents extrinsic to the pleadings that are necessary for adjudication of this
5  motion are subject to judicial notice or incorporated by reference into the pleadings.
6  Thus, the instant case may be treated as a facial attack to subject-matter jurisdiction *or* an
7  attack for failure to state a claim, which are governed by similar standards.  *See*
8  *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).  Under either
9  standard, the Court must determine whether the complaint, documents incorporated
10  therein, and documents subject to judicial notice demonstrate "sufficient factual matter,
11  accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S.
12  at 678.

**REQUEST FOR JUDICIAL NOTICE**

13
14       Generally, on a motion to dismiss, courts will limit their review to the contents of
15  the complaint and may only consider extrinsic evidence that is properly presented as part
16  of the complaint.  *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001).
17  However, under Federal Rule of Evidence 201, a district court may take notice of facts
18  not subject to reasonable dispute that are capable of accurate and ready determination by
19  resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).
20  AG Bonta seeks judicial notice of four documents: (1) the complaint by AG Bonta in
21  *People v. Heartbeat International, Inc. et al.*, Case No. 23CV044940 (Alameda Cnty.
22  Sup. Ct., Sept. 21, 2023) (Ex. 1); (2) Defendants' answer to the complaint (Ex. 2); (3)
23  Order by Superior Court Judge Michael Markman denying the demurrers filed by
24  Heartbeat International and Real Options, Inc. (Ex. 3); and (4) the scheduling order for
25  the state case (Ex. 4).  RJN at 2.  All exhibits are relevant to the instant case and are
26  matters of public record, so the Court may take judicial notice of them "without

27
28

9

converting a motion to dismiss into a motion for summary judgment." *Lee*, 250 F.3d at 689 (quotations and citations omitted). But the Court will not take judicial notice of the truth of any disputed facts contained in those public records. *See id*.

## DISCUSSION

**A. Standing**

As a threshold matter, a plaintiff "bears the burden of establishing standing." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).  A plaintiff "must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  This is the "irreducible constitutional minimum" of standing that Article III demands.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A court may raise the issue of standing *sua sponte* in order to ensure that it has jurisdiction.  *See, e.g.*, *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) (per curiam).

Although neither party directly briefed on this issue, the Court finds that Plaintiff here fails to establish standing for its claim for damages.  In order to have standing for damages, Plaintiff must show that it has suffered a "concrete" injury, *Clapper*, 568 U.S. at 409, but Plaintiff has not pled any injury other than the future threat of enforcement against it by Defendant AG Bonta.  This will not suffice for a claim for damages.  The Court accordingly DISMISSES Plaintiff's claim for damages, as standing is absent.

/ / /

/ / /

/ / /

**B. Abstention**

1. _Younger_ abstention

_Younger_ abstention is premised on the desire of Congress, subject to few exceptions, "to permit state courts to try state cases free from interference by federal courts." _Younger v. Harris_, 401 U.S. 37, 43 (1971). It permits federal courts to "preserve respect for state functions such that the national government protects federal rights and interests in a way that will not 'unduly interfere with the legitimate activities of the States.'" _Younger_, 401 U.S. at 44. Under _Younger_ abstention doctrine, a federal court may abstain from hearing a case in the following types of cases: (1) parallel, pending state criminal proceedings; (2) state civil proceedings akin to criminal prosecutions; and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts. _Herrera v. City of Palmdale_, 918 F.3d 1037, 1043 (9th Cir. 2019) (citing _ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund_, 754 F.3d 754, 759 (9th Cir. 2014)).

The Ninth Circuit invokes a "five-prong test" to determine "whether a civil case is _Younger_-eligible." _Seattle Pac. Univ. v. Ferguson_, 104 F.4th 50, 63 (9th Cir. 2024). "_Younger_ abstention is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." _Rynearson v. Ferguson_, 903 F.3d 920, 924-25 (9th Cir. 2018). If these elements are met, then the court should consider a fifth prong: "(5) 'whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to _Younger_ applies.'" _Id._ (quoting _ReadyLink Healthcare_, 754 F.3d at 759).

Here, the first and second prong are easily met because the Enforcement Action is an "ongoing" state quasi-criminal enforcement action. The Attorney General began the

Enforcement Action in September 2023, and the case is still pending.  It was "initiated before any proceedings of substance on the merits have taken place in the federal court," and this federal action has not "moved beyond an embryonic stage."  *Credit One Bank, N.A. v. Hestrin*, 60 F.4th 1220, 1225 (9th Cir. 2023) (citations omitted).

The third prong is also met because the Attorney General seeks to protect Californians from false and misleading advertising regarding APR services.  *See* RJN, Ex. 1.  The Ninth Circuit has held that "[w]here the state is in an enforcement posture in the state proceedings, the 'important state interest' requirement is easily satisfied." *Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 884 (9th Cir. 2011); *see Credit One Bank*, 60 F.4th at 1228 (finding an important state interest where the district attorney was seeking to enforce California's consumer protection laws).

The fourth prong is satisfied by "an *opportunity* to present the federal issue" in state court.  *Fresh Int'l Corp. v. Agric. Labs. Rels. Bd.*, 805 F.2d 1353, 1362 (9th Cir. 1986) (emphasis in original).  Federal courts assume that state courts have the jurisdiction to hear federal claims, *see Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) and that state procedures "afford an adequate remedy," *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 619 (9th Cir. 2003).  "[T]the burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'" *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (quoting *Moore v. Sims*, 442 U.S. 415, 432 (1979)).  Because COLFS has not pled or argued that it is barred by California state procedural law from intervening as a party in the ongoing state case, the fourth prong is met.

Turning to the fifth prong, the Court now addresses the crux of the issue.  This prong is met when the requested relief "seeks to enjoin or has the *practical effect* of enjoining the ongoing state judicial proceeding."  *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018).  "Direct interference" is not required.  *Gilbertson*, 381 F.3d at 977-78.

However, "*Younger*'s scope is closely circumscribed to parties actually involved in state litigation; even the presence of co-plaintiffs representing identical interests in state proceedings does not extend *Younger* to parties not actually involved in those proceedings." *Benavidez v. Eu*, 34 F.3d 825, 832 (9th Cir. 1994) (citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 927-29 (1975)). While *Younger* abstention <u>can</u> apply to entities that are not parties to the state case, *see Hicks v. Miranda*, 422 U.S. 332, 349-50 (1975), the non-party must have a "sufficiently close relationship or sufficiently intertwined interests" with a party to the state case. *Herrera*, 918 F.3d at 1047.

Plaintiff COLFS is not the party that is subject to the Enforcement Action in state court. In his motion to dismiss, Defendant AG Bonta argues that COLFS has a "sufficiently close relationship or sufficiently intertwined interests" with Heartbeat International because of six reasons:

(1)  Delgado created the APRN, including its website and hotline, before it was transferred to Heartbeat International. Am. Compl. ¶ 43.

(2)  Delgado remains "in charge of medical protocols and research" for the APRN, as he agreed to do so when HBI received the APRN from COLFS. *See* Connolly Decl. Ex. B 70:13-21.

(3)  COLFS remains "responsible for maintaining the APR Protocol" as part of its "partnership with Heartbeat International." *Id*. Ex. D 165.

(4)  Delgado, as part of the HBI Advisory Team, is tasked with providing "current knowledge, critical thinking, and analysis on various medical issues presented in the course of [HBI's] provision of APR-related services." *Id*. Ex. A 53.

(5)  HBI's Training Kit includes Delgado's "approval" of the APR protocol; his note to providers about methotrexate treatment; and his creation of FAQs for APRN providers to use with potential patients. *Id*. Ex. C 104, 105, 109.

(6)   Delgado co-authored the 2012 Case Series and the 2018 Report with RealOptions's medical director, Davenport.  The HBI Defendants rely on these reports to defend themselves in the Enforcement Action.  *See* RJN Ex. 3 74-75.

*See* Mot. at 9.  AG Bonta further argues that each of COLFS's claims "arise directly out of the Enforcement Action" and that they also mirror the HBI Defendants' defenses in the Enforcement Action.  *Id*. at 11.

Certainly, Delgado and HBI have a longstanding close relationship.  However, the Court does not find this to be sufficient intertwining between COLFS and HBI and RealOptions for the sake of *Younger* abstention.  Caselaw from the Supreme Court, this Circuit, and sister Circuits have demanded more.  In *Doran v. Salem Inn, Inc.*, a town ordinance was passed that prohibited topless dancing.  *Doran*, 422 U.S. 922, 924-26 (1975).  Two bars stopped the practice; one bar did not and was prosecuted.  *Id.*  All three bars together brought a federal civil rights action challenging this ordinance.  *Id.*  The Supreme Court held that only the bar being prosecuted was subject to *Younger* abstention because although the other bars were "represented by common counsel, and have similar business activities and problems [as the prosecuted bar], they are apparently unrelated in terms of ownership, control, and management."  *Id.* at 928-29.

In the same Term, the Supreme Court issued a ruling in *Hicks*, in which the employees of an adult theater were charged with violating California's obscenity statute, and the theatre's four copies of the pornographic film were seized.  *Hicks v. Miranda*, 422 U.S. 332, 334-36 (1975).  The theatre's owners filed an action in federal court, asking for a declaration that the obscenity statute was unconstitutional and for an order returning their property (the four copies of the film).  *Id.* at 337-38.  The Court held that *Younger* abstention applied here because the interests of the theatre owners "and those of

14

their employees were intertwined" and "the federal action sought to interfere with the pending state prosecution."  *Id.* at 348-49.

While the federal action in *Hicks* was clearly an interference with the pending state prosecution, the federal action brought by the two bars in *Doran* was not so clearly such an interference with the pending state prosecution against the one bar.  This case is more like *Doran* than it is *Hicks.*  Despite the fact that COLFS and Delgado started the APRN, and COLFS transferred it to HBI, and continues to offer support and guidance regarding APR to HBI, these connections between the two organizations do not rise to the level of any sort of ownership, control, or management.  The "partnership" between COLFS and HBI is not legal in nature.  *See* Delgado Decl. ¶¶ 10-17.  And according to the APRN Policies and Procedures Manual, APRN Advisory Team members are "volunteers" and "shall not be deemed an employee of APRN or Heartbeat International."  Connolly Decl. Ex. A at 53-54.  And even if there *were* actual legal or organizational ties between the two entities, this may not be sufficient.  *See Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33 (1st Cir. 2012) (finding *Younger* did not apply to industry association even though some of its members were state-court civil defendants); *Bickham v. Lashof*, 620 F.2d 1238, 1244 (7th Cir. 1980) (finding *Younger* did not apply because the interests of a corporation, the state-court defendant, and "its sole shareholder" were insufficiently intertwined).  *Cf. Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 882 (8th Cir. 2002) (applying *Younger* to a non-party in whom state-court defendant, the parent corporation, had a "controlling interest").

The cases cited by AG Bonta in support of *Younger* abstention do not persuade the Court.  In *Spargo*, the court found that *Younger* applied because the federal court plaintiffs' claim was "entirely derivative of whatever rights that" the state-court defendant may have.  *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir. 2003).  The court reasoned that because federal plaintiffs had a protected interest

in hearing the state-court defendant Spargo speak *only if* Spargo had an underlying First Amendment right to engage in his speech, it would be "impossible for the District Court to analyze plaintiffs' claims independently without first analyzing Spargo's constitutional right to engage in the charged conduct…" *Id.* at 84; *see also Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 636 (6th Cir. 2005) (finding that the rights of federal plaintiffs are "merely derivative" of the rights of the state-court defendants). That is not the situation here. COLFS has First Amendment rights to speak that are entirely separate from those of HBI and RealOptions.

The other cases cited by AG Bonta involve federal plaintiffs seeking relief that is directly related to the state-court proceedings. In *Herrera*, the court applied *Younger* abstention to the federal claims brought by two operators of a motel, Bill and Mona Herrera, and their children and the LLC that owned the motel, Palmdale Lodging. *Herrera v. Palmdale*, 918 F.3d 1037, 1047 (9th Cir. 2019). There was a state-court nuisance action against only Bill and the LLC, seeking an order shutting down their motel. The court found that the federal claims of Mona and her children "present[ed] the same risk of interference in the state proceeding as d[id] the federal claims of Bill and Palmdale Lodging," because all federal plaintiffs sought "the same relief from the state court proceedings." *Id. See also Women's Cmty. Health Ctr. of Beaumont, Inc. v. Tex. Health Facilities Comm'n*, 685 F.2d 974, 982 (5th Cir. 1982) (the "only relief requested" by the federal plaintiffs was an order allowing the state-court defendant to continue operating its business); *Kuhn v. Thompson*, 304 F. Supp. 2d 1313, 1323 (M.D. Ala. 2004) (plaintiffs sought to "directly interfere" with the prosecution of the state-court defendant by asking for an injunction reinstating defendant to original position). COLFS here is not asking for any relief that directly involves HBI or RealOptions. Its requests for declaratory and injunctive relief only involve its own organization.

Although "direct interference" with the state-court proceeding is not required in order to have the practical effect of interference,[5] the simple prospect of preclusion or precedent cannot suffice as interference.  *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan,* 397 F.3d 56, 71 (1st Cir. 2005) ("Normal res judicata effects of federal actions on state actions… are of course not enough to trigger *Younger*."); *Robinson v. Stovall*, 646 F.2d 1087, 1091 (5th Cir. 1981) (finding that federal plaintiffs' sought-out relief would affect the pending state proceedings "if at all, only through the operation of ordinary principles of collateral estoppel" but that "such an attenuated impact cannot be the basis for *Younger* abstention," citing to *Doran* and *Steffel v. Thompson*, 415 U.S. 452 (1974)); *Mass. Delivery Ass'n*, 671 F.3d at 47 (finding that the asked-for declaratory relief could create judicial precedent, but that "did not warrant *Younger* abstention," relying on *Doran* and *Steffel*).  In other words, "parallel challenges to the constitutionality of a state statute or policy are typically not barred by *Younger*…"  *Spargo*, 351 F.3d at 83.

There are good public policy reasons for applying *Younger* to non-parties in only "certain limited, exceptional circumstances."  *Mass. Delivery Ass'n v. Coakley*, 671 F.3d at 46 (collecting circuit cases that limit *Younger*'s application to non-parties).  The district court in *Cobb* stated it clearly:

> "a City could foreclose totally any federal constitutional challenge to an ordinance… merely by prosecuting one individual among the many at whom the ordinance was directed. This result truly 'would turn federalism on its head' and would impose an exhaustion requirement upon § 1983 actions, which the Supreme

---

[5] Note that in *Gilbertson v. Albright*, where the Ninth Circuit held that "direct interference" is not required, the court was <u>not</u> dealing with the exceptional situation of non-parties, since the federal plaintiff was the same state-court defendant.  *Gilbertson*, 381 F.3d at 968.

1    Court has refused to do. Further, it would constitute an abrogation of the

2    paramount duty of the federal courts to protect constitutional rights."

3    *Cobb v. Beame*, 402 F. Supp. 19, 25 (S.D.N.Y. 1975).

4         For the above reasons, the Court finds that the connections between COLFS and

5    Heartbeat International are not sufficiently intertwined such that they may be "treated

6    similarly for purposes of *Younger* abstention." *Herrera*, 918 F.3d at 1047. The Court

7    therefore **DENIES** AG Bonta's motion to dismiss on these grounds.

8              2. *Colorado* River abstention

9         In "exceptional circumstances," a federal court may decline to exercise its

10   "virtually unflagging obligation" to exercise federal jurisdiction, in deference to pending

11   parallel state proceedings. *Col. River Water Conservation Dist. v. United States*, 424

12   U.S. 800, 817 (1976). *Colorado River* abstention is based on "considerations of wise

13   judicial administration, giving regard to conservation of judicial resources and

14   comprehensive disposition of litigation." *Id.* The "task in [potential abstention] cases…

15   is not to find some substantial reason for the *exercise* of federal jurisdiction by the district

16   court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the

17   'clearest of justifications' that can suffice… to justify the *surrender* of that jurisdiction."

18   *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)

19   (emphasis in original); *see Martinez v. Newport Beach City*, 125 F.3d 777, 785 (9th Cir.

20   1997) ("the Supreme Court has indicated that *Colorado River* abstention has even rarer

21   application than does *Younger* abstention").

22        To that end, the decision to abstain "does not rest on a mechanical checklist, but on

23   a careful balancing of the important factors as they apply in a given case, with the

24   balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone

25   Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). There are eight factors

26   to be considered:

27

28

"(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court."

*R.R. Street & Co. Inc. v. Transport Ins. Co*., 656 F.3d 966, 978-79 (9th Cir. 2011). "No one factor is necessarily determinative." *Col. River*, 424 U.S. at 818-19. "Any doubt as to whether a factor exists should be resolved against a stay" or dismissal. *Seneca Ins. Co., Inc. v. Strange Land, Inc*., 862 F.3d 835, 842 (9th Cir. 2017). We address each factor as it applies to this case.[6]

### a. Inconvenience of the federal forum

Defendant AG Bonta admits that the "forum itself is not inconvenient for the Attorney General." Mot. at 14. As such, the Court finds that this factor weighs in favor of exercising jurisdiction.

### b. The desire to avoid piecemeal litigation

While there may be a "highly interdependent" relationship between the state and federal claims, *R.R. Street*, 656 F.3d at 978, it is also true that "conflicting results, piecemeal litigation, and some duplication of judicial effort is the unavoidable price of preserving access to the federal relief which section 1983 assures." *Tovar v. Billmeyer,* 609 F.2d 1291, 1293 (9th Cir. 1979). And in fact, unlike the fact pattern of *Colorado River*, which dealt with complicated water systems and rights, here, the adjudication of each party's claim does not necessarily imply or immediately affect the other party's

---

[6] The first factor is irrelevant because there is no dispute over property.

claim.  Regardless of the outcome of the state case, the resolution of the federal constitutional claims will determine the instant case.  The Court finds this factor weighs more towards exercising jurisdiction.

### c.  The order in which the forums obtained jurisdiction

Undisputably, the HBI litigation was filed first, RJN Ex. 1, and has been going on for over a year.  The Enforcement Action is currently in discovery.  RJN Ex. 4.  The Court finds that this factor favors abstention.

### d.  Whether federal or state law provides the rule of decision

Defendant AG Bonta tries to argue, in the Reply, that the issue in these federal and state actions is whether the UCL and the FAL apply to the APR statements.  "If so, the speech is both commercial and false and misleading…"  Reply at 7.  AG Bonta has it flipped: the issue is whether the APR statements are commercial speech and whether they are false and misleading.  If yes to both, then the UCL and FAL apply.  Since the threshold question is constitutional, federal law provides the rule of decision.

"If the state and federal courts have concurrent jurisdiction over a claim, this factor becomes less significant."  *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989) (citing *Moses H. Cone,* 460 U.S. at 25).  State courts are competent and able to resolve federal constitutional questions.  However, "the presence of federal-law issues must always be a major consideration weighing against surrender."  *Moses H. Cone*, 460 U.S. at 26.  The Court finds this factor to weigh in favor of exercising jurisdiction.

### e.  Adequacy of the state court proceedings

The state court would be adequate to hear Plaintiff COLFS's claims, and COLFS has not alleged otherwise.  Because this factor is "of little or no weight" unless it counsels in favor of federal jurisdiction, the Court finds that it is neutral.  *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1370 (9th Cir. 1990).

### f.  The desire to avoid forum shopping

1       Defendant AG Bonta argues that this case is a "clear example of forum shopping,"

2   citing to the fact that shortly after receiving an unfavorable order in the Enforcement

3   Action suit, the HBI Defendants' counsel filed this federal lawsuit on behalf of COLFS.

4   Mot. at 15.  While the Court is not blind to the strategic litigation at play here, it is

5   important to note that while counsel is the same across the state and federal actions, there

6   are different parties in each action.  In *Nakash*, the federal plaintiff had become

7   dissatisfied with a state court ruling and then he himself sought out a new forum in the

8   federal courts.  *Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir. 1989).  Here, the HBI

9   Defendants received an unfavorable ruling in the Enforcement Action, but they did not

10  themselves then use the federal courts as a workaround.  An entirely new plaintiff,

11  COLFS, is the party in this case.  While this may indicate strategic litigation by counsel,

12  the fact that the HBI Defendants cannot directly use COLFS's litigation for their own

13  relief attenuates the benefit they would receive from whatever forum-shopping.  The

14  Court finds this factor neutral.

### g.  Whether the state court proceedings will resolve all issues

16      To abstain from the federal action, the court must "conclude[] that the parallel

17  state-court litigation will be an adequate vehicle for the complete and prompt resolution

18  of the issues between the parties. If there is any substantial doubt as to this, it would be a

19  serious abuse of discretion to grant the stay or dismissal at all." *Moses H. Cone*

20  *Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).  "Thus, the decision to

21  invoke *Colorado River* necessarily contemplates that the federal court will have nothing

22  further to do in resolving any substantive part of the case…" *Id.*

23      Although the court in *Nakash* held that exact parallelism (same parties, same

24  claims) was not required, this was because it found that Nakash's "attempts to distinguish

25  between the two actions" were "unavailing" and "disingenuous." *Nakash*, 883 F.2d at

26  1416.  The only difference between the two cases was the absence in one case of the

27

28

corporate entities owned and operated by the parties. The federal action was simply a "spin-off" of more comprehensive state litigation. *Id.* at 1417. Here, the federal action is no such "spin-off" where COLFS and HBI are not entities owned or operated by the other. *See supra* for discussion on their legal distinctiveness.

While it is true that the claims brought by COLFS mirror the HBI Defendants' defenses in the Enforcement Action, Mot. at 15, no action in this federal case would immediately or actually bind the HBI Defendants. There is no legal relationship between COLFS and HBI Defendants; the relief sought by COLFS is for itself only. For any effect to take place on HBI Defendants, there would have to be further litigation making use of preclusion law. *Cf. Montanore Minerals Corp. v. Bakie*, 867 F.3d 1160, 1170 (9th Cir. 2017) (finding that although there was not exact parallelism, the state court claims would have fully resolved the issues pertaining to the *pertinent* parties, who were involved in both actions). The Court finds this factor weighs in favor of exercising jurisdiction.

Thus, upon review and consideration of all the factors listed above, the Court does not find that exceptional circumstances exist here such that *Colorado River* would apply, and therefore the Court **DENIES** the motion to dismiss on these grounds.

## C. Failure to state a claim

Defendant AG Bonta argues that COLFS has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court takes each of COLFS's claims in turn.

### 1. Free Speech Clause claim

COLFS avers that AG Bonta's enforcement of the UCL and FAL against the targeted APR statements would violate its free speech rights under the First Amendment.

"The First Amendment, applicable to the States through the Fourteenth **\*1148** Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family and*

*Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("NIFLA").  The right to free speech includes "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  However, the right to speak or to refrain from speaking is not absolute.  If "the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message."  *Wooley*, 430 U.S. at 717.

Factors that determine the level of scrutiny include determining (1) whether the speech regulation is content-based or content-neutral regulations of speech; and (2) whether the speech is commercial speech or non-commercial speech.

### a. Content-Neutral Regulation

In applying the First Amendment, the Court distinguishes between content-based and content-neutral regulations of speech.  In a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 (1984). Content-based regulations "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S.155, 163 (2015).   Generally, a content-based regulation cannot withstand a challenge unless the government proves the law is narrowly tailored to serve a compelling state interest. *NIFLA*, 585 U.S. at 766.  This stringent standard reflects the fundamental principle that the government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dept. of Chicago v. Mosely*, 408 U.S. 92, 95 (1972).

Here the statutes at issue are general application laws that prohibit false and misleading statements. On their face, they do not focus on messages in favor or against abortion. Ultimately, the laws are agnostic by targeting all statements directed at consumers that are misleading. The Court finds that the UCL and FAL are content-neutral and do not trigger strict scrutiny.

### b. Commercial or Non-Commercial Speech

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001) (citing *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Next, because "the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech," the Court "must first determine the proper classification" of the speech at issue. *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 65 (1983). In general, laws regulating commercial speech are subject to a lesser standard of scrutiny. *See id.* at 64-65. Inherently false and misleading statements in commercial speech are given little constitutional protection. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Because "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising ... there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 563 (1980). As a result, it is permissible to "ban forms of communication more likely to deceive the public than to inform it." *Id.; see Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading").

More specifically, the Supreme Court has held that speech may be "characterized as commercial when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir.2004) (citing *Bolger*, 463 U.S. at 66–67). While "[t]he combination of all of these characteristics ... provides strong support for the ... conclusion that [the communication is] properly characterized as commercial speech," *Bolger*, 463 U.S. at 67, it is not necessary that each of the characteristics "be present in order for speech to be commercial," *id*. n. 14.

Defendant AG Bonta argues that the APR statements propagated by COLFS are commercial speech.  He states that COLFS uses its APR statements to advertise the APR treatment to its patients.  *See, e.g.*, Am. Compl. ¶ 104 (COLFS website "tells women to reach out to COLFS even if they have a non-standard situation since COLFS will always do what it can to provide them with care").  According to AG Bonta, these statements "induce or encourage potential patients to obtain care with COLFS" and therefore qualify as commercial speech.  Mot. at 20.  AG Bonta also states that COLFS has expressly alleged an economic motivation to use these APR statements, specifically for its fundraising efforts, citing to Am. Compl. ¶ 103 ("For example, every year, COLFS holds an annual fundraising gala. Every year COLFS mentions its work, including Abortion Pill Reversal.").

Many of the disputed statements appear on COLFS's website, specifically on a FAQs page that describes the purported scientific principles and support underlying APR (e.g. that APR has a high success rate, and that there are no birth deects, that it works in non-standard situations).  Abortion Pill Rescue FAQs, COLFS Medical Clinic, https://colfsclinic.org/abortion-pill-rescue-faqs/; Am. Compl. ¶ 104.  The FAQS address general questions about APR, and there are only a few mentions of COLFS providing the service. The introduction at the top of the FAQs states: "At COLFS Medical Clinic we

can help you <u>learn everything</u> you need to know about the APR procedure and where you can get the help you need in your <u>local community</u>." (emphasis added). Abortion Pill Rescue FAQs. The FAQs appear more informational and educational than intended to solicit clients and promote COLFS own services.  In other words, it is a close call whether the FAQs are placed in a "commercial context" or an "exchange of ideas."

AG Bonta cites exclusively to *First Resort, Inc.* for legal support.  In *First Resort, Inc.*, a limited services pregnancy clinic brought an action for declaratory and injunctive relief challenging the constitutionality of a city ordinance that prohibited use of false or misleading advertising made by limited services pregnancy centers.  *First Resort, Inc. v. Herrera*, 860 F.3d 1263 (9th Cir. 2017).  The Ninth Circuit held that the ordinance did not regulate First Resort's protected speech because the ordinance targeted commercial speech.  *Id.* at 1276.  While First Resort provided counseling and basic medical services free of charge, these services still had "monetary value," and First Resort used its online and print advertisements, including Google's Adwords, to "compete [against abortion providers] in a competitive marketplace" for the "attention of online viewers."  *Id.*  The court found that these advertisements "constitute[d] commercial speech because they are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas."  *Id.* (citation omitted).  The Ninth Circuit also noted that First Resort has a "clear economic motivation to produce successful advertisements" because its ability to attract new clients would boost its fundraising efforts.  *Id.*  As such, a majority of First Resort's fundraising communications referenced the benefits of its services and incorporated client stories; employees were eligible for a bonus compensation based, in part, on the number of new clients.  *Id.*  Because First Resort's communications constituted promotional advertising of services, the statements were deemed "classic examples of commercial speech."  *Id.*

24-cv-01338-GPC-KSC

Here, while COLFS disseminates the targeted APR statements at their annual fundraising galas, *see* Am. Compl. ¶ 103, at the pleading stage, it is less clear if this conduct rises to the level of economic motivation as shown in *First Resort*.   In *First Resort*, evidence presented to the district court demonstrated that a "majority" of First Resort's fundraising communications included the targeted advertising language at issue, giving rise to an inference of economic motivation.  Here, the Amended Complaint does not indicate that is true for COLFS, and AG Bonta does not argue otherwise.  And unlike First Resort's employee compensation scheme, there are no other allegations that speak to a possible economic motivation.  Additionally, COLFS has not averred that it views its online advertising as competing with that of abortion providers.  *Cf. First Resort, Inc*., 860 F.3d at 1274.

Instead, COLFS alleges that it provides "free material[s] and support to needy women" and as such, there is "no economic motivation of any kind."  Am. Compl. ¶ 68 (citing *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023)); *see also Nat'l Inst. for Fam. & Life Advocs. v. James*, No. 24-CV-514 (JLS), 2024 WL 3904870, at *12 (W.D.N.Y. Aug. 22, 2024) ("morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction.'").  However, at the motion hearing on February 7, 2025, COLFS acknowledged that in exchange for its APR services, it accepts insurance and/or payment from women who have insurance or the means to pay.  Despite this, COLFS reiterated at the hearing that it is a religious non-profit that helps women regardless of their ability to pay and provides free treatment.  *See also* Am. Compl. ¶ 98 (COLFS alleging that "it is a religious nonprofit and is morally obligated to provide life-affirming care to any woman who requests it from COLFS").

While AG Bonta's arguments raise the possibility of COLFS's underlying economic motivations, economic motivation is "insufficient by itself to turn the materials

into commercial speech." *Bolger*, 463 U.S. at 67; *see also Fargo Women's Health Org., Inc. v. Larson*, 381 N.W. 2d 176, 180-81 (N.D. 1986) ("we do not believe that factor [of women being charged for services by the clinic] is dispositive of our determination that the communication involved is commercial speech"). The Court must instead look at all the *Bolger* factors in a "fact-driven" analysis, given the "inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort*, 860 F.3d at 1272 (citations and quotations omitted).

Here, a fact-driven analysis is not possible given the paucity of the record. Reviewing the FAC and properly judicially noticed documents, the Court finds that COLFS has sufficiently pled that its APR statements do <u>not</u> constitute commercial speech and therefore deserve constitutional protection under the First Amendment. Plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

If the speech at issue is protectible, then it is protected, by some level of scrutiny, even if it is false speech. *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (rejecting notion that false speech should be in a general category that is presumptively unprotected). Since the Court has determined that Plaintiff has sufficiently alleged that the APR statements constitute protectible noncommercial speech, the Court need not examine parties' arguments for whether the APR statements promulgated by COLFS are false and misleading. Furthermore, at this pleading stage, the Court will not weigh the scientific evidence offered in the FAC. *See Ferrari v. Nat. Partners, Inc*., 2016 WL 4440242, at *5 (N.D. Cal. Aug. 23, 2016) (citing *Jones v. Johnson*, 781 F.2d 769, 772,

24-cv-01338-GPC-KSC

n.1 (9th Cir. 1986) ("[A]ny weighing of the evidence is inappropriate on a 12(b)(6) motion")).[7]

      2. <u>Free Exercise Clause claim</u>

A plaintiff may bring a Free Exercise claim if it can show that a government entity has "burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507, 525 (2022). "If the purpose of the law is to restrict practices *because of* the religious motivations of those performing practices, the law is not neutral." *Tingley v. Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022). The UCL and FAL protect consumers by prohibiting false and misleading advertisements – because of the stated interest in consumer protection, not because of any sort of motivations underlying those advertisements – and as such these laws are neutral. *See* Cal. Bus. & Prof. Code §§ 17200, 17500.

"Broadly speaking, there are two ways a law is not generally applicable. The first is if there is a 'formal mechanism for granting exceptions' that 'invite[s] the government to consider the particular reasons for a person's conduct.' The second is if the law 'prohibits religious conduct while permitting secular conduct' that also works against the government's interest in enacting the law." *Tingley*, 47 F.4th at 1087-88 (citing *Fulton v. City of Philadelphia*, 593 U.S. 522, 534, 537 (2021)). Neither the UCL nor the FAL have a formal mechanism that allows "individual exceptions" because all false and misleading advertising is prohibited under these statutes. *See* Cal. Bus. & Prof. Code §§ 17200, 17500.

---

[7] The Court will conduct a full analysis of the parties' arguments on this point (whether the APR statements are false or misleading) in a separate Order ruling on the motion for preliminary injunction.

24-cv-01338-GPC-KSC

Furthermore, these statutes do not treat "any comparable secular activity more favorably than religious exercise." *Tingley*, 47 F.4th at 1088. The UCL and FAL prohibit all false and misleading advertisements, regardless of whether the actor had secular or religious motives, and the California Attorney General "regularly enforces" these laws against secular entities. Mot. at 21 (citing to Am. Compl. ¶ 101, listing past enforcement actions).

COLFS argues that the statutes are not generally applicable because they do not apply to public entities or political speech. Am. Compl. ¶¶ 132-33. It is faulty to assume that the UCL and FAL must apply to every type of entity in order to be considered "generally applicable" laws. Under the current Free Exercise caselaw, a law does not need to apply to every entity in order to be considered "generally applicable." Instead, it must not treat comparable secular activities more favorably than religious activities. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). The emphasis is on the "comparable" nature of the activities. "Whether secular and religious activity are 'comparable' is evaluated 'against the asserted government interest that justifies the regulation at issue' and requires looking at the *risks* posed, not the reasons for the conduct." *Tingley*, 47 F.4th at 1088 (citing *Tandon*, 593 U.S. at 62) (emphasis added).

The risks are different here. According to AG Bonta, "[n]either public entities nor political speech present the same risks as deceptive advertisements or business practices by private corporations." Mot. at 22. Public entities are exempted because the state is a "sovereign entity representing the people." *Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198, 1203 (1999). Political speech is exempted because it runs against the First Amendment, since false and misleading *political* speech is protected while inherently false and misleading commercial speech is not. *See Cent. Hudson*, 447 U.S. at 563. Both public entities and political speech also benefit from a separate accountability

mechanism, namely that of elections. Thus, AG Bonta argues, the risks posed by public entities and political speech are not the same as those posed by private corporations. The Court finds these arguments persuasive in showing that public activities and political speech activities are <u>not</u> comparable to the commercial activities regulated by these state laws.

The Court also notes here that COLFS's "generally applicable" arguments regarding the UCL (and its enforcement) potentially encroach upon the constitutional principles of sovereign immunity and federalism. First, COLFS's argument that the UCL is not enforceable against public entities fails to recognize that "[i]t is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued…" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citations and quotations omitted). This principle of sovereign immunity extends to states, as well. *See Alden v. Maine*, 527 U.S. 706 (1999); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). Only with consent of the government can a law be enforced against it. COLFS implies that statutes need to be enforceable against public entities in order to be "generally applicable," but the *status quo* is that statutes are *not* enforceable against federal, state, and local governments. And here, the State of California has not consented to being sued under the UCL. (This is entirely reasonable, given that the UCL is a consumer protection law aimed at *business practices*.)

Additionally, COLFS states that because AG Bonta's Enforcement Action "limit[s] off-label uses of progesterone in one context only – APR – while allowing it in all other contexts," Opp. at 24, AG Bonta has violated COLFS's Free Exercise rights. *See* Am. Compl. ¶ 61 ("Allowing bioidentical progesterone to be prescribed for everything except APR treatment is not neutral and generally applicable…"). However, laws do not need to cure every problem or aspect of a problem. Where there are matters of local concern, the "States traditionally have had great latitude under their police powers to legislate as to the

1  protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc.*

2  *v. Lohr*, 518 U.S. 470, 475 (1996) (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S.

3  724, 756 (1985)).  This latitude is not only a *consequence* of our federalism, but a

4  significant *advantage* of it.  "The federal structure allows local policies more sensitive to

5  the diverse needs of a heterogeneous society, *permits innovation and experimentation*,

6  enables greater citizen involvement in democratic processes, and makes government

7  more responsive by putting the States in competition for a mobile citizenry."  *Bond v.*

8  *United States*, 564 U.S. 211, 221 (2011) (citations and quotations omitted) (emphasis

9  added).  Here, California is entirely within its prerogative to regulate progesterone

10  differently in different contexts.  Again, to be clear, AG Bonta is not banning APR

11  treatment, but is enforcing consumer protection laws against specific advertisements of

12  APR treatment.  This is entirely acceptable, and does not render the UCL (or its

13  enforcement) not generally applicable so as to trigger the Free Exercise Clause.

14      COLFS also argues that the Attorney General has selectively enforced the UCL

15  and FAL against COLFS but has refused to enforce these laws against Planned

16  Parenthood.  *See* Am. Compl. ¶ 136.  This argument lacks merit in that COLFS's

17  statements and Planned Parenthood's statements present *different* harms to the public.

18  COLFS's statements refer to a medical treatment that has only undergone studies for

19  efficacy and safety since 2012, *see* Am. Compl. ¶¶ 37-40, while Planned Parenthood's

20  statements speak to an FDA-approved medical procedure, Am. Compl. ¶ 27.  There are

21  greater, and different, risks involved: one involves the *unknown* risks of an unapproved

22  treatment; the other involves the known risks of a treatment studied and approved by the

23  FDA.  Because of this difference in risk, COLFS's statements about APR treatment and

24  Planned Parenthood's statements about the abortion pill are not comparable.

25      Also, for COLFS's allegation of selective prosecution to be plausible, Planned

26  Parenthood's statements would have to actually be in violation of the UCL and FAL, but

27

28

there is no indication that they are.  COLFS, in a conclusory manner, alleges that "Planned Parenthood also misleads women about the safety, efficacy, and side-effects of the Abortion Pill."  Am. Compl. ¶ 136.  COLFS's primary support for this is the allegation that Planned Parenthood does not disclose to women some of the serious consequences of an abortion.  Am. Compl. ¶ 88-89.  However, as AG Bonta points out in the motion to dismiss, COLFS cherry-picks information from Planned Parenthood's website.  On the "How Safe Is the Abortion Pill?" page, there *is* information on the rare but serious complications that can occur with a medication abortion.  Connolly Decl. Ex. I.  There are no allegations that Planned Parenthood has promulgated false and misleading statements about its own services.  Since Planned Parenthood is facially not in violation of the UCL or the FAL, the Attorney General has nothing to prosecute, and therefore selective prosecution is not at work.

Because COLFS has not sufficiently alleged that the UCL and the FAL – and their enforcement by AG Bonta – violate the Free Exercise Clause, the Court **GRANTS** Defendant's motion to dismiss this second cause of action **without leave to amend**.

3.  <u>"Right to Receive Information" claim</u>

COLFS also alleges a "right to receive information" claim on behalf of its patients.  Even if COLFS had third-party organizational standing here, which the Court does not decide, the "listeners" (its patients) must independently also have standing.  While the Supreme Court has recognized a First Amendment right to 'receive information and ideas,' "it has identified a cognizable injury only where the listener has a concrete, specific connection to the speaker."  *Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).  In *Murthy*, the Supreme Court found that plaintiffs had no standing for its right-to-listen claim because they "do not point to any specific instance of content moderation that caused them identifiable harm" nor

1   identify any "specific speakers or topics that they have been unable to hear or follow."
2   *Id.*

3       Here, COLFS's allegations do not come close to pleading a "concrete, specific
4   connection" between the speech at issue and the patients.  The Court notes that the
5   "connection" here is not about whether there is a connection between COLFS and its
6   patients, which undoubtedly there is, via the patient-doctor relationship.  Rather, the
7   question is whether or not there is a "connection" <u>between the speech at issue (the eight
8   target statements) and the patients</u>.  *Cf. Kleindienst*, 408 U.S. at 762-65 (finding that a
9   certain group of professors had a First Amendment interest in challenging the visa denial
10  of a person whom they had invited to speak at a conference).  In *Kleindienst*, the court
11  was not concerned about the relationship between the professors and the *person* of
12  Mandel, the invited guest.  Instead, it looked to the relationship between the professors
13  and their "access to Mandel's *ideas*" and the value of "sustained, face-to-face debate,
14  discussion and questioning" with Mandel.  *Id.* at 765 (emphasis in first part).

15      It's unclear what "concrete, specific connection" exists between COLFS patients
16  and the eight statements targeted by the Enforcement Action, especially those made
17  outside of the doctor-patient context like in websites, podcasts, and galas.  COLFS makes
18  no allegations showing that COLFS's patients have been injured by the alleged
19  suppression of this speech or even what the nature of their injury would be.  *See* Am.
20  Compl. ¶ 150 (conclusory statement that "COLFS's patients have no adequate remedy at
21  law and will suffer serious and irreparable harm to their constitutional rights absent
22  declaratory and injunctive relief").

23      The Court **GRANTS** Defendant's motion to dismiss this **claim with leave to**
24  **amend.**

25          4.  <u>Substantive Due Process claim</u>

26

27                                      34

28                                                              24-cv-01338-GPC-KSC

1    COLFS brings a Substantive Due Process claim, alleging that AG Bonta's attempts
2    to restrict speech about APR "violates COLFS's patients' rights to procreation,
3    reproductive privacy, and to reject unwanted medical treatment" as guaranteed by the
4    Fourteenth Amendment.  Am. Compl. ¶ 159.  COLFS alleges that restricting speech
5    about APR violates women's rights to "not be forced to undergo or continue an
6    abortion."  *Id.* ¶ 158.

7    While undisputedly there is a liberty interest in "bodily integrity," *Wash. v.*
8    *Glucksberg*, 521 U.S. 702, 720 (1997), and the right to refuse "unwanted medical
9    treatment," *Cruzan v. Mo. Dept' of Health*, 497 U.S. 261, 278 (1990), those interests are
10   not implicated in the Enforcement Action brought by AG Bonta.  First, there is no state
11   action forcing unwanted medical treatment on women.  Second, to the extent that COLFS
12   is arguing that the Enforcement Action is preventing pregnant women from exercising
13   their right to continue their pregnancy, *see* Am. Compl. ¶ 158, this is an overly attenuated
14   claim.  The Enforcement Action is targeting eight specific statements – not all APR-
15   related speech writ large, and certainly not the practice of APR treatment itself.  COLFS
16   alleges, in a conclusory manner, that the restriction of these eight statements "will have
17   the practical effect of banning APR altogether."  Am. Compl. ¶ 11; 137.  However, it
18   provides no support for how the restriction of this speech would lead to that effect.

19   Plaintiff inserts another, slightly different, point in its Opposition: that AG Bonta's
20   alleged speech restrictions would prevent physicians from providing full and complete
21   counsel to women seeking medical counsel about their pregnancy situation.  "A woman
22   has the right to make her reproductive decisions 'in accordance with her licensed
23   physician's best judgment.'"  *Doe v. Bolton*, 410 U.S. 179, 197 (1973).  However,
24   nothing in the Amended Complaint suggests that AG Bonta's restrictions on certain
25   statements about APR would cloud a physician's best judgment or force a woman to
26   undergo or continue an abortion.

27

28

24-cv-01338-GPC-KSC

Because COLFS does not allege the infringement of any liberty interest, the Court **GRANTS** Defendant's motion to dismiss the fourth cause of action **with leave to amend**.

## CONCLUSION

Based on the foregoing reasons, the Court DISMISSES Plaintiff's claims for damages, DENIES Defendant's motion to dismiss as to the first count, GRANTS Defendant's motion to dismiss count two without leave to amend, and GRANTS Defendant's motion to dismiss counts three and four with leave to amend.

**IT IS SO ORDERED.**

Dated:  June 13, 2025

Hon. Gonzalo P. Curiel
United States District Judge

24-cv-01338-GPC-KSC